UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

GEORGE DUMONT, JONATHAN GRIMES,
YVONNE WILLIAMS and KUJTIM ADILI,
On Behalf of Themselves And All Others
Similarly Situated,

                        Plaintiffs,

            - against -

LITTON LOAN SERVICING, LP, OCWEN
LOAN SERVICING, LLC, OCWEN
FINANCIAL CORPORATION, and
GOLDMAN SACHS GROUP, INC.,

                        Defendants.
-------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED:3/3/14

**<u>OPINION AND ORDER</u>**

12-cv-2677-ER-LMS

<u>Ramos, D.J.</u>:

        This case arises out of allegedly abusive practices employed by mortgage loan servicers

in the wake of the recent housing crisis.  Plaintiffs George DuMont, Jonathan Grimes (together,

the "DuMonts"), Yvonne Williams ("Williams") and Kujtim Adili ("Adili") (collectively,

"Plaintiffs") bring suit against Defendants Litton Loan Servicing, LP ("Litton"), Ocwen Loan

Servicing, LLC ("OLS"), Ocwen Financial Corporation ("OFC") (together with OLS, "Ocwen")

and Goldman Sachs Group, Inc. ("Goldman") (collectively, "Defendants").  Third Amended

Class Action Complaint ("TAC"), Doc. 51.  Litton and OLS are mortgage servicers, and OFC

and Goldman were their corporate parents:  OFC owned OLS during the entire time period at

issue, while Goldman owned Litton at the start of that period before subsequently selling the

company to OFC.

        The TAC alleges causes of action for breach of contract and the implied covenant of

good faith and fair dealing, promissory estoppel, violations of the New York General Business

Law, violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, violations of the New Jersey Consumer Fraud Act, and violations of the federal Fair Debt Collection Practices Act ("FDCPA").  *Id.*  Plaintiffs seek certification of the case as a class action.  *Id.*  Pending before the Court are three motions to dismiss the TAC pursuant to Federal Rule of Civil Procedure 12(b)(6):  one filed by Litton and OLS (Doc. 66), one filed by OFC (Doc. 68) and one filed by Goldman (Doc. 70).  In addition to the arguments specifically raised in support of their individual motions, both OFC and Goldman join in the arguments raised by Litton and OLS.  *See* OFC's Mem. of Law in Supp. at 1; Goldman's Mem. of Law in Supp. at 1.

For the reasons discussed below, Litton and OLS's motion to dismiss is GRANTED IN PART and DENIED IN PART, Goldman's motion to dismiss is GRANTED, and OFC's motion to dismiss is GRANTED.  Absent repleading, the only remaining plaintiffs will be the DuMonts and Williams, and the only remaining defendant will be OLS.

## I.  Factual Background

The following facts are based on the allegations in the TAC, which the Court accepts as true for purposes of the instant motions.  *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).  Additional facts will be discussed, as necessary, in subsequent sections of this Opinion.

### A.  The Home Affordable Modification Program

In early 2009, as part of an effort to mitigate the housing crisis and keep borrowers out of foreclosure, the federal government established the Home Affordable Modification Program ("HAMP").  *See* TAC ¶ 27.  In very general terms, HAMP is designed to lower the monthly mortgage payments of participating borrowers to an affordable level.  *See id.*  Participating mortgage servicers offer modifications to qualifying homeowners via temporary agreements

known as trial period plans ("TPPs") that set forth various conditions that must be met in order for the borrower to obtain a permanent loan modification. *See id.* ¶¶ 47, 52. Foreclosure proceedings are suspended during the evaluation and trial periods. *Id.* ¶ 54. Borrowers who do not qualify for HAMP must be considered for alternative foreclosure prevention options. *Id.* ¶ 57.

### B. The DuMont Loan

The DuMonts are residents of Pennsylvania. *Id.* ¶ 9. In July 2010, they submitted a HAMP application to Litton, who was servicing their mortgage. *Id.* ¶ 72. In June 2011, Litton denied the application on the grounds that the DuMonts had not provided all of the required documents. *Id.* ¶ 73. The DuMonts responded with a letter informing Litton that they had received multiple requests for the same materials and that, each time they had called Litton, they had been told to disregard the request. *Id.* ¶ 74.

On June 24, 2011, the DuMonts received a letter from Litton, offering them a three-month trial payment plan under an "alternative, non-HAMP modification program." *Id.* ¶ 75. They were required to make three monthly trial payments in order to accept the offer and qualify for a permanent modification. *Id.* The DuMonts made their trial payments in July, September and October. *Id.* ¶¶ 76, 80. In August, they were informed that the servicing rights to their loan had been transferred to OLS.[1] *Id.* ¶ 79. They received the non-HAMP modification agreement from OLS on November 11 and returned an executed copy the same day. *Id.* ¶ 84.

---

[1] The TAC repeatedly refers to "Ocwen" without distinguishing between the two Ocwen entities. *See* TAC ¶ 1 (defining "Ocwen" to refer to both OLS and OFC). However, the introductory portion of the TAC makes clear that the suit arises out of Plaintiffs' interactions with Litton and OLS. *See id.* ¶¶ 1-5. Goldman and OFC are implicated because, as parent companies, they are alleged to have directed and controlled Litton's and OLS's actions. *See id.* ¶ 1. The Court therefore reads factual allegations about loan-specific interactions between Plaintiffs and "Ocwen" to refer to interactions between Plaintiffs and OLS. Such a reading comports with the approach OLS takes in its briefs

The following month, OLS sent the DuMonts a letter stating that OLS could not offer the DuMonts a modification because they failed to submit the agreement or the required payment on time. *Id.* ¶ 86.  A series of follow-up calls yielded conflicting messages:  one OLS representative told the DuMonts that OLS needed another signed copy of the agreement, one requested proof of the trial payment arrangement, one said that the requisite documents had been received and were under review, and one said that the DuMonts were delinquent.  *Id.* ¶¶ 87-90.  Then followed a series of letters, received over a period of months, returning the DuMonts' payments on the basis that they were insufficient to cure the purported default.  *Id.* ¶¶ 91, 94, 101, 106.  Other letters urged the DuMonts to contact OLS "immediately" to resolve issues related to their "severely delinquent mortgage loan."  *Id.* ¶¶ 95, 111.  At one point, an OLS representative indicated that the payments were being rejected because there was a "payment refusal" hold on their account. *Id.* ¶ 98.

During a March 2012 call, the DuMonts were told that their non-HAMP modification application had expired and that they had to reapply for a HAMP modification.  *Id.* ¶ 103.  The following month, a representative told them that, if they wanted to reinstate the non-HAMP modification, they needed to pay $31,000.  *Id.* ¶ 104.  During the same call, they were told that OLS's notes indicated that the DuMonts had requested a short sale of their property.  *Id.*  Later in April, a different representative informed the DuMonts that they owed $7,000 under a

---

and is reasonable, in the Court's opinion, given the background provided in the TAC's opening paragraphs.  The alternative would be to summarily dismiss the claims against "Ocwen" for failure to distinguish between the respective Defendants' conduct.  *See, e.g., Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (holding that "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct," plaintiff failed to satisfy the minimum pleading requirements); *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 CIV. 2837 KBF, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."), *aff'd*, 530 F. App'x 19 (2d Cir. 2013).

"forbearance plan." *Id.* ¶ 107.  The DuMonts received a notice of intent to terminate forbearance a few days later.  *Id.* ¶ 108.

A May 4 letter said that the loan modification had not been finalized because OLS did not receive the agreed-upon payments.  *Id.* ¶ 109.  The letter indicated that OLS would process the modification if the DuMonts submitted the unpaid amount of $8,758.61.  *Id.*  The DuMonts and OLS subsequently agreed to a reduced amount of $7,507.38, which the DuMonts paid on May 21, 2012.  *Id.* ¶ 110.  The last of the "severe delinquency" notices arrived a month later.  *Id.* ¶ 111.

The DuMonts allege that OLS damaged their credit by reporting the purported delinquencies to credit agencies.  *Id.* ¶ 112.  They further allege that they have been improperly charged various fees, along with increased principal and interest amounts.  *Id.* ¶¶ 113-14.

### C.  The Williams Loan

Williams resides in Brooklyn, New York.  *Id.* ¶ 10.  She was in default on her mortgage loan when it was transferred to OLS in April 2010.  *Id.* ¶ 120.  That summer, she put her home up for sale and received a short sale offer in the fall.  *Id.* ¶ 121.  However, OLS informed Williams's real estate broker that the loan was being handled by OLS's bankruptcy department and that, as a result, the property was not eligible for a short sale.  *Id.* ¶ 122.  Toward the end of 2010, Williams was informed that the house would be put up for auction in February 2011.  *Id.* ¶ 124.

Around December 7, 2010, Williams received an offer for a non-HAMP loan modification.  *Id.* ¶ 125.  Williams was given until December 10, 2010 to accept the offer and make the initial payment, and she did so prior to the deadline.  *Id.* ¶¶ 125-26.  However, her December 31, 2010 statement showed a principal balance that was approximately $4,000 higher

than the agreed-upon amount.  *Id.* ¶ 127.  Beginning in January 2011, OLS increased the monthly payment amounts in order to include escrow payments that were not required under the modified terms of the loan.  *Id.* ¶¶ 130, 134, 138, 142.  When Williams called to ask about the additional amounts, OLS representatives initially told her to disregard them.  *Id.* ¶¶ 131, 134.  In April 2011, however, a representative told her she needed to pay an additional $950.26 and that the payment amounts would return to their previous levels once she did.  *Id.* ¶¶ 139-40. Williams made the payment, but her next account statement nevertheless included escrow and late charges.  *Id.* ¶¶ 139, 142.  Around June 1, 2011, she received notice that her loan was 31 days in default and that she was at risk of losing her home.  *Id.* ¶ 146.  Approximately one week later, an OLS representative indicated over the phone that Williams's account had been corrected to show that she was current on her payments and that escrow payments were not required.  *Id.* ¶ 150.

In September 2011, Williams was denied a personal loan because her credit report showed a late mortgage payment from May of that year.  *Id.* ¶ 154.  Williams contacted OLS, and she was told that the information provided to the credit reporting agencies was wrong and would be corrected.  *Id.*  Despite multiple conversations to this effect, Williams's credit report was not corrected as of December 9, 2011.  *Id.* ¶¶154-56.  After continued efforts on Williams's part, including correspondence with the New York State Banking Department, OLS conceded in February 2012 that Williams made her May 2011 payment on time and indicated that it submitted a correction to the major credit agencies.  *Id.* ¶¶ 157-162.

### D.  Adili Loan

Adili resides in Passaic, New Jersey.  *Id.* ¶ 11.  At the beginning of 2009, Adili became unable to make his full mortgage payments, so he contacted Litton to seek a HAMP

modification. *Id.* ¶ 166.  He submitted a modification package the following month. *Id.* ¶ 167.

In June 2009, Litton served him with foreclosure documents. *Id.* ¶ 169.  Upon inquiry, he was

told that the HAMP modification request had been denied. *Id.*  Adili alleges, upon information

and belief, that the denial was part of "one of Litton's and Goldman Sachs' mass denial

sweeps."[2] *Id.* ¶ 170.  Adili submitted three subsequent HAMP modification packages, all of

which were denied. *Id.* ¶¶ 176-82, 187.  The last of these denials came from OLS, to whom

Litton had transferred the loan servicing rights. *Id.* ¶¶ 182, 187.

Adili submitted a fifth modification package around April 2012, and this one was

approved. *Id.* ¶¶ 189-90.  He made trial payments in October, November and December of that

year. *Id.* ¶ 191.  In January 2013, a letter from OLS informed him that OLS "was in receipt of

his signed HAMP modification package." *Id.* ¶ 195.  However, he was not allowed to make his

February 2013 payment because his account was frozen. *Id.* ¶ 196.  He was then told that the

signed loan modification had not been received prior to the deadline and that, as a result, he did

not qualify for a HAMP modification. *Id.* ¶¶ 197-199.  He was given the option of applying for a

non-HAMP modification or facing foreclosure. *Id.* ¶ 199.[3]

## II.    Procedural Background

This case was originally filed April 6, 2012 under the caption *Cavaciuti et al. v. Litton

Loan Servicing, LP et al.*  Doc. 1.  The only plaintiffs named in the original complaint were

Rosie and Andrew Cavaciuti, and Litton and OLS were the only named defendants. *Id.*  The first

amended complaint (the "FAC") was filed October 24, 2012, adding the DuMonts as additional

---

[2] Elsewhere in the TAC, Plaintiffs describe "denial sweeps" as denials "without the proper review."  TAC ¶ 64
(quoting Suzanne Kapner, *NY Fed Investigates Goldman Unit*, Financial Times, May 25, 2011).

[3] There are no allegations beyond this point, perhaps because the TAC was filed less than a month later, so the Court
is unable to discern how Adili responded or what the end result was.

7

plaintiffs and OFC as a third defendant. Doc. 16. A second amended complaint ("SAC"), filed February 25, 2013, dropped the Cavacitus as plaintiffs and added Williams and Adili. Doc. 47. The TAC was filed March 7, 2013. Doc. 51. Although Goldman was identified as a defendant in the SAC, *see* SAC ¶ 20, it was not officially added as a party to the action until the filing of the TAC. *See* ECF Docket Entries for March 7, 2013 (noting that a summons was issued as to Goldman on that date). All four Defendants now move to dismiss.

## III.  Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc.*, 624 F.3d at 108. However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

8

**IV.   Defendants Litton and OLS's Motion to Dismiss**

    **A.  Breach of Contract[4]**

The parties have briefed the breach of contract claims under the assumption that each named Plaintiff's cause of action arises under the law of that Plaintiff's state of residence.  Given the parties' apparent agreement on this point, and since the pleadings do not include the full text of the contracts themselves, the Court will adopt the same assumption for purposes of the instant motions.

In addition, a relatively significant portion of the briefing on the breach of contract claims focuses on the level of specificity with which the Plaintiffs are required to plead the various state law elements (and sub-elements) in order to survive the 12(b)(6) motion.  At this stage, two related points of general applicability should be borne in mind:  (1) although state law governs the substantive elements of the contract claims, the pleading requirements in federal court are governed solely by the Federal Rules of Civil Procedure; and (2) while Third Circuit opinions are instructive with respect to the federal pleading standard as applied to New Jersey and Pennsylvania law, such cases are not binding on courts within this District.

    **i.  The DuMonts**

"To state a breach of contract claim under Pennsylvania law, Plaintiffs must plead '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'"  *Mickel Drilling Partners ex rel. Mickel v. Cabot Oil &*

---

[4] The Court observes that Plaintiffs' allegations with respect to the duty of good faith and fair dealing are introduced merely as one example of how Defendants breached the alleged contracts.  TAC ¶ 218.  Plaintiffs do not bring a separate cause of action for breach of the implied covenant.  There is thus no need for the Court to address Defendants' arguments that such a cause of action would be duplicative.  *See* Litton's Mem. of Law in Supp. at  12.

*Gas Corp.*, No. 3:CV-11-0061, 2012 WL 4953081, at *8 (M.D. Pa. Oct. 16, 2012) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super.1999)).

There are two alleged contracts at issue with respect to the DuMont loan.  The first is a purported contract between the DuMonts and Litton, pursuant to which Litton promised to modify the DuMonts' loan if the specified trial payments were made on time.  TAC ¶ 75.  Litton transferred the servicing rights to OLS during the course of performance of this contract, and the TAC alleges (in multiple paragraphs) that OLS and the DuMonts did, in fact, execute a non-HAMP modification agreement.  *Id.* ¶¶ 79, 84, 103, 114.  Given that the TAC itself indicates that OLS performed under the initial contract, and since the Court must assume that these statements are true for purposes of the instant motions, there is no colorable breach of contract claim with respect to that alleged contract.

Moreover, because Litton's role was confined to that preliminary contract (and because there are no allegations that Litton breached any of its contractual obligations prior to the transfer to OLS), there is no basis on which Litton can be held liable.  The DuMonts' cause of action for breach of contract, to the extent it is directed at Litton, is therefore dismissed.

The second alleged contract is a permanent non-HAMP modification agreement that the DuMonts claim they executed and returned to OLS on November 11, 2011.  *Id.* ¶ 84.  The DuMonts have stated a viable claim for breach of this alleged contract.  Although Defendants observe that the only material terms alleged are the amount of and due date for the DuMonts' first monthly payment, it bears noting that even this very first payment under the modified loan was rejected, allegedly in contravention of the contract's terms.  *See* Litton's Reply Mem. in

10

Supp. at 2; TAC ¶¶ 84, 91-92.[5]  Subsequent attempts to make payments were similarly rejected,

the DuMonts were held in default, and at least some of the correspondence suggests that OLS

was refusing to honor the alleged modification *at all*.  *See* TAC ¶¶ 93-98, 101, 103, 106, 109.

Defendants observe that the TAC fails to "identify, or even suggest, the other essential terms of

the alleged agreement such as the principal amount of the modified loan, the monthly payment

amounts, the applicable interest rate (whether fixed, step-up, or adjustable), the existence and

amounts of escrow payments, or the duration of the modified loan."  Litton's Reply Mem. in

Supp. at 2.  In light of the expansive nature of the purported breach, however, it does not seem

that the additional information Defendants seek would move the scales in terms of the claim's

overall plausibility.  While the DuMonts will presumably need to set forth the contract's

"essential terms" in greater detail in order to prevail on the merits, the Court is of the view that

requiring them to provide more at this early stage would be to impose a pleading standard that

exceeds the Rule 8 requirements.[6]  *See generally Travelers Cas. & Sur. Co. of Am. v. A.G.

Cullen Const., Inc.*, No. CIV. A. 07-0765, 2008 WL 4816477, at *10 (W.D. Pa. Nov. 4, 2008)

(noting that "Rule 8 does not require a plaintiff to identify a specific contract provision at

issue").

      The TAC further alleges that, due to the breaches discussed above, the DuMonts incurred

improper late fees and other charges, along with damage to their credit.  TAC ¶¶ 108, 112-13.

Viewed as a whole and read in a light most favorable to Plaintiffs, the DuMonts' breach of

contract allegations against OLS are sufficient to survive Defendants' 12(b)(6) motion.

---

[5] Citations to "Litton's" briefs refer to the papers filed jointly by Litton and OLS.

[6] The primary federal case on which Defendants rely in calling for more detailed pleadings, *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 103 F. Supp. 2d 830, 831 (E.D. Pa. 2000), is a decision following a bench trial and is therefore inapposite for present purposes.

### ii. Williams

Plaintiffs must allege the following four elements in order to state a claim for breach of contract based on New York law:  "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

As a preliminary matter, the Court notes that none of the allegations specific to Williams's loan describes events that occurred prior to OLS's acquisition of the servicing rights. *See* TAC ¶¶ 116-165.  Litton is not alleged to have had any role in the events on which Williams's causes of action rest.[7]  The breach of contract claim, as it pertains to the Williams loan, is therefore dismissed with respect to Litton.

The TAC does, however, contain sufficient factual allegations to support a breach of contract action against OLS.  The TAC indicates that OLS offered Williams a non-HAMP loan modification with a stated principal balance of $367,472.67, that Williams accepted the offer and made her initial payment by the specified deadline, and that she subsequently made her monthly payments on time. *Id.* ¶¶ 125-126, 129, 133, 135, 137, 141, 145, 153, 163.  Williams further alleges that the modification agreement did not require escrow payments. *Id.* ¶ 130.  OLS allegedly breached the contract by increasing the principal balance to $371,490.89, by requiring escrow payments, and by imposing improper fees. *Id.* ¶¶ 127, 130, 134, 138, 139, 142, 152. Furthermore, the TAC alleges that OLS's purported breaches led Williams to make unnecessary loan payments and caused her to be denied a personal loan due to an impaired credit report. *Id.*

---

[7] Indeed, Plaintiffs' opposition papers indicate that Litton was not even the prior mortgage servicer with respect to the Williams loan. *See* Pls.' Mem. of Law in Opp'n (Litton) at 5 n.4.  Rather, Litton appears to have transferred the servicing rights to a non-party in 2006, and OLS then acquired the rights from that non-party. *Id.*

¶¶ 139, 152, 154.  This set of factual allegations nudges Williams's contract claim into the realm of plausibility, and it would therefore be inappropriate for the Court to dismiss the claim at this stage.

Defendants urge that a more detailed showing is required to survive a 12(b)(6) motion.  *See* Litton's Mem. of Law in Supp. at 9-10.  The Court disagrees.  While Defendants point to cases in which this Court has dismissed breach of contract actions for failure to plead the requisite elements with sufficient specificity, those cases are factually distinguishable.  *See Ostrolenk Faber LLP v. Unigene Labs., Inc.*, No. 12 CIV. 3991 HB, 2012 WL 3114742, at *2 (S.D.N.Y. Aug. 1, 2012) (noting that the complaint did not contain *any* allegations about the contract terms, whether the alleged contract was written or oral, or whether the contract was express or implied); *Guerrero v. FJC Sec. Servs. Inc.*, No. 10 CIV. 9027 JPO, 2012 WL 2053535, at *5 (S.D.N.Y. June 5, 2012) (observing that the plaintiff merely alleged that he was to be made whole, with no references to the contractual provisions breached or the damages incurred); *Posner v. Minnesota Min. & Mfg. Co., Inc.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989) ("Although the existence of a contract is alleged, plaintiffs fail to set forth any specific information as to when the agreement was made, the terms of the agreement *upon which liability is predicated*, or any other evidence supporting the formation of an agreement." (emphasis added)).  Williams's allegations, while they may not be sufficient to *prove* that a breach of contract occurred, go further than those rejected in Defendants' cases and therefore survive the motion to dismiss.[8]

---

[8] In responding to Defendants' arguments regarding the adequacy of the pleadings as they pertain to Williams's breach of contract claim, Plaintiffs cite to only one case, *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). *See* Pls.' Mem. of Law in Opp'n (Litton) at 11.  Since that case predates *Twombly and Iqbal* by over a decade, it is inapposite for purposes of the present analysis.  The four cases on which Plaintiffs rely in discussing the pleading

In *Levy v. Bessemer Trust Co.*, the Court dismissed a complaint for failure to include "specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." No. 97 CIV. 1785 (JFK), 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997).[9] However, the deficiency in those pleadings was that, although the plaintiff alleged that the defendant made various promises, the complaint did not allege that defendant's statements "were a part of any contract." *Id.* There were thus no grounds on which to conclude that the alleged "breaches" were contractual in nature or whether they merely constituted allegations of fraud. *Id.* Here, Williams has specifically alleged that there was an executed contract, and she has described enough of the terms as to make out a colorable claim of breach.

Finally, Defendants urge the Court to dismiss Williams's claim because it does not allege offer, acceptance, consideration and meeting of the minds. Litton's Mem. of Law in Supp. at 9-10. Defendants rely on this Court's opinion in *DeSouza v. Andy Frain Servs., Inc.*, No. 12 CIV. 1308 WHP, 2012 WL 3245496, at *2 (S.D.N.Y. Aug. 6, 2012). The Court declines to insist upon such specificity in the pleadings. As detailed above, the TAC does explicitly allege both offer and acceptance. TAC ¶¶ 125-126. In light of these allegations, and given that the purported contract took the form of a signed writing, further allegations regarding a meeting of the minds would not add much to the overall plausibility of the claim. With respect to consideration, this Court has expressed inconsistent views in terms of whether such a showing is

---

standard for contract claims more generally are equally deficient. *See id.* at 7-8. The most recent of those decisions was handed down in 2006, while *Twombly* was not decided until 2007. In other words, the Court's conclusion is not compelled by the authority to which Plaintiffs cite. Plaintiffs have indeed set the bar too low; Williams's claim survives simply because Defendants have erred too far in the other direction.

[9] Defendants have directed the Court to this quote in *Guerrero*, which was itself quoting *Levy*. *See* Litton's Mem. of Law in Supp. at 9.

required at the pleading stage.  *Compare Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05 CIV. 9608 GEL, 2007 WL 950133, at *2 (S.D.N.Y. Mar. 28, 2007) ("As a matter of pleading, however, the prevailing rule is that consideration need not be pled in the complaint, and that lack of consideration is best treated as an affirmative defense."), *with DeSouza,* 2012 WL 3245496, at *2.  The *Bennett* approach seems to be more in line with the standard set forth in *Twombly* and *Iqbal*.  While each specific element of contract formation will need to be present in order for Williams to prevail at trial (or at summary judgment), her claim for breach is not implausible merely because she fails to address each of those sub-elements at this stage.[10]

### iii.  Adili

A breach of contract claim under New Jersey law consists of the following elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).

The TAC acknowledges that Adili's first four HAMP modification applications were denied.  TAC ¶¶ 167, 169, 176-82, 187.  Along the way, Adili's loan was transferred from Litton to OLS.  *Id.* ¶ 182.  It was OLS that ultimately approved his fifth application.  *Id.* ¶ 190.  Thus, there is no plausible basis on which Adili can maintain a breach of contract action against Litton, and the claim is dismissed to the extent it seeks to do so.[11]

With respect to Adili's claim against OLS, the core allegation appears to be OLS's approval of his fifth HAMP modification application.  In briefing the issue, Plaintiffs argue that

---

[10] The TAC does allege, in general and conclusory terms, that all Plaintiffs and class members gave "fair and reasonable" consideration in support of their contracts.  TAC ¶ 216.

[11] Because none of the named Plaintiffs has asserted a plausible claim for breach of contract against Litton, Litton will be dismissed entirely from that cause of action.

"Adili alleges that Defendants entered into a contract with him to permanently modify his mortgage under HAMP."  Pls.' Mem. of Law in Opp'n (Litton) at 11.[12]  However, the TAC itself alleges no such thing.  Although Adili alleges that OLS approved his "HAMP modification package" in or around July 2012 and that he thereafter made trial payments, there is no detail provided in terms of what the so-called "modification package" entailed.  TAC ¶¶ 190-91.  Instead, the TAC goes on to reference a January 2013 letter in which OLS indicated that it "was in receipt of [Adili's] signed HAMP modification package," presumably referring to a different "package" from the one that was approved in July 2012.  *Id.* ¶ 195.  There is then discussion of a dispute regarding whether OLS received his "signed HAMP modification" on time.  *Id.* ¶¶ 197-99.

The implication seems to be along the lines of what Plaintiffs describe earlier in the TAC, when they write, "[I]f the homeowner executes the HAMP TTP agreement, complies with all documentation requirements and makes all three HAMP TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner *must be offered* a permanent HAMP modification."  *Id.* ¶ 53 (emphasis in original).  However, this sort of general allegation about HAMP procedure cannot sustain a specific homeowner's state law claim for breach of contract.[13]  Adili has not even alleged that the July "modification package" was a TPP, let alone

---

[12] Since Plaintiffs submitted briefs in opposition to each of the three individually filed motions to dismiss, citations to Plaintiffs' papers will include a parenthetical notation indicating the party to whom Plaintiffs are replying. Parenthetical references to "Litton" refer to the papers submitted jointly by Litton and OLS.

[13] This is particularly so given that there is no private right of action under HAMP.  *See, e.g.*, *Griffith-Fenton v. Chase Home Fin.*, No. 11 CV 4877 VB, 2012 WL 2866269, at *3 (S.D.N.Y. May 29, 2012), *aff'd sub nom. Griffith-Fenton v. MERS*, 531 F. App'x 95 (2d Cir. 2013); *see also* Litton's Mem. of Law in Supp. at 21-22 (collecting cases).  Plaintiffs do not dispute this point and simply argue that they are not attempting to assert "a claim for a HAMP violation itself."  Pls.' Mem. of Law in Opp'n (Litton) at 27.  Adili must therefore base his claims on the specifics of his particular contract and not on a general understanding of how the HAMP modification process is meant to play out.

that the terms of that TPP obligated OLS to offer a permanent modification.  The factual

allegations regarding the supposed contract and its purported breach are therefore insufficient to

support a contract claim against OLS.[14]

Moreover, the section of the TAC devoted to Adili's loan is entirely devoid of details

regarding the purported damages he suffered as a result of the supposed breach.  The TAC

simply says that Adili was told that "his home was currently in foreclosure" and that OLS "tried

to steer him to an internal modification, which is more financially lucrative to Ocwen."  *Id.* ¶¶

198, 200.  It also suggests, however, that Adili was given the option of applying for that non-

HAMP modification in order to help him avoid foreclosure.  *Id.* ¶ 199.  There are no references

to any late fees, penalties, increased interest payments or principal balances, longer loan payoff

times, damage to Adili's credit, or any of the other purported damages referenced in Plaintiffs'

brief.  Pls.' Mem. of Law in Opp'n (Litton) at 12.  Although these types of damages are alleged

generally in the section of the TAC dedicated to the overall breach of contract cause of action,

that cause of action purports to summarize the damages suffered by all Plaintiffs and all similarly

situated class members, and it attributes the injuries to all four Defendants' breach of "the

contracts."  TAC ¶ 219.  The Court is unable to find that this sort of generalized pleading,

unsupported by any specific factual allegations of injury to Adili, puts OLS on adequate notice of

the contract claim being asserted against it.  *See Landmark Ventures, Inc. v. Wave Sys. Corp.*,

No. 11 CIV. 8440 PAC, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (rejecting as

---

[14]  Even the generalized language setting out the breach of contract cause of action later in the TAC merely refers to "binding and enforceable agreements," "written contracts," and "the first required payment under [the] respective contracts offered in writing by Defendants."  TAC ¶ 215.  Nowhere does it offer additional insight into the nature of the contract under which Adili's cause of action arises.

conclusory plaintiff's assertion that it was owed damages for "additional amounts" due under a contract), *aff'd*, 513 F. App'x 109 (2d Cir. 2013).

Therefore, the breach of contract action with respect to Adili's loan is dismissed in its entirety.

### B. Promissory Estoppel

In the alternative to their breach of contract causes of action, all four named Plaintiffs assert claims for promissory estoppel. These claims allege that:

> Defendants, by way of the written contracts described above, made representations to Plaintiffs and members of the Class that if they agreed to the terms of a loan modification proposal, by returning an executed agreement, with supporting documentation and made the proposed TPP payments, they would receive a permanent loan modification.

*Id.* ¶ 223. Plaintiffs go on to allege that they relied on these representations to their detriment by complying with the TPP agreements and then having their permanent HAMP loan modifications denied or delayed. *Id.* ¶ 226.

The elements of promissory estoppel are similar under New York, New Jersey and Pennsylvania law. New York requires "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000). New Jersey requires "(1) a express [sic] promise, (2) made with the expectation that the promisee will rely on it, (3) reasonable reliance, and (4) definite and substantial detriment." *Slimm v. Bank of Am. Corp.*, No. CIV. 12-5846 NLH/JS, 2013 WL 1867035, at *11 n.20 (D.N.J. May 2, 2013) (citing *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 944 A.2d 1, 19 (N.J. 2008)). Under Pennsylvania law, "the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee

actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Vigilante v. Statharos*, No. 08-CV-3408, 2009 WL 398781, at *2 (E.D. Pa. Feb. 16, 2009) (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)) (internal quotation marks omitted).

All three promissory estoppel claims fail to state a claim and will be dismissed.  With respect to the DuMonts and Williams, the general allegations described above are inconsistent with the specific factual allegations concerning those Plaintiffs' loans.  The DuMonts' HAMP application was denied outright, and they were never required to make any trial payments with respect to that application.  *See* TAC ¶ 73.  Indeed, the balance of their allegations are explicitly directed at events related to "an alternative, non-HAMP modification program."  *Id.* ¶ 75. What's more, the DuMonts further allege that they actually did receive a permanent modification, albeit a non-HAMP one.  *Id.* ¶¶ 84, 103, 114.  Their complaint is merely that OLS failed to honor its terms.  *Id.* ¶ 114-15.  In Williams's case, there is no reference to HAMP at all. Instead, the first reference is to "an internal Ocwen loan modification."  *Id.* ¶ 125.  Like the DuMonts, Williams received the modification and now merely challenges OLS's alleged noncompliance with its terms.  *Id.* ¶ 126; *see, e.g.*, *id.* ¶¶ 127-28, 130.

Adili also fails to assert a plausible claim for promissory estoppel.  First, there is no suggestion that any of the first four HAMP denials came subsequent to or in contravention of a promise.  With respect to his fifth application, the TAC merely alleges that OLS approved his "modification package," that Adili made three trial payments, and that his subsequent "modification package" was rejected even though OLS received it on time.  *Id.* ¶¶ 190-91, 195, 198-99.  The TAC offers nothing specific in terms of the content of these particular documents and the alleged promises they contained, aside from the above-quoted claim that "the written

19

contracts described above" contained representations regarding permanent loan modifications.[15]

Even if the Court were to deem that general allegation sufficient to cure the deficiencies in the

Adili-specific portion of the TAC (by inferring that the first "modification package" contained

the alleged representation), the claim would still fail.  As with Adili's contract claim, the TAC

alleges no specific damages that Adili suffered by virtue of OLS's purported misconduct.

Instead, the TAC once again simply catalogues various detriments purportedly suffered by all

Plaintiffs and class members as a result of reasonable reliance on all four Defendants' alleged

representations.  *Id.* ¶ 226.  This highly generalized pleading is a far cry from an allegation of

"definite and substantial" injury to Adili.  Looking at the TAC as a whole, the Court concludes

that Adili has not stated a plausible, but merely a conceivable, claim for promissory estoppel.

Since none of the named Plaintiffs has successfully stated a claim for promissory

estoppel, Plaintiffs' second cause of action is dismissed in its entirety.[16]

## C.  Williams's Claim under § 349 of New York's General Business Law ("GBL")

To state a claim under section 349 of the GBL, Williams must allege that "(1) the act or

practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and

(3) the plaintiff was injured as a result."  *Costigan v. CitiMortgage, Inc.*, No. 10 CIV. 8776 SAS,

2011 WL 3370397, at *5 (S.D.N.Y. Aug. 2, 2011) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d

64, 74 (2d Cir. 2009)) (internal quotation marks omitted).  Keeping in mind that all reasonable

---

[15] Notably, the portion of the TAC that Plaintiffs cite as alleging a promise specifically directed to Adili says only that, "[i]n or around April 2012, Plaintiff Adili received from Ocwen another HAMP modification package."  TAC ¶ 188; *see* Pls.' Mem. of Law in Opp'n (Litton) at 13, 14.

[16] Even had the Court come to a contrary conclusion with respect to the underlying plausibility of the pleadings, the claims by Williams and Adili would nevertheless have been dismissed with respect to Litton.  As discussed above, Litton was not involved with the Williams loan at any point during the time period at issue, and the servicing rights to the Adili loan were transferred to OLS before any HAMP application had allegedly been accepted.

inferences must be drawn in Williams's favor, the Court concludes that the allegations in the TAC are sufficient to survive the instant motion to dismiss.

The "consumer-oriented" prong is satisfied when a plaintiff can demonstrate that the alleged acts or practices "have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995). Private contract disputes that are "unique to the parties" fall outside the scope of the statute. *Id.* In this case, although Williams's GBL claim is related to her claim for breach of contract, the allegations in the TAC are not confined to a one-off, private contractual dispute. Instead, the claim rests on allegations that OLS, *inter alia*, knowingly maintained "a loan modification process that was riddled with flaws" and "systematically" assessed fees and increased borrowers' principal balances. TAC ¶ 234. These types of practices would certainly have the potential to "affect similarly situated customers." *Oswego*, 647 N.E.2d at 745; *see Pandit v. Saxon Mortg. Servs., Inc.*, No. 11-CV-3935 JS GRB, 2012 WL 4174888, at *6 (E.D.N.Y. Sept. 17, 2012) (finding that allegations of routinized misconduct satisfied the first prong, and surveying state and federal cases in support of its determination); *see also Turbeville v. JPMorgan Chase Bank*, No. SA CV 10-01464 DOC, 2011 WL 7163111, at *8 (C.D. Cal. Apr. 4, 2011) (applying New York law and observing that a plaintiff's "particularized experience" of an alleged deception does not preclude her from suing under section 349).

The TAC also contains sufficient allegations to satisfy the second and third prongs, *i.e.*, the facts alleged plausibly suggest that Williams was injured as a result of materially misleading practices on the part of OLS. The TAC indicates that Williams was charged improper fees and that the principal balance of her loan was unilaterally increased. TAC ¶¶ 127, 130, 134, 138, 142. It further alleges that she made unnecessary payments as a result, at least once at the

21

explicit direction of an OLS representative, and that the erroneous charges led to improper notices of default and to a false report to the credit agencies, with the end result being that she was denied a personal loan. *Id.* ¶¶ 139-40, 146, 152, 154. If these improper charges and incorrect account statements were indeed the product of "systematically" flawed practices, then Williams does have at least a plausible claim that she was materially misled throughout the loan modification process and suffered injuries as a result.[17]

Having found that the TAC satisfies the plausibility standard imposed by Rule 8 and explicated in *Twombly* and *Iqbal*, the Court denies the motion to dismiss the GBL claim against OLS.

As discussed above, Williams's causes of actions are not supported by any factual allegations against Litton. The GBL claim is therefore dismissed with respect to Litton.

### D.  Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

The DuMonts' UTPCPL claim is brought pursuant to that statute's "catchall" provision, which bars any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi); *see* TAC ¶ 243.[18]

---

[17] Defendants argue that there is a disconnect between the GBL cause of action and the factual allegations supporting it. Specifically, they argue that the GBL claim focuses on the loan modification process itself, while the allegations specific to Williams's loan describe only post-modification misconduct. *See* Litton's Mem. of Law in Supp. at 14-15; Litton's Reply Mem. in Supp. at 7. Plaintiffs respond by accusing Defendants of "preposterously distinguishing between pre- and post-modification loan activity." Pls.' Mem. of Law in Opp'n (Litton) at 19. The Court does not consider the distinction to be quite as "preposterous" as Plaintiffs suggest. However, because the Court must draw all reasonable inferences in favor of Plaintiffs, the Court reads general references to the "loan modification process" to include the post-modification servicing of the modified loans at issue.

[18] The parties dispute whether a plaintiff alleging a UTPCPL claim based on deceptive (as opposed to fraudulent) conduct must still allege the elements of common law fraud, in which case the heightened pleading requirements of Federal Rule 9(b) would also apply. *See* Litton's Mem. of Law in Supp. at 16-17; Pls.' Mem. of Law in Opp'n (Litton) at 20-21; Litton's Reply Mem. in Supp. at 8-9; *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). The Pennsylvania Supreme

To state a claim based on deceptive conduct, the DuMonts are required to allege (1) a deceptive act; (2) justifiable reliance; and (3) ascertainable loss caused by that reliance. *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009). A "deceptive act" is "conduct that is likely to deceive a consumer acting reasonably under similar circumstances." *Id.* (quoting Black's Law Dictionary 455 (8th ed. 2004)) (internal quotation marks omitted).

Plaintiffs argue that Litton acted deceptively by denying the DuMonts' HAMP application based on false claims that the DuMonts failed to submit the required paperwork. Pls.' Mem. of Law in Opp'n (Litton) at 21; *see* TAC ¶¶ 72-73. The DuMonts further allege that, on multiple prior occasions, Litton representatives had told them that the requisite materials had been received and that they could disregard letters to the contrary. TAC ¶ 74. In addition, as detailed above, the TAC alleges that OLS failed to honor the terms of the non-HAMP modification agreement that the DuMonts executed in November 2011, instead holding them in default even as they attempted to comply with the requirements of the modified loan. These allegations are sufficient, at this stage, to establish deceptive conduct on the part of Litton and OLS.

However, with respect to the denial of the HAMP modification, the Court cannot find sufficient allegations of "ascertainable loss" as to merit further proceedings on that basis. Plaintiffs argue that "the DuMonts were forced to accept defeat and accept an alternative modification with terms more favorable to Defendants and more onerous to the DuMonts." Pls.' Mem. of Law in Opp'n (Litton) at 22. The TAC, however, does not provide factual allegations

---

Court has not spoken directly on this issue, and the state appellate courts have split. *See Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 468 (E.D. Pa. 2009) (surveying the unresolved state of Pennsylvania law). Because the Court finds that the DuMonts' UTPCPL claim fails to satisfy even the minimal Rule 8 requirements, it is not necessary to resolve this question at the present time.

in support of this theory, and arguments contained in motion papers cannot be used to cure deficiencies in the pleadings.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  The section of the TAC specifically devoted to the DuMonts does not say anything about the relative merits of the HAMP modification they expected versus the non-HAMP modification they received.  In the general background portion of the TAC, Plaintiffs allege that, "[u]pon information and belief, servicers such as [OLS] and Litton have also rejected homeowners for a HAMP modification and instead have offered proprietary 'alternative modifications' with terms more favorable to the servicers and those to whom they report and more onerous to homeowners than HAMP modifications."  TAC ¶ 33.  This broad allegation about purported actions undertaken at unspecified times by loan servicers "such as" the ones named in this lawsuit is far too conclusory to permit an inference that the DuMonts' particular non-HAMP modification was less favorable than a hypothetical HAMP modification to which they assume—again without any support—that they were entitled.  Finally, in articulating the express cause of action for the UTPCPL violation, Plaintiffs accuse Defendants of "leading borrowers to believe that [they] would offer permanent HAMP modifications of their mortgage upon successfully completing a TPP and then offering an Alternative Modified Contract" that contained various unfavorable terms.  *Id.* ¶ 248.  But this is not what the DuMonts allege happened to them.  Rather, the DuMonts claim that they "accepted defeat" and agreed to the alternative modification before they were even presented with any sort of trial plan.  Indeed, the DuMonts allege only that Litton misled them with respect to whether their application materials were received; there is nothing in the TAC suggesting that Litton promised them a HAMP modification.

All that is left, then, is OLS's purported failure to honor the terms of the permanent loan modification.  While there is certainly enough in the TAC to support allegations of reliance and

resultant loss with respect to that deceptive conduct, the economic loss doctrine bars recovery on

this basis.  The economic loss doctrine "prohibits plaintiffs from recovering in tort economic

losses to which their entitlement flows only from a contract."  *Duquesne Light Co. v.

Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995).  Though the Pennsylvania Supreme

Court has not spoken on the issue, the Third Circuit and various district courts in Pennsylvania

have applied the doctrine to UTPCPL claims.  *See Werwinski v. Ford Motor Co.*, 286 F.3d 661,

681 (3d Cir. 2002); *Tubman v. USAA Cas. Ins. Co.*, 943 F. Supp. 2d 525, 530-31 (E.D. Pa. 2013)

(applying the doctrine to a UTPCPL claim involving allegations of deceptive practices); *Spruce

St. Props., Ltd. v. Noblesse*, No. 2:09cv1405, 2011 U.S. Dist. LEXIS 105835, at *33-34 (W.D.

Pa. Sept. 19, 2011) (collecting cases).[19]

    Here, the allegations giving rise to the UTPCPL claim are clearly "inextricably entwined"

with the allegations underlying the DuMonts' contract claim.  *Wulf v. Bank of Am., N.A.*, 798 F.

Supp. 2d 586, 597 (E.D. Pa. 2011) (quoting *Sarsfield v. Citimortgage, Inc.*, 707 F. Supp. 2d 546,

553 (M.D. Pa. 2010)) (internal quotation marks omitted).  Indeed, the damages alleged to have

resulted from the UTPCPL violations are identical to those the DuMonts attribute to the alleged

---

[19] Other Pennsylvania district courts have expressly disagreed with the Third Circuit's decision in *Werwinski*.  *See, e.g.*, *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 275 (E.D. Pa. 2003).  Lower state courts have also come to differing views as to how the state supreme court is likely to decide the issue.  *See Sarsfield v. Citimortgage, Inc.*, 707 F. Supp. 2d 546, 557-59 (M.D. Pa. 2010) (discussing the "uncertainty expressed by Pennsylvania courts regarding the application of the economic loss rule to the UTPCPL, both before and after *Werwinski*").  Though the Third Circuit's rulings are not binding on this Court, this Court has previously cited *Werwinski* favorably in applying the economic loss doctrine to UTPCPL claims.  *See Szymczak v. Nissan N. Am., Inc.*, No. 10 CV 7493 VB, 2011 WL 7095432, at *17 (S.D.N.Y. Dec. 16, 2011).  Absent contrary guidance from the Pennsylvania Supreme Court or the Second Circuit, the Court sees no reason to adopt a different approach in this case.  The alternative would effectively be to read the UTPCPL as imposing an additional layer of liability in any breach of contract action.

breach of their loan modification contract.  *See* TAC ¶¶ 114, 250.  There is thus no basis for the

Court to find that contract remedies would not suffice in this instance.[20]

Because the TAC fails to suggest a plausible UTPCPL claim, Plaintiffs' fourth cause of

action is dismissed.

### E.  New Jersey Consumer Fraud Act ("CFA")

Adili brings a cause of action under New Jersey's Consumer Fraud Act.  *Id.* ¶ 255; *see*

N.J. Stat. § 56:8-1 *et seq.*  The CFA prohibits

> [t]he act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression or omission, in connection
> with the sale or advertisement of any merchandise or real estate . . . .

N.J. Stat. § 56:8-2.  This Court has previously observed that mortgage loans fall within the scope

of the statute.  *See Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 794 (S.D.N.Y.

2011).  An "unconscionable commercial practice" has been understood to imply "conduct that

lacks 'good faith, honesty in fact, and observance of fair dealing.'"  *Green v. Am. Online (AOL)*,

318 F.3d 465, 473 (3d Cir. 2003) (quoting *Gennari v. Weichert Co. Realtors*, 672 A.2d 1190,

1205 (N.J. Super. Ct. App. Div. 1996)).

To successfully plead a CFA claim, Adili must allege (1) unlawful conduct; (2)

ascertainable loss; and (3) a causal relationship between the unlawful conduct and the

---

[20] Defendants urge that the economic loss doctrine analysis is premature at this stage, as discovery will uncover
whether the DuMonts suffered any damages that are "distinct from their breach of contract claim."  Pls.' Mem. of
Law in Opp'n (Litton) at 23-24.  The Court disagrees given that the DuMonts have alleged the existence of two
contracts:  a contract to provide a permanent modification, and the permanent modification itself.  Under Plaintiffs'
own version of the facts, if Defendants were successful in disproving the existence of the second contract (*i.e.*, if the
alleged damage became the failure to provide a permanent modification at all), then the alleged deception would
merely become a breach of the first contract.  Since the DuMonts have failed to allege any actionable deception
apart from breach of contract, the Court can find no reason why the economic loss doctrine should not preclude the
UTPCPL claim in this case.

ascertainable loss. *Morris Cnty. Cardiology Consultants, PA v. Nw. Mut. Life Ins. Co.*, No. CIV.A.08-00308SRC, 2009 WL 3068260, at *2 (D.N.J. Sept. 21, 2009) (citing *Frederico v. Home Depot,* 507 F.3d 188, 202 (3d Cir. 2007)).[21]

Adili's claim that each of his first four loan modification applications was denied as part of a "mass denial sweep" is insufficiently pled to survive the instant motions to dismiss. The TAC merely alleges that a general "denial sweep strategy" existed whereby Litton denied modifications by falsely claiming that necessary documents were missing. TAC ¶ 64. Notably, Adili only alleges that one of his four denials, the second one, was based on missing documents. *Compare* TAC ¶ 177, *with id.* ¶¶ 169, 180-81, 187. Moreover, the TAC suggests that the fourth application was denied after the servicing rights to the Adili loan were transferred to OLS, and yet it still alleges that the denial was predicated on the "denial sweep strategy" attributed to Litton. *Id.* ¶¶ 182-83, 187. Even more importantly, the TAC fails to adequately plead ascertainable loss. As previously discussed, the allegations specifically pertaining to Adili's applications are silent with respect to damages. The CFA cause of action does reference damages but, like the DuMonts' UTPCPL claim, it does so only in relation to alleged promises to "offer permanent HAMP modifications . . . upon successfully completing a TPP and then denying a permanent modification altogether." *Id.* ¶ 260. The entire notion of the "denial sweep strategy" necessarily implies that, with respect to the first four HAMP applications, no such promises were ever made.[22] Thus, even if the Court were to conclude that a single denial

---

[21] Once again, the parties dispute whether the heightened Rule 9(b) pleading requirements apply to New Jersey CFA claims. *See* Litton's Mem. of Law in Supp. at 19; Pls.' Mem. of Law in Opp'n (Litton) at 24; Litton's Reply Mem. in Supp. at 10-11. As with the DuMonts' statutory claim, however, Adili's CFA claim fails irrespective of whether the more rigorous standard is applied.

[22] It again bears noting that, because there is no private right of action under HAMP itself, Adili cannot rely on any sort of implied promise based on the HAMP guidelines.

27

predicated on missing documents creates a viable allegation of unlawful conduct under the CFA, the remainder of the allegations in the TAC cannot sustain a viable claim on that basis.[23]

The pleadings are equally deficient with respect to Adili's fifth HAMP application, which purportedly gave rise to an enforceable written contract with OLS.  Adili alleges that OLS wrongfully denied his permanent modification on the grounds that the required paperwork was not received on time.  *Id.* ¶¶ 197, 199, 200.  Plaintiffs argue that, by virtue of this wrongful denial, Adili received "less than what was promised" and thus suffered an ascertainable loss for purposes of the CFA.  Pls.' Mem. of Law in Opp'n (Litton) at 26 (quoting *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002)).  However, as discussed earlier in this Opinion, the TAC fails to plausibly allege the existence of a promise particular to Adili and independent of general HAMP procedure; instead, it merely refers to approval and receipt of certain "HAMP modification packages."  TAC ¶¶ 190, 195.  Since HAMP violations are not actionable standing alone, Adili's CFA claim thus rises and falls with the private breach of contract claim.  In other words, although the CFA cause of action alleges that "borrowers" were led to believe that they would receive HAMP modifications if they completed their TPPs, there are insufficient grounds on which to infer that Adili in particular was the object of an actionable misrepresentation.  *Id.* ¶ 260.  And, once again, the only damages alleged are catalogued in extremely general terms:  they are said to have been incurred by "borrowers" in the abstract, and they are tied together with an "and/or" that makes it impossible to determine which, if any, were sustained by Adili.  *Id.*

---

[23] Indeed, although Plaintiffs' brief focuses on the "denial sweep strategy" in discussing unlawful conduct, the section of the brief devoted to loss and causation cites only to portions of the TAC that relate to Adili's fifth HAMP application.  *See* Pls.' Mem. of Law in Opp'n (Litton) at 25-27.

As was the case with Adili's previous claims, the CFA cause of action is merely conceivable, but not plausible, based on the facts alleged.

### F.  FDCPA

The FDCPA cause of action is brought exclusively against OLS and Litton.

#### i.  Statute of Limitations

The threshold matter for determination is whether any of the Plaintiffs' FDCPA claims are barred by the one-year statute of limitations.  *See* 15 U.S.C. § 1692k(d).  The parties dispute whether the claims alleged in the TAC relate back to the filing of the original complaint.  *See* Pls.' Mem. of Law in Opp'n (Litton) at 28-29; Litton's Reply Mem. in Supp. at 12-14.

Under Rule 15, an amendment relates back to the date of the original pleading if it asserts a claim that "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  When the amendment adds new defendants, it will relate back only if the new parties "received such notice of the action that [they] will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  The Second Circuit has held that, although the rule "is framed in terms of an amendment that would change the party 'against' whom a claim is asserted and of the new party's ability to maintain a 'defense,' it is also applicable to a proposed change of plaintiffs." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir. 1997).

The outcome of the relation-back question turns first on the proper characterization of the "conduct, transaction, or occurrence" giving rise to Plaintiffs' FDCPA claims.[24]  Plaintiffs point to Litton and OLS's "common scheme to string homeowners along, delaying or denying permanent loan modifications, 'losing' payments, and charging late fees and penalties."  Pls.' Mem. of Law in Opp'n (Litton) at 29.  If this is the relevant "conduct" for purposes of Rule 15, then the FDCPA cause of action in the TAC can relate back to the original complaint, assuming the other conditions for adding new plaintiffs are satisfied.  Litton and OLS, on the other hand, argue that each Plaintiff's claim is "predicated and depend[s] upon completely independent interactions between [Plaintiffs] individually and Litton or OLS."  Litton's Reply Mem. in Supp. at 13.  If this is the correct view, then each Plaintiff's FDCPA claim in the TAC can relate back only to the round of pleadings that first set forth the allegations specific to that Plaintiff's loan. For the DuMonts, this would mean the claim relates back to the FAC, while Williams's and Adili's claims would relate back to the SAC.[25]  *See* FAC ¶¶ 86-129; SAC ¶¶ 116-200.

---

[24] Plaintiffs rely on *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 87 (2d Cir. 1999), in arguing that Rule 15(c) should be liberally applied because no new cause of action is being alleged.  Pls.' Mem. of Law in Opp'n (Litton) at 28.  However, the FDCPA claim raised in the original complaint was subsequently omitted from the FAC.  The Court therefore treats it as a newly asserted cause of action that appeared for the first time in the SAC.  *See Bridge v. Ocwen Fed. Bank FSB*, No. 1:07-CV-02739, 2013 WL 331095, at *10 (N.D. Ohio Jan. 29, 2013) (rejecting plaintiffs' "novel" attempt to use Rule 15 to revive expired claims that had not been re-filed in a prior intervening complaint); *Tese-Milner v. Diamond Trading Co., Ltd.*, No. 04 CIV. 5203 KMW, 2011 WL 4501336, at *7 (S.D.N.Y. Sept. 29, 2011) ("There is nothing in the Federal Rules of Civil Procedure that allows a plaintiff to resurrect once-abandoned claims by (1) filing another complaint; (2) including those abandoned claims in that new complaint; and (3) contending that the new complaint relates back to the original complaint."), *aff'd in part, vacated in part, remanded sub nom. W.B. David & Co., Inc. v. De Beers Centenary AG*, 507 F. App'x 67 (2d Cir. 2013). Although *Tese-Milner* is distinguishable on the grounds that the intervening complaint also omitted all of the facts on which the abandoned claim had been based, the Court nevertheless finds its reasoning compelling.  Thus, in applying Rule 15, the Court will treat the FDCPA claim as a newly asserted cause of action.

[25] With respect to the DuMonts' claim, the Court does not view it as relevant that the FAC failed to include an FDCPA cause of action.  The relation-back inquiry asks whether "adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'"  *Stevelman*, 174 F.3d at 86 (quoting *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d

Litton and OLS have the better of the argument.  This is not a situation in which the new allegations merely "amplify the facts alleged in the original pleading or set forth those facts with greater specificity." *Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 9, 12 (S.D.N.Y. 1985).  The analysis thus turns on "whether there is a common core of operative facts linking the amendments and the original complaint." *Id.*  As the Court reads the TAC (and the earlier pleadings), the operative facts are not the general and, at times, conclusory allegations that Defendants were engaged in a "common scheme" to mislead borrowers.  Instead, the case turns almost entirely on the Plaintiff-specific allegations concerning the servicing of each individual loan.  Unlike the original complaint, which referred to "standardized" HAMP contracts that were purportedly sent to all members of the proposed class, the allegations in the TAC describe highly particularized sets of communications and interactions.  *See* Compl. ¶ 2 ("Defendants entered into *standardized* written temporary loan modification contracts . . . with certain borrowers whom Defendants presumably pre-qualified for loan modifications under the . . . Home Affordable Modification Program." (emphasis added)).  Many of the cases on which Plaintiffs rely are distinguishable on that basis.  *See Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 397-98 (E.D.N.Y. 1998) (allowing relation back where the new plaintiffs "received the same collection letters" as had been received by the original named plaintiff); *Andujar v. Rogowski*, 113 F.R.D. 151, 158-59 (S.D.N.Y. 1986) (permitting relation back where three additional migrant workers joined an existing suit arising out of the same eviction on which the new plaintiffs' claims were based).  Rather than merely expanding Defendants' potential damages

---

Cir.1973)).  Thus, since the DuMonts' current FDCPA claim is predicted on the exact same set of underlying factual allegations included in the FAC, the Court finds that Litton and OLS had "adequate notice" of their potential exposure based on those allegations, even though the particular legal theory at issue was not raised at the time.

31

liability, the amendment here would force Litton and OLS to defend against alleged misconduct arising from distinct and transaction-specific sets of "operative facts."  *See Espinosa v. The Delgado Travel Agency, Inc.*, No. 05 CIV.6917 SAS, 2006 WL 2792689, at *3 (S.D.N.Y. Sept. 27, 2006) (denying relation back where "new factual allegations focus[ed] on events, dates, and people that were never mentioned in the original complaint"); *see also Kahn v. Chase Manhattan Bank, N.A.*, No. 90 CIV. 2824 (LMM), 1995 WL 491067, at *3 (S.D.N.Y. Aug. 17, 1995) ("The spirit and the letter of statutes of limitations require the Court to recognize a defendant's interest in foreclosing claims by additional plaintiffs arising out of identical but separate acts.").  In other words, this is not a case where Defendants are in a position to defend themselves by refuting the existence of the alleged scheme in the abstract; successfully proving that there was no overriding plan or policy governing their loan modification practices would not absolve them of the wrongdoing specifically alleged by each of the four named Plaintiffs.

　　　In addition, even if the Court were to accept Plaintiffs' formulation of the relevant "conduct, transaction, or occurrence," the Court is unable to conclude that the initial complaint provided OLS and Litton with adequate notice of the current named Plaintiffs' claims.  The original complaint focused exclusively on HAMP loan modifications and defined a class that was limited to New York homeowners.  Compl. ¶¶ 2-3.  Since Williams is the only named Plaintiff residing in New York, and her contract involved a non-HAMP modification, none of the current Plaintiffs' claims would have fallen within the scope of the original complaint.  Thus, the fact that the case was originally brought as a class action does not bolster Plaintiffs' position.  It would be unreasonable for the Court to assume that allegations of HAMP-related misconduct in New York put OLS and Litton on notice that they would also have to defend against allegations arising out of non-HAMP loan modification activity and against allegations (both HAMP- and

non-HAMP-related) related to their servicing practices on a nationwide basis.  See *Arneil v. Ramsey*, 550 F.2d 774, 782-83 (2d Cir. 1977) (finding that, because the plaintiffs seeking relation back did not qualify as "'asserted members' of the plaintiff class" at the time the original complaint was filed, that complaint "did not notify the [defendant] of the generic identities of [those plaintiffs] or of their particular claims"), *overruled on other grounds by Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983); *Espinosa*, 2006 WL 2792689, at *3-4 (relying on *Arneil* for the proposition that defendants must have adequate notice of the potential scope of the litigation in order for relation back to be justified); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 529 (S.D.N.Y. 2005) (finding that a new class of plaintiffs, whose claims related to stock purchases made prior to an IPO, could not relate back to an earlier class action complaint wherein the scope of the class was "explicitly tied" to that IPO).

Furthermore, there is absolutely no suggestion that the initial failure to name the current Plaintiffs (or to encompass them within the scope of the proposed class) resulted from any sort of mistake.  In applying Rule 15 to amendments adding new plaintiffs, courts—including those within this Circuit—have disagreed as to "whether the failure originally to name the newly added plaintiff must have been the result of a mistake."  *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 290 (S.D.N.Y. 2009).  Some have adopted the view that requiring mistake in such instances would be inconsistent with "the liberal 'attitude' of Rule 15, which is to permit amendment of pleadings to encourage resolution of claims on the merits."  *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2005 WL 2277476, at *25 (E.D.N.Y. Sept. 19, 2005); *see also Apartheid Litig.*, 617 F. Supp. 2d at 290 ("Courts in this Circuit have more recently rejected the suggestion that amendments seeking to add new plaintiffs must satisfy Rule 15(c)(1)(C)'s 'mistake' requirement.").  However, the Second Circuit has itself applied the

33

mistake requirement to newly added plaintiffs, *see Levy v. U.S. Gen. Accounting Office*, 175 F.3d 254, 255 (2d Cir. 1999), and this Court has continued to do so as well.  *See Lee v. Marvel Enterprises, Inc.*, 765 F. Supp. 2d 440, 454-55,  (S.D.N.Y. 2011) (noting the disagreement surrounding the issue but then proceeding to discuss facts that precluded a finding of mistake), *aff'd*, 471 F. App'x 14 (2d Cir. 2012); *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 09 CIV. 2137 LTS MHD, 2010 WL 3239430, at *9 (S.D.N.Y. Aug. 17, 2010); *Espinosa*, 2006 WL 2792689, at *4 ("There was no mistake in this case—rather, plaintiffs' counsel obtained new evidence causing him to bring new claims.  And plaintiffs have not shown that defendants should have known that this change would occur.").

    For these reasons, the DuMonts' claim relates back only as far as the FAC, while both Williams's and Adili's claims relate back to the SAC.[26]  Because the FAC was filed on October 24, 2012, any FDCPA claims by the DuMonts that predate October 24, 2011 must be dismissed as untimely.  Because the SAC was filed on February 25, 2013, any FDCPA claims by Williams or Adili that predate February 25, 2012 must similarly be dismissed.[27]  Since Litton did not hold

---

[26] Note that, even though the proposed class in the FAC was arguably broad enough to encompass Williams and Adili, *see* FAC ¶¶ 1, 3, 131, the fact that the four Plaintiffs' FDCPA claims do not arise out of the same "conduct, transaction, or occurrence" still precludes Williams and Adili from relating their claims back to any pre-SAC pleadings.

[27] While the parties did not raise the issue in their briefs, there is an additional question as to whether any of the prior class action complaints served to toll the statute of limitations.  *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974) (holding that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action").  For the reasons discussed above, *American Pipe* cannot apply with respect to the original complaint, because the proposed class in that first complaint was not broad enough to encompass the current Plaintiffs.  The FAC, however, proposed a class broad enough to cover Williams and Adili.  Nevertheless, *American Pipe* cannot save their claims because the FAC did not include an FDCPA cause of action.  Although the Second Circuit has held that *American Pipe* can extend to situations where the subsequent filing states a new cause of action, it did so in the context of pleadings that challenged the same underlying conduct and thus "involve[d] the same evidence, memories, and witnesses as were involved in the initial putative class action."  *Cullen v. Margiotta*, 811 F.2d 698, 720-21 (2d Cir. 1987), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff &*

the servicing rights to any of the three loans during the applicable limitations periods, all four

Plaintiffs' FDCPA claims against Litton are dismissed as time-barred.  *See* TAC ¶¶ 79, 120, 182.

Since Williams's allegations against OLS only extend through February 19, 2012, her FDCPA

claim is dismissed in its entirety.  *See id.* ¶ 163.  The DuMonts' and Adili's FDCPA claims

against OLS survive, but only to the extent that they are premised on those Plaintiffs' allegations

of loan-related misconduct that occurred during the respective limitations periods.  *See id.* ¶¶ 83-

111, 186-98.

### ii.  Debt Collectors

With respect to the DuMont and Adili loans, Litton and OLS further argue that they were

not functioning as "debt collectors" for purposes of the FDCPA and therefore cannot be held

liable under its provisions.  The Court agrees and therefore dismisses both of their FDCPA

claims against OLS on this basis (the claims against Litton having already been dismissed as

time-barred).

The FDCPA defines a "debt collector" as:

> any person who uses any instrumentality of interstate commerce or the mails in
> any business the principal purpose of which is the collection of any debts, or who
> regularly collects or attempts to collect, directly or indirectly, debts owed or due
> or asserted to be owed or due another.

15 U.S.C. § 1692a(6).  Exempted from the definition of "debt collector" is "any person

collecting or attempting to collect any debt owed or due . . . another to the extent such activity . .

. (iii) concerns a debt which was not in default at the time it was obtained by such person."  *Id.* §

1692a(6)(F).  Mortgage servicers are therefore not covered by the FDCPA if the debt at issue

---

*Assocs., Inc.*, 483 U.S. 143 (1987).  Given that the FAC includes neither an FDCPA cause of action nor the specific
factual allegations that form the basis for Williams's and Adili's claims, tolling would be inappropriate in this case.

was acquired prior to the borrower's default.  That is, the FDCPA only covers servicers who

obtain a mortgage that is *already* in default.  *See Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296

(PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July 13, 2012) ("[C]ompanies or persons that service

debts acquired before a customer default are not 'debt collectors.'"); *Costigan v. CitiMortgage,*

*Inc.*, No. 10 CIV. 8776 SAS, 2011 WL 3370397, at *5 (S.D.N.Y. Aug. 2, 2011) ("[T]he

classification of debt collector depends upon the status of a debt, rather than the type of

collection activities used.").  To survive a motion to dismiss, an FDCPA claim must allege that

this statutory condition was satisfied.  *See Gabriele v. Am. Home Mortgage Servicing, Inc.*, 503

F. App'x 89, 96 (2d Cir. 2012) ("As the district court held, the complaint does not allege that

[defendant] acquired [plaintiff's] debt before it was in default and so fails plausibly to allege that

[defendant] qualifies as a debt collector under the FDCPA."); *Costigan*, 2011 WL 3370397, at *9

("The Amended Complaint does not allege that [plaintiff's] loan was in default at the time

[defendant] 'obtained' that loan.  As a result, [defendant] is excluded from the definition of 'debt

collector' under the statute.  [Plaintiff's] claim under the FDCPA is therefore dismissed."

(footnote omitted)); *Zirogiannis v. Dreambuilder Investments LLC*, 782 F. Supp. 2d 14, 19

(E.D.N.Y. 2011) (dismissing a complaint for failure to allege post-default acquisition, despite the

defendants' implied admission that the condition had was met).

In this case, the DuMonts have failed to allege that they were in default on their loans

prior to the transfer of servicing rights to OLS.  Plaintiffs' briefs do not dispute this point, relying

instead on allegations OLS *treated* the debt as though it were in default.  *See* Pls. Mem. of Law

in Opp'n (Litton) at 30-31.  As discussed, however, it is the actual status of the debt, and not the

conduct of those seeking to collect, that determines whether a defendant falls within the

FDCPA's definition of "debt collectors."[28]   The DuMonts therefore fail to state a plausible claim against OLS under the FDCPA.

Adili's claim is similarly deficient.  Although the TAC notes various points at which Adili was unable to meet his payment obligations, *see* TAC ¶¶ 166, 174, this alone does not raise an inference of default.  *See Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86-87 (2d Cir. 2003) (rejecting the argument that "default" occurs, for purposes of the FDCPA, as soon as a debt becomes due).  For one thing, both references to payment delinquencies are placed in or around 2009, while the transfer of servicing rights to OLS did not occur until late 2011.  TAC ¶¶ 166, 174, 182.  The status of the loan at the actual time of transfer is unclear from the face of the pleadings.  Adili does allege that OLS notified him that it intended to foreclose on his home in January 2012, three months after the servicing rights were transferred.  *See id.* ¶ 184.  While this allegation, combined with the periodic references to payment shortfalls, makes it conceivable that the loan was in default when it was transferred, the gaps in the timing and the absence of a specific allegation of default preclude the Court from drawing any sort of reasonable inference regarding the state of the debt at the time OLS actually acquired the servicing rights.[29]  Adili

---

[28] In advocating for a more lenient standard, Plaintiffs rely on *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355 (6th Cir. 2012).  Since the Sixth Circuit cannot bind this Court and the Second Circuit (the rulings of which are binding on this Court) has provided contrary guidance, Plaintiffs' position is without merit.

[29] Plaintiffs' own brief highlights the deficiency, as it argues only that "the first correspondence [Adili] received from Ocwen after the servicing of Adili's loan was acquired by Ocwen was a letter of intent to foreclose on his home, *treating him in default*."  Pls.' Mem. of Law in Opp'n (Litton) at 30 (emphasis added).  By falling back on their argument that FDCPA claims need not include an allegation that the loan was actually in default at the time it was acquired, Plaintiffs implicitly concede that the Adili loan did not satisfy that prerequisite.

therefore fails to state a plausible basis for relief under the FDCPA, and the otherwise-timely portion of his claim is dismissed on that basis.[30]

## V.      Claims Asserted Against Corporate Parents Goldman and OFC

The Court turns next to the claims brought against the two parent entities:  (1) Goldman, which acquired Litton in December 2007 and sold it to OFC in September 2011, and (2) OFC, which owned OLS during all time periods at issue and acquired Litton in September 2011.  *See id.* ¶¶ 13-14, 21-22.[31]  Finding that the TAC fails to state any plausible claims against either entity, all causes of action against these Defendants are hereby dismissed.

### A.  Direct Liability

#### i.  Goldman

First, it is clear from the TAC that Plaintiffs do not have any basis on which to bring a direct claim against Goldman on any count.  There is no suggestion that Goldman directly contracted with or made promises or representations to any of the Plaintiffs.  Indeed, after Goldman pointed this out in its opening brief, Plaintiffs made no attempt to argue otherwise.  *See*

---

[30] Litton and OLS also challenge the adequacy of Adili's pleadings on the grounds that the TAC fails to allege that they engaged in debt collection with respect to his loan, and that Adili was the one who initiated the alleged communications.  Litton's Mem. of Law in Supp. at 25.  The Court notes that these are really two versions of the same argument, as the rationale for excluding debtor-initiated communications from the scope of the FDCPA is precisely that such communications do not constitute debt collection activity.  *See Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, No. 1:05-CV-0583, 2005 WL 2098068, at *2 (N.D.N.Y. Aug. 30, 2005).  In any event, the Court struggles to understand exactly what deficiency Defendants are attempting to identify.  For instance, the TAC alleges that OLS "telephoned Plaintiff Adili and told him that his mortgage loan amount of $116,000 was past due and that his home was currently in foreclosure."  TAC ¶ 198.  Whether or not the substance of this communication was misleading or otherwise violative of the FDCPA (Defendants do not argue this point), the communication itself was allegedly initiated by OLS and clearly relates to the collection of Adili's debt.  There is no need, at this juncture, for the Court to examine whether certain of Adili's other allegations fail to describe actionable debt collection activity, particularly since the claim is being dismissed on other grounds in any event.

[31] Though Goldman and OFC have filed independent motions to dismiss, the arguments proffered against them are similar.  The Court will therefore address both motions in this section of the Opinion.

Goldman's Mem. of Law in Supp. at 4-5; Pls.' Mem. of Law in Opp'n (Goldman) at 7-11;

Goldman's Reply Mem. of Law in Further Supp. at 2.  The only apparent basis for direct

liability, then, would be the various state law consumer protection claims.  Here, too, Plaintiffs

fail to state a claim.  Plaintiffs' own brief proves as much:  in attempting to defeat Goldman's

motion, Plaintiffs acknowledge that its claims are based on Goldman's alleged "deceptive and

unconscionable scheme to collect fees *by directing its subsidiary and agent*, Litton, to

improperly and summarily deny loans without the proper review under Goldman Sachs' 'denial

sweep strategy,' and to abandon loan modifications altogether and push homeowners into

foreclosure before the foreclosure moratorium occurred."  Pls.' Mem. of Law in Opp'n

(Goldman) at 7-8 (emphasis added; original emphasis omitted).  Thus, Plaintiffs' own theory

demonstrates that Goldman's alleged liability is premised on indirect conduct taken through its

subsidiary.[32]

Most of the authorities on which Plaintiffs rely in support of their direct claim are from

jurisdictions that have nothing to do with the statutory claims at issue in this lawsuit.  *See id.* at

8-11.  The New Jersey and Pennsylvania cases are distinguishable.  In *Yates v. All American*

*Abstract Co.*, 487 F. Supp. 2d 579, 581 (E.D. Pa. 2007), the plaintiffs alleged that the parent

company participated directly in the purported scheme by sharing in "illegal fee splitting or

referral fees."  Likewise, direct liability in *Schwartz v. Avis Rent A Car System, LLC*, No. CIV.A.

11-4052 JLL, 2013 WL 2182078, at *5 (D.N.J. May 20, 2013), was premised on allegations that

---

[32] It bears noting at this point that, on its face, the TAC seeks to hold Goldman liable for loan-related activities even
in situations where Litton was never involved.  For instance, as seen above, Litton is not implicated by the
allegations concerning the Williams loan; nevertheless, the TAC purports to bring Williams's claims against
"Defendants" generally.  Because the claims against Goldman will be dismissed in any event, the Court will not take
the time to sort through the various allegations in order to determine which causes of action even state a *possible*
claim against Goldman.  The Court merely observes that this sort of generalized pleading significantly undermines
the notice-providing purpose of Rule 8.

the parent exercised direct control over the website whose content formed the basis for the plaintiff's fraud claims.

Here, by contrast, the TAC merely offers general, conclusory allegations about Goldman's involvement.  For instance, Plaintiffs allege that, "[a]s more fully described herein and upon information and belief, Goldman Sachs directed, controlled, formulated and/or participated in the loan modification practices of Litton complained of herein."  TAC ¶ 24; *see also id.* ¶¶ 1, 36 (providing equally conclusory allegations that Goldman directed Litton's alleged misconduct).[33]  The only apparent elaboration comes in paragraph 64 of the TAC and takes the form of (1) a claim that "former Litton employees" have confirmed that Goldman directed the alleged misconduct and (2) quotations from a *Financial Times* article and a *Huffington Post* blog entry.[34]  The newspaper article says nothing about Goldman's involvement in coordinating the alleged "denial sweep strategy," which the article attributes solely to Litton.  *See* Decl. of D. Andrew Pietro Ex. 1.  The blog, like the "former employees," merely accuses Goldman of directing Litton to take various actions.  *See id.* Ex. 2 (reporting an ex-Litton executive's claims that "Goldman quickly sent down word to abandon loan modifications altogether" and that "Goldman's micro-managers sent down some commandments:  deny, deny and deny").  There is,

---

[33] Plaintiffs do not even attempt to qualify their broad-based allegations against Goldman by accounting for Goldman's having sold Litton to OFC in September 2011, thus limiting the time period over which Goldman could conceivably be found liable for any of the alleged wrongdoing.  *See* TAC ¶ 22.

[34] Goldman has provided the full text of these sources.  Decl. of D. Andrew Pietro Ex. 1, 2.  The Second Circuit has upheld district courts' authority to consider the full text of partially quoted sources in deciding a motion to dismiss when the documents are "integral" to the complaint.  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996); *see also S.E.C. v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 700 (S.D.N.Y. 2005) ("Where plaintiff has actual notice of the documents and has utilized them in framing the complaint, the underlying rationale for precluding review of the documents no longer exists.").  Because the quoted sources are public and Plaintiffs relied on them in setting out the core allegations against Goldman, the Court will consider the full text as appropriate.

once again, no indication that Goldman took any direct action with respect to any of the loans Litton was servicing, much less that it did anything specific with respect to the particular Plaintiffs named in this suit.

Plaintiffs also point to a consent order between Goldman, Goldman Sachs Bank USA and the Federal Reserve, and to the accompanying press release. *See* TAC ¶ 66; *id.* Ex. D.[35] However, while the consent order suggests issues of mismanagement and deficient oversight of Litton, it does not offer any indication that Goldman affirmatively participated in the types of activities alleged in the TAC. *See id.* Ex. D. Indeed, there is not a single reference to the alleged "denial sweep strategy." *See id.* Moreover, the document makes clear that Goldman (the entity named in the instant action) controlled Goldman Sachs Bank USA, which in turn "indirectly owned" Litton. *Id.* Ex. D, at 1. The Court finds no support in these documents for an inference that Goldman directly participated in any of the alleged malfeasance attributed to its indirect subsidiary.

### ii.  OFC[36]

Plaintiffs' direct liability arguments are even more attenuated with respect to OFC. The TAC's general references to "Ocwen" or "Defendants," unsupported by any factual allegations specific to OFC, cannot form the basis for a plausible claim. *See* sources cited *supra* note 1. Apart from these generic references, though, the TAC offers nothing suggesting that OFC had any direct contact with Plaintiffs, had any direct role in servicing Plaintiffs' loans, or had any direct involvement in handling Plaintiffs' modification paperwork. All Plaintiffs allege is that

---

[35] As with the newspaper article and the blog, Plaintiffs quote selectively from the press release, but the Court will rely on the full version of the document provided by Goldman. *See* Decl. of D. Andrew Pietro Ex. 3.

[36] As with their claims against Goldman, Plaintiffs concede that their direct claims against OFC are limited to the statutory consumer protection causes of action. Pls.' Mem. of Law in Opp'n (OFC) at 6-7.

OFC "directed, controlled, formulated and/or participated in the loan modification practices of [OLS] and Litton complained of herein."[37] TAC ¶ 18.  Other references to OFC are equally conclusory.  *See id.* ¶¶ 1, 14, 36.  As with the corresponding assertions against Goldman, these conclusory allegations require some sort of factual support in order to nudge Plaintiffs' claims into the realm of plausibility.  *See Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264, 277 (E.D.N.Y. 2010) (dismissing a direct liability claim against a parent corporation where the complaint merely referenced "Defendants" collectively, asserted that the parent controlled its subsidiary, and otherwise left the parent company "almost entirely out of the story").

In an effort to overcome the absence of OFC-specific allegations, Plaintiffs rely on regulatory agreements that supposedly highlight OFC's "deceptive and unconscionable practices devised to take advantage of vulnerable homeowners already in distress for [OFC]'s own profit motive."  Pls.' Mem. of Law in Opp'n (OFC) at 7; *see* TAC ¶¶ 67-70; *id.* Ex. A, C.  First, OFC signed an agreement, on behalf of itself and OLS, with the New York State Department of Financial Services (the "DFS Agreement").  *Id.* Ex. A.  The DFS Agreement commits OFC and OLS (and Litton, by its own signature) to adhere to certain mortgage servicing practices.  *Id.*  A subsequent consent order indicates that the Financial Services Department "preliminarily identified" issues that it "believes indicate non-compliance" with the DFS Agreement.  *Id.* Ex. C, at 2-3.  The consent order uses language like "certain borrowers" and "some instances."  *Id.* Nothing in either of these documents suggests the type of systemic and deliberate scheming that Plaintiffs allege, nor do they provide any basis for assuming that OFC was directly involved in

---

[37] Once again, Plaintiffs make no attempt to qualify their generalized pleadings to account for the fact that OFC did not acquire Litton from Goldman until September 2011.

any of the activities related to the named Plaintiffs' loans.[38]  Rather, as OFC correctly observes,

Plaintiffs simply assume that evidence of potential misconduct in some instances can be used to

infer similar misconduct in all instances.[39]  *See* OFC's Reply Mem. in Supp. at 3.  The Court

views this leap as an unreasonable one, and all direct claims against OFC must therefore be

dismissed.

### B.  Indirect Liability

#### i.  Alter Ego

Plaintiffs next argue that the Court should pierce the corporate veil and hold Goldman

and OFC liable on the grounds that their mortgage servicing subsidiaries were their "alter egos."

These arguments find no support in the TAC.

---

[38] Plaintiffs mischaracterize the extent to which the DFS Agreement obligated OFC to participate directly in the loan-servicing activities of OLS and Litton.  In describing the agreement, Plaintiffs write that it required OFC to:

> "(1) establish and maintain sufficient capacity to properly board and manage its significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete, and reliable; and (3) *implement a system of robust internal control and oversight with respect to mortgage servicing practices performed by [OFC] and its 'subsidiaries and affiliates.'*"

Pls.' Mem. of Law in Opp'n (OFC) at 15-16 (emphasis in original).  Notably, the majority of this language is taken verbatim from the description of the DFS Agreement appearing in the subsequent consent order, though the only citation is to the DFS Agreement itself.  *See* TAC Ex. C, at 2; Pls.' Mem. of Law in Opp'n (OFC) at 16.  More importantly, the end of the quote (which Plaintiffs emphasize) is altered in material respects.  The original text of the consent order reads, "(3) implement a system of robust internal *controls* and oversight with respect to mortgage servicing practices performed by *its staff and third-party vendors*."  TAC Ex. C, at 2.  Whether inadvertent or not, the change from "internal controls" (a common term-of-art generally referring to corporations' internal compliance policies and procedures) to the singular "internal control" makes the obligation sound a lot more like direct involvement than the documents themselves actually require.  The change from "staff and third-party vendors" to "[OFC] and its 'subsidiaries and affiliates'" is similarly distortive, again overstating the extent to which the obligations were specifically geared toward requiring OFC to take direct responsibility for its subsidiaries' affairs.

[39] In addition, the Court does not agree with Plaintiffs' reading of the consent order as an "admission" of wrongdoing on the part of OFC (or its subsidiaries).  Rather, the consent order simply indicates that OFC has consented to a "comprehensive review" by an independent monitor.  TAC Ex. C, at 3.

New York choice-of-law rules provide that veil-piercing determinations are made based on the law of the subsidiary's state of incorporation. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  Since both Litton and OLS are Delaware entities, the Court must apply Delaware law. *See* TAC ¶ 12-13. [40]  "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" *Fletcher*, 68 F.3d at 1457 (quoting *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990)) (alteration in original).  The central inquiry is whether the corporate parent exercised "complete domination" over its subsidiary.  *See Dover Ltd. v. A.B. Watley, Inc.*, No. 04 CIV. 7366 (FM), 2006 WL 2987054, at *9 (S.D.N.Y. Oct. 18, 2006).  Courts will look at various factors, including but not limited to whether the subsidiary was adequately capitalized, whether the subsidiary was solvent, whether corporate formalities were observed,[41] and whether the parent corporation siphoned funds from the subsidiary. *See, e.g.*, *Leber Associates, LLC v. Entm't Grp. Fund, Inc.*, No. 00 CIV.3759 LTS MHD, 2003 WL 21750211, at *14 (S.D.N.Y. July 29, 2003) (quoting *Fletcher*, 68 F.3d at 1458).  "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).  That fraud must be in the use of the

---

[40] With respect to OFC's motion, both OFC's opening brief and Plaintiffs' opposition mistakenly analyzed the veil-piercing issue under New York and Florida law. *See* OFC's Mem. of Law in Supp. at 11-19; Pls.' Mem. of Law in Opp'n (OFC) at 12-24.  OFC noted the error in its reply.  OFC's Reply Mem. in Supp. at 4 n.4.  Because the outcome of the analysis under Delaware law is clear from the face of the TAC, the Court does not find it necessary to order re-briefing on the issue.

[41] Formalities include payment of dividends, maintenance of corporate records, and the proper functioning of officers and directors. *See Leber Associates, LLC v. Entm't Grp. Fund, Inc.*, No. 00 CIV.3759 LTS MHD, 2003 WL 21750211, at *14 (S.D.N.Y. July 29, 2003) (quoting *Fletcher*, 68 F.3d at 1458).

corporate form, not in the activity giving rise to the underlying cause of action.  *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268-69 (D. Del. 1989).

### a.  Goldman

The allegations in the TAC do not come close to establishing a plausible alter ego claim against Goldman.  While Plaintiffs allege that Goldman directed Litton's activities, they offer no allegations—factual or otherwise—suggesting that Litton existed solely as a sham corporation. To the contrary, Litton existed both before and after the period during which it was owned by Goldman.  There are no facts alleging an absence of corporate formalities, a comingling of funds, undercapitalization, or any other indicia that Goldman and Litton "operated as a single economic entity."[42]

Plaintiffs point to indemnification provisions in the purchase agreement governing Goldman's sale of Litton to OFC, alleging that these provisions cover exposures resulting from Litton's loan modification practices.  *See* TAC ¶ 23; *id.* Ex. B, at 65-66.  Relying on this allegation, Plaintiffs argue that "[t]he paying of one entity's liabilities by the other is evidence in favor of piercing the corporate veil."  Pls.' Mem. of Law in Opp'n (Goldman) at 13 n.5 (citing *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).  However, this sort of provision simply allocates potential liabilities between buyer and seller (as most corporate acquisition agreements do); it cannot reasonably be viewed as an indication that Goldman assumed Litton's debts while they were related entities.

---

[42] In fact, as discussed above, Litton was not even Goldman's direct subsidiary.  The TAC is completely silent with respect to what role, if any, Goldman Sachs Bank USA is alleged to have played.  The cross-referenced media articles fail to cure this deficiency in the pleadings, as the articles merely refer to "Goldman Sachs" in the abstract, without specifying a particular Goldman entity.  *See* Decl. of D. Andrew Pietro Ex. 1, 2.  Plaintiffs simply bring suit against the ultimate parent and, in this instance, seek to hold Goldman liable by piercing the corporate veil all the way to the top of the corporate chain.

The Court therefore finds the TAC to be "totally devoid of solid, nonconclusory allegations" in support of a corporate veil-piercing claim.  *Robles v. Copstat Sec., Inc.*, No. 08 CIV. 9572 (SAS), 2009 WL 4403188, at *2 (S.D.N.Y. Dec. 2, 2009) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)) (internal quotation mark omitted); *see also Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 351 (S.D.N.Y. 2013) (dismissing a claim in light of "the absence of adequate factual allegations sufficient to raise a plausible inference that either prerequisite for veil piercing is present").  Indeed, the TAC is basically devoid of *any* allegations along these lines, conclusory or otherwise.  The indirect claims against Goldman cannot go forward on this basis.

### b.  OFC

The veil-piercing argument against OFC fails for similar reasons.  Most importantly, as with Goldman, there is absolutely no suggestion that either Litton or OFC existed solely as a sham corporation.  The only alleged wrong is, once again, the underlying misconduct; the TAC is silent with respect to fraudulent use of the corporate form itself.

While the failure to allege an "element of injustice" in the use of the corporate form is fatal in its own right, the TAC is also deficient with respect to the "single economic entity" prong.  Of the various factors discussed above, the only one Plaintiffs address at all is the question of corporate formalities, and Plaintiffs' arguments on that front fail to support a plausible claim for relief.  For instance, in an effort to demonstrate that OFC completely dominated and controlled OLS and Litton, Plaintiffs rely heavily on the fact that OFC was the sole signatory to regulatory agreements that purported to bind both OFC and its subsidiaries.  *See* Pls.' Mem. of Law in Opp'n (OFC) at 15-18.  However, this Court has previously rejected an alter ego claim that included an analogous factual allegation.  *See Spagnola v. Chubb Corp.*, 264

F.R.D. 76, 87-88 (S.D.N.Y. 2010) (conducting an alter ego analysis under Minnesota and

Indiana law and declining to pierce the corporate veil, notwithstanding plaintiffs' allegation that,

*inter alia*, the parent corporation was the sole signatory to an agreement with three states'

attorneys general that purported to bind the corporation's wholly owned subsidiaries).[43]

Plaintiffs do not identify—and the Court has not uncovered—any case law to the contrary.

Similarly, there is no significance in the fact that OFC filed consolidated annual reports with the

Securities and Exchange Commission.  *See BASF Corp. v. POSM II Properties P'ship, L.P.*, No.

CIV.A. 3608-VCS, 2009 WL 522721, at *7-8 (Del. Ch. Mar. 3, 2009) (rejecting the notion that a

holding company "eliminate[s] its subsidiaries' separate legal existences" by filing consolidated

reports).  The alleged overlap in executives and office space is equally irrelevant.[44]  *See

Capmark*, 491 B.R. at 350 (S.D.N.Y. 2013) ("That a subsidiary shares employees, officers, and

directors with a parent does not permit the corporate form to be disregarded.").  Finally, as

discussed above, the substantive content of the DFS Agreement does not support the inference of

complete domination for which Plaintiffs' advocate in their brief.  In short, while the TAC

certainly demonstrates that OFC was involved in the affairs of its subsidiaries to an extent, it

---

[43] Although the veil-piercing analysis in *Spagnola* was not based on Delaware law, Minnesota and Indiana require a similar showing to establish alter ego liability, and the factors that the *Spagnola* Court applied in analyzing the first prong mirror those discussed in this Opinion.  *See Spagnola*, 264 F.R.D. at 86-87.

[44] It bears noting that Plaintiffs only allege that OFC and OLS shared one executive:  Ronald Faris is identified in the exhibits to the TAC as the President and CEO of OFC and as the President of OLS.  TAC Ex. C, at 9; *id.* Ex. E, at 14.  The existence of a single common officer, absent other factors, can hardly be said to raise a plausible inference that a parent company completely dominates its subsidiary.  Furthermore, while Plaintiffs point to an apparent overlap in office space (based solely on the address provided for Faris in one of the exhibits), the body of the TAC makes clear that each of OFC, OLS and Litton maintained its own principal place of business.  *Id.* ¶¶ 12-14; *id.* Ex. C, at 8.  The allegation of shared office space is thus coextensive with the allegation of common officers, and each is limited to the information concerning Faris that can be garnered from the exhibits.  Moreover, these allegations are specific to OLS and say nothing at all about the alleged alter ego relationship between OFC and Litton.

fails to "allege facts beyond relationships 'typical of a majority shareholder or parent corporation' which courts have found to be insufficient to veil piercing as a matter of law." *Id.* at 349-50 (quoting *Fletcher*, 68 F.3d at 1459-60).

Given the TAC's failure to plausibly allege either element required to establish alter ego liability, there is no basis for any of Plaintiffs' claims to proceed against OFC on a veil-piercing theory.

### ii.  Agency

Under New York law,[45] "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir.2001)) (internal quotation mark omitted), *cert. denied*, 133 S. Ct. 952 (2013); *see also Spagnola*, 264 F.R.D. at 89 ("[T]o establish actual agency, a plaintiff must demonstrate the following elements:  (1) manifestation by the principal that the agent shall act for him; (2) the agent accepted the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking.").  Control is generally viewed as the central element of an agency relationship. *See Spagnola*, 264 F.R.D. at 89; *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009).  "A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient to demonstrate the existence of an agency relationship."  *Bigio*, 675 F.3d at 175.

---

[45] "The law of the forum state governs where, as here, no party alleges that the law of a different state controls and differs from that of the forum."  *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 n.43 (S.D.N.Y. 2009).

### a. Goldman

Here, Plaintiffs have failed to allege any facts suggesting that Goldman's relationship with Litton was anything other than that of a parent and its subsidiary.  The repeated, conclusory references to "direction" and "control" remain unavailing.  As previously discussed, the cross-referenced *Financial Times* article does not attribute the "denial sweep strategy" to Goldman.  The *Huffington Post* blog, though it does allege that Goldman "sent down" instructions to deny loan modifications, is similarly unhelpful to Plaintiffs' case.  First, it does not specify the Goldman Sachs entity alleged to have "sent down" the instructions.  More importantly, although the blog suggests that Litton began denying modifications at Goldman's request, that allegation alone does not produce a plausible inference that any such denials were subject to Goldman's control or undertaken on Goldman's behalf.  *See Maung Ng We v. Merrill Lynch & Co., Inc.*, No. 99 CIV. 9687 (CSH), 2000 WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000) ("The essence of control in an agency sense is in the *necessity* of the consent of the principal on a given matter. Otherwise, if the subsidiary has discretion to act, the parent cannot justifiably be said to have the essential right of control over its subsidiary's actions." (emphasis in original)); *Nw. Nat. Ins. Co. of Milwaukee, Wis. v. Alberts*, 769 F. Supp. 498, 508 (S.D.N.Y. 1991) ("[A]n agency relationship only exists if the agent acts primarily for the benefit of the principal and not for himself.").  To put it simply, irrespective of whatever instructions Litton may have received from Goldman, the TAC offers no factual allegations suggesting that Litton's subsequent actions were untaken for Goldman's, as opposed to its own, benefit.  There is likewise no basis on which to infer that Litton surrendered its discretion to grant or deny a modification in any given case, regardless of what Goldman's default preference might have been.  To allow Plaintiffs' claims to go forward on the basis of this one relatively vague allegation would be to expose any corporate parent to

49

potential agency liability merely for encouraging its subsidiaries to conduct their business in a particular manner.  Such an outcome would undermine the liability-limiting function of corporate organization, and it would contravene the long-held judicial principal that agency liability in the parent-subsidiary context is "remote."  *Spagnola*, 264 F.R.D. at 88-89.

Because Plaintiffs have failed to state a plausible agency claim, they cannot proceed against Goldman under that theory.[46]  All three bases for holding Goldman liable having been rejected, the Court grants Goldman's motion to dismiss.

### b.  OFC

Plaintiffs also fail to allege any facts that would support an agency-based claim against OFC.  As discussed above, the OFC-specific allegations in the TAC are limited to conclusory allegations of direction and control; there is no suggestion anywhere in the pleadings that either Litton or OLS took any specific actions (let alone any of the specific actions alleged relative to Plaintiffs' loans) on OFC's behalf.  The exhibits attached to the TAC, which failed to save the veil-piercing argument, are equally unavailing here.  Since the Court cannot infer agency merely from the existence of a parent-subsidiary relationship, the agency claims must be dismissed.

---

[46] In their briefs, Plaintiffs argue that agency claims should be allowed to go forward if the pleadings suggest a mere "possibility" that an agency relationship exists.  Pls.' Mem. of Law in Opp'n (Goldman) at 16; Pls.' Mem. of Law in Opp'n (OFC) at 25.  Plaintiffs' position sets the bar too low.  *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 88 (S.D.N.Y. 2010) (noting that "courts routinely dismiss claims based on agency theory where the pleadings contain insufficient allegations in that regard").  Indeed, the "possibility" language that Plaintiffs quote from *Amusement Industry, Inc. v. Stern*, 693 F. Supp. 2d 327, 345 (S.D.N.Y. 2010), was itself a quotation from a New York state case.  Two of the three other cases Plaintiffs cite are themselves state court decisions and are thus inapposite in the instant federal action; the third is a federal case that predates *Twombly* and *Iqbal*.  While *Amusement Industry* did not point out the divergence between the state and federal requirements, the Court nevertheless remains bound to adhere to the strictures of *Twombly* and *Iqbal* in this instance.  The Court also observes that Plaintiffs' briefs fail to identify the state-court origin of the language they quote on this point, a consequence of counsel's questionable decision to omit, throughout the entirety of all three of its briefs, all internal citations, quotations and footnotes unless otherwise indicated.  *See* Pls.' Mem. of Law in Opp'n (Litton) at 6 n.5; Pls.' Mem. of Law in Opp'n (OFC) at 4 n.2; Pls.' Mem. of Law in Opp'n (Goldman) at 5 n.3.

Because the allegations in the TAC fail to state any plausible claims against OFC, OFC's motion to dismiss is granted in its entirety.

## VI.   Conclusion[47]

For the reasons set forth above, Defendants Litton and OLS's motion to dismiss is GRANTED IN PART and DENIED IN PART.  Defendant Goldman's motion to dismiss is GRANTED in its entirety.  Defendant OFC's motion to dismiss is likewise GRANTED in its entirety.  All dismissals are without prejudice, with the exception of those FDCPA claims that have been dismissed on statute-of-limitations grounds.

The following claims survive the instant motions:  (1) the DuMonts' breach of contract claim ("Count I") against OLS; (2) Williams's breach of contract claim ("Count I") against OLS; and (3) Williams's GBL claim ("Count III") against OLS.

The following claims are dismissed with prejudice:  (1) all four Plaintiffs' FDCPA claims against Litton, and (2) Williams's FDCPA claim against OLS.

All remaining claims are dismissed without prejudice:  (1) the DuMonts' breach of contract claims ("Count I") against Litton, OFC and Goldman; (2) Williams's breach of contract claims ("Count I") against Litton, OFC and Goldman; (3) Adili's breach of contract claims ("Count I") against all four Defendants; (4) all four Plaintiffs' promissory estoppel claims against all four Defendants ("Count II"); (5) Williams's GBL claims ("Count III") against Litton,

---

[47] On February 28, 2014, Plaintiffs filed a Second Notice of Supplemental Authority.  Doc. 84.  This filing included a copy of a Consent Judgment entered against OFC and OLS in the District Court for the District of Columbia.  *See id.* Ex. A.  While that Consent Judgment related to general allegations of loan-servicing misconduct similar in nature to the allegations at issue in this case, the Judgment expressly states that it does not represent an admission of wrongdoing on the part of, or constitute evidence against, OFC or OLS.  *Id.* Ex. A, at 8.  In any event, nothing in the Consent Judgment or accompanying documents speaks to misconduct specifically directed at the individual Plaintiffs' loans.  As such, the supplemental filing does not affect the Court's plausibility analysis under Rule 12(b)(6).

OFC and Goldman; (6) the DuMonts' UTPCPL claims ("Count IV") against all four

Defendants; (7) Adili's CFA claims ("Count V") against all four Defendants; (8) the DuMonts'

FDCPA claim ("Count VI") against OLS; and (9) Adili's FDCPA claim ("Count VI") against

OLS.

The Clerk of the Court is respectfully directed (1) to terminate Adili as a plaintiff in this

case; (2) to terminate Litton Loan Servicing, LP, Ocwen Financial Corporation, and Goldman

Sachs Group, Inc. as defendants in this case; and (3) to terminate the pending motions (Docs. 66,

68, 70).

The remaining parties shall appear for a status conference on **April 1, 2014** at **4:00 p.m.**,

at which time the Court will set a pleading schedule. All pleading deadlines are adjourned until

that date.

It is SO ORDERED.

Dated:    March 3, 2014
          New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.