UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

GEORGE DUMONT, JONATHAN GRIMES,  :  Civil Action No. 7:12-cv-02677-ER-LMS
YVONNE WILLIAMS and KUJTIM ADILI,  :
On Behalf Of Themselves And All Others  :  <u>CLASS ACTION</u>
Similarly Situated,  :
  :
                    Plaintiffs,  :
  :  **JURY TRIAL DEMANDED**
    vs.  :
  :
  :
LITTON LOAN SERVICING, LP, and OCWEN  :
LOAN SERVICING, LLC.  :
  :
                Defendants.  :
  :

———————————————————— x

## FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs George DuMont and Jonathan Grimes (the "DuMont Plaintiffs"), Yvonne Williams

("Plaintiff Williams"), and Kujtim Adili ("Plaintiff Adili") (collectively, "Plaintiffs"), on behalf of

themselves and all others similarly situated, pursuant to the Court's Minute Entry entered April 1,

2014, for their Fourth Amended Class Action Complaint ("Complaint") against defendants Litton

Loan Servicing, LP ("Litton") and Ocwen Loan Servicing, LLC ("Ocwen Loan") (collectively,

"Defendants"), allege upon knowledge with respect to themselves and their own acts and upon

information and belief based, in part, on the investigation of counsel, as follows:

## I.    NATURE OF THE CASE

1.    Plaintiffs bring this class action on behalf of themselves and all similarly situated

individuals as described in the paragraphs set forth herein. This Complaint challenges, among other

things, the failures and abuses of Litton and Ocwen Loan as mortgage servicers operating under the

guise of and receiving the benefits of a federal program targeted at benefiting struggling

homeowners. Specifically, the stated purpose of the Home Affordable Modification Program

homeowners.   Specifically, the stated purpose of the Home Affordable Modification Program ("HAMP") was to encourage the modification of residential loans and avoid foreclosure where possible.   In stark contrast to the purpose of HAMP, as further described herein, Defendants systematically failed to honor agreements directly with individual homeowners and violated consumer protection laws.

2.      As a direct result of Defendants' misconduct alleged herein, Plaintiffs and the classes they seek to represent have suffered fear and anxiety as their ability to maintain ownership of their homes remains uncertain, and in some circumstances, have been subjected to unnecessary foreclosure proceedings and/or felt compelled to accept deals on less favorable terms than were promised to them.   Defendants have left thousands of borrowers in a state of legal and financial limbo – often worse off than they were before they sought a modification from Litton and/or Ocwen Loan.   Defendants' actions violate their contractual obligations, including the obligation of good faith and fair dealing, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

3.      To be sure, despite the fact that Plaintiffs and those similarly situated fulfilled their end of temporary payment agreements entered into with Litton and/or Ocwen Loan providing for permanent HAMP or alternative loan modifications, Litton and Ocwen Loan routinely and systematically violated these agreements, incentivized by collecting lucrative fees and charges on delinquent loans, realizing profits by continuing to keep a mortgage in a state of default or distress and to push loans toward foreclosure.   As a *New York Times* article described mortgage servicers such as Litton and Ocwen Loan's incentives: "Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure.   So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal

services." Peter S. Goodman, *Lucrative Fees May Deter Efforts to Alter Loans*, N.Y. TIMES, July 29, 2009, *available at* http://www.nytimes.com/2009/07/30/business/30services.html?pagewanted=all (last visited April 22, 2014).

4.      The DuMont Plaintiffs and Plaintiff Adili bring this action on behalf of themselves and all similarly situated homeowners who submitted a HAMP application to Litton and/or Ocwen Loan and provided all necessary paperwork for the application on a timely basis and qualified for a HAMP modification, but were nevertheless improperly denied a HAMP modification by Litton and/or Ocwen Loan and suffered actual and ascertainable losses of money or property as a result thereof ("Denial Sweep Class").

5.      The DuMont Plaintiffs and Plaintiff Adili also bring this action on behalf of themselves and all similarly situated homeowners who entered into a Trial Period Plan ("TPP") agreement[1] with Litton and/or Ocwen Loan and complied with all conditions required by the TPP agreement, including making all payments and complying with Defendants' requests for documentation, but were nevertheless improperly denied permanent loan modifications or improperly delayed from receiving permanent loan modifications and have suffered actual and ascertainable losses of money or property as a result of Litton and/or Ocwen Loan's failure to modify their loan in accordance with the TPP agreement ("TPP Class").

6.      Plaintiff Williams brings this action on behalf of herself and all similarly situated homeowners who entered into a non-HAMP permanent modification agreement with Litton and/or Ocwen Loan and complied with all conditions required by the non-HAMP permanent modification agreement, including making all payments and complying with Defendants' requests for

---

[1]   "TPP agreements" as used and discussed in detail herein include, unless differentiated, both HAMP and non-HAMP TPP agreements.

documentation, and have suffered actual and ascertainable losses of money or property as a result of Litton and/or Ocwen Loan's failure to modify their loan in accordance with the non-HAMP permanent modification agreement (the "Alternative Modified Contract Class").

## II.   JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

8.      Venue is proper in this District under 28 U.S.C. §1391. Defendants conduct business in New York, receive substantial compensation and profits from the servicing of home mortgage loans in this District, and have made material omissions and misrepresentations and breached contracts and other promises and engaged in unlawful practices in this District, so as to subject themselves to personal jurisdiction in this District.  Further, Plaintiff Williams resides in this District, and her property is located in this District.

9.      This Court has personal jurisdiction over Defendants because, as further described herein, Defendants engage in substantial business in New York and/or have consented to personal jurisdiction in New York, and a substantial portion of the wrongdoing alleged took place in this District.

## III.   PARTIES AND RELEVANT NON-PARTIES

10.      *The DuMont Plaintiffs* reside in Luzerne County, Pennsylvania and are citizens of Pennsylvania.  Their home mortgage loan was originally serviced by Litton, and, on information and belief, was transferred to Ocwen Loan for servicing in approximately August 2011.

11.      *Plaintiff Williams* resides in Kings County, New York and is a citizen of New York. Her home mortgage loan was serviced by Litton and then, in approximately April 2010, the servicing of her loan was transferred to Ocwen Loan.

12.   *Plaintiff Adili* resides in Passaic, New Jersey and is a citizen of New Jersey.  His home mortgage loan was serviced by Litton and then, in approximately November 2011, the servicing of his loan was transferred to Ocwen Loan.

13.   *Defendant Litton* is a Delaware limited partnership.  Litton provides residential mortgage loans to homeowners in the United States.  Litton was formerly known as Litton Mortgage Servicing Center, Inc.  Litton was founded in 1988 and is based in Houston, Texas.  As of September 1, 2011, upon information and belief, Litton operates as a subsidiary of Ocwen Financial Corporation ("Ocwen Financial").

14.   *Defendant Ocwen Loan* is a Delaware limited liability company and is a subsidiary of Ocwen Financial.  Ocwen Loan is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  Ocwen Loan maintains its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409.

15.   Non-party Ocwen Financial, the parent company of Ocwen Loan and Litton, is a provider of residential and commercial mortgage loan servicing, special servicing and asset management services, and is a Florida corporation headquartered at 2002 Summit Boulevard, 6th Floor, Atlanta, Georgia 30319.  Ocwen Financial and Ocwen Loan are collectively referred to herein as "Ocwen."

16.   Non-party Goldman Sachs Group, Inc. ("Goldman Sachs") is a bank holding company and financial holding company regulated by the Federal Reserve Board and a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  During a portion of the period complained herein, Litton was a subsidiary of Goldman Sachs.  Goldman Sachs acquired Litton in December 2007.  *See* Goldman Sachs Form 10-K, filed January 29, 2008, at 84.  On

September 1, 2011, Goldman Sachs sold Litton to Ocwen Financial. *See* Ocwen Financial 2011 Form 10-K, filed February 29, 2012, at 3, 6.

## IV.  FACTUAL BACKGROUND

17.  The United States housing market has been and continues to be in crisis.  A Congressional panel in 2009 noted that one in eight U.S. mortgages was then in foreclosure or default.  Press Release, Congressional Oversight Panel Releases Assessment of Foreclosure Mitigation Efforts (Oct. 9, 2009), *available at* http://cybercemetery.unt.edu/archive/cop/20110401231636/http:/cop.senate.gov/press/releases/release-100909-foreclosure.cfm.  In 2010, owners of a record 2.9 million homes, or one out of every 45 homes, suffered a foreclosure filing.

18.  Recently, all fifty (50) state attorneys general and numerous federal agencies, including the Consumer Financial Protection Bureau ("CFPB"), joined forces in an investigation into the foreclosure practices of mortgage loan servicers such as Ocwen Loan and Litton.  This reflects the realization that mortgage loan servicers, such as Defendants, have taken advantage of struggling homeowners to boost their profits.  As one expert explained, the "core problem" is "servicers' failure to service loans, account for payments, limit fees to reasonable and necessary ones, and provide loan modifications where appropriate and necessary to restore loans to performing status." *Problems in Mortgage Servicing From Modification to Foreclosure:  Hearing Before the S. Comm. on Banking, Housing & Urban Affairs*, 111th Cong., at 3 (Nov. 16, 2010) (written testimony of Diane E. Thompson, National Consumer Law Center) ("Thompson Testimony").

19.  In February 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable ("MHA") program.  In an effort to stem the foreclosure crisis, and as part of the MHA, HAMP was created.  HAMP lowers mortgagors' monthly payments to 31% of their verified monthly gross (pretax) income to make their

payments    more    affordable.        Home    Affordable    Modification    Program, http://www.makinghomeaffordable.gov/programs/lower-payments/pages/hamp.aspx (last visited April 22, 2014).  Homeowners have increasingly attempted to utilize the benefits of HAMP since 2009.

20.    Unfortunately, HAMP has been abused by servicers such as Defendants.  *See* Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown,* Mar. 8, 2011 ("Pierce, et al., *Meltdown*"), *available at* http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown.    The "average rate of [mortgage] modifications in the past two years is not significantly different than the rate before HAMP launched." *Id.*  Indeed, since HAMP was launched in April 2009, applicants have waited many months for modifications – well beyond the three months contemplated under the program. *Id.*

21.    Upon information and belief, Defendants do not own the loans on which they function as servicers, and in the event of a foreclosure, they recover their expenses and fees *before* the investors get paid.  In fact, foreclosure is a lucrative profit center for Defendants. Economic factors that disincentivize Defendants from meeting their obligations to facilitate loan modifications include the following:[2]

- The monthly servicing fee that Litton and Ocwen Loan collect, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool.  Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Litton and Ocwen Loan charge borrowers that are in default constitute a significant source of revenue to them.  Aside from servicing fee income Litton and Ocwen Loan directly receive, late fees and "process management" fees are often

---

[2]    *See* Diane E. Thompson, *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior,* NATIONAL CONSUMER LAW CTR. (Oct. 2009) ("*Servicers Foreclose*").

added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports, and financing costs.

- Loan servicers such as Litton and Ocwen Loan may be required to repurchase loans from the investor in order to modify the loan. This presents a substantial cost and loss of revenue, and a risk of lost capital, that can be avoided by keeping the loan in a state of temporary modification or lingering default.

22.    On November 1, 2012, Ocwen Financial hosted a conference call to discuss its third quarter 2012 financial results. During the call, Ocwen Financial's Executive Chairman, William Erbey, boasted that its "cost of servicing non-performing loans is approximately [70%] lower than the industry average" and that Ocwen's "low cost structure" and "ability to bring down advances . . . translates into strong cash flow" for Ocwen Financial.

23.    According to a news report entitled "Litton/Ocwen Foreclosure Threats | Not Missed a Payment and Yet Foreclosure Warnings Keep Arriving," as of October 14, 2011, Ocwen Loan had 890 complaints filed against them with the Better Business Bureau and had an "F" rating. *See* http://4closurefraud.org/2011/10/14/littonocwen-foreclosure-threats-not-missed-a-payment-and-yet-foreclosure-warnings-keep-arriving/ (last visited April 22, 2014). As of April 16, 2014, Ocwen Loan continues to have a solid **"F"** rating, with 2,647 complaints filed against it. *See* http://www.bbb.org/central-florida/business-reviews/loan-servicing/ocwen-loan-servicing-in-orlando-fl-13002055 (last visited April 22, 2014).

24.     Since HAMP's inception, the number of trial "TPP" modifications cancelled by participating servicers such as Defendants has vastly exceeded the number of conversions to permanent modifications.  During this period, upon information and belief, of approximately 1.4 million trial modifications started, roughly 729,000 were cancelled and only about 550,000 trials were converted to permanent modifications.  *See* U.S. GOV'T ACCOUNTABILITY OFFICE, TROUBLED ASSET RELIEF PROGRAM: STATUS OF PROGRAMS AND IMPLEMENTATION OF GAO RECOMMENDATIONS (Jan. 12, 2011) GAO-11-74, at 35.

25.     Central to the failure of HAMP is a pattern of arbitrary and inequitable actions by servicers such as Defendants, the purpose and effect of which has been to prevent TPP modifications from proceeding to permanency.  According to ProPublica, most of the canceled HAMP TPP modifications have occurred "despite the fact that the homeowner had made all of the payments." Pierce, et al., *Meltdown*.  And in nearly one-quarter of modification rejections, servicers cited "missing" or "incomplete" documents as the reason for the denial.  *Id.* (analyzing Treasury Department data).  ProPublica estimates that almost half a million homeowners may have been rejected because of documents purportedly "lost" by servicers such as Defendants.

26.     Upon information and belief, servicers such as Ocwen Loan and Litton have repeatedly offered temporary "repayment plans" in lieu of permanent modifications.  However, interminable temporary repayment plans harm homeowners who are left with no finality and no permanent modification of the terms of their mortgages.

27.     Upon information and belief, servicers such as Ocwen Loan and Litton have also rejected homeowners for a HAMP modification and instead have offered proprietary "alternative modifications" with terms more favorable to the servicers and those to whom they report and more onerous to homeowners than HAMP modifications.

28.     Servicers delay and obstruct mortgagors, forcing them to submit the same paperwork repeatedly, returning or refusing to accept payments, and otherwise thwarting mortgagors' sincere efforts to obtain permanent modifications. Thompson Testimony at 9-13 (describing examples of how servicers drag out the mortgage modification process).

29.     Upon information and belief, the objective of these tactics is to profit at the expense of distressed homeowners.  Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000 for each HAMP modification.  However, this incentive is countered by a number of financial factors that make it more profitable for servicers such as Ocwen Loan and Litton to avoid permanent modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by Litton and/or Ocwen Loan because Defendants do not carry a significant risk of loss in the event of foreclosure.

30.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Litton, as directed by Goldman Sachs, and Ocwen Loan, as directed by Ocwen Financial, have undertaken a pattern and practice to serially string out, delay, and otherwise hinder the modification processes that they undertook to facilitate. Ocwen Loan's and Litton's delay and obstruction tactics have taken various forms with the common result being that the homeowners serviced by Litton and Ocwen Loan, who are eligible for permanent modifications, have not received the permanent modifications to which they are entitled.

31.     Not surprisingly, Litton and Ocwen Loan have pitiful records for HAMP modifications. In August 2010, the U.S. Treasury reported that Litton had 47,451 HAMP-eligible

loans in its portfolio. Of these loans, just 8,447 resulted in permanent modifications (approximately 17%) even though many more homeowners had made the payments and submitted the documentation required by their TPP agreement. That same report indicates that Litton is among the worst servicers in the nation in terms of the conversion of trial period plans into permanent modifications.

32.     A January 19, 2010 *ProPublica* article, *"Logjam Continues for Loan Mods; Big Banks Fare Poorly, Data Show"* reported that Ocwen Loan had placed only about 20% of its eligible homeowners into HAMP trials, and funneled many more of its customers into so-called *"**inhouse modifications**,"* which provide terms **that are substantially less favorable** to the borrower than modifications under HAMP. *See also* Andy Kroll, *Can Anyone Stop the Predatory Lenders?*, Mother Jones, Jan./Feb. 2010, *available at* http://www.motherjones.com/politics/2010/01/mortgage-sharks-foreclosing ("Through no fault of her own, Ocwen incorrectly processed or lost dozens of [the mortgagor's] payments and charged her more than $2,000 in late fees and thousands more in additional charges—all without notifying her.").

33.     Further, in a post dated May 2, 2012 on the "Consumer Affairs" website, one consumer commented on Ocwen Loan:

> I was with Litton Loan Servicing and had been trying to get a modification for 2 years as my fiance passed away, leaving me to care for our 2-year-old twin boys. I was struggling to pay my mortgage with the cost of daycare. My kids were not able to get Social Security from their father as he was ill and did not pay enough into Social Security. I had my loan with Litton for 5 years and upon the 5th year (October 2011), I was told my loan was sold to Ocwen. Litton advised all modification paperwork would be transferred to Ocwen to continue making my payments. I have never been late (30 days). I received a proposal to modify my loan from Ocwen on 12/09/2011. I had a balloon disclosure in which I had multiple questions and I had to schedule and call back with an account manager in which I had several questions on the balloon disclosure interest rates, trial payments, etc.
>
> ***Never once was I advised that my credit was being reported negative.*** I was told about past due balances: however, when I questioned that, the representatives always indicated they just had to disclose this information, but I was past due because I was

under "modification". *In my proposal and agreement I signed and faxed back, it was never indicated I was being reported negative to the credit bureau.* I was told the payment I made in December went toward loan suspense, thus not making anything due again until 02/01/12, which I paid on 02/06/12.

*I paid every payment I was told to pay.* When I was offered the modification in December 2011, my loan was contractually current. Never was I told that if I didn't make my normal monthly payment on top of my modification payment, this would reflect negatively on my credit. If I would have known this, I would have continued paying as agreed. The rep that I talked to doesn't care. They have cell phones ringing in the background, they laugh, they eat and think this is a game. *My credit is ruined and they do not care nor understand. I have disputed this with the credit bureau per Ocwen.* It's easier that way. So they then updated my credit report to reflect $5800 past due that's 90 days late; however, I'm current according to the representative. But my credit report does not reflect this. So I faxed proof and I received a letter advising they reported correctly. I'm not sure what to do; however, I think this company is scamming or trying to get my house as it has equity.

*See* http://www.consumeraffairs.com/finance/ocwen_loan.html?page=18 (emphasis added) (last visited April 22, 2014).

34.     On this same "Consumer Affairs" website, on April 20, 2012, a consumer commented on Ocwen Loan:

My loan was sold to Ocwen also by Litton Loan Servicing and I received a letter in March stating that I owed them property taxes from 2011. If I elect to pay the advance in full at this time, to please remit payment to the address shown below, along with a copy of this and escrow portion will be removed. Easy right? So I sent them proof from my city clerk and county treasurer and my copies of my cashed checks and they still haven't removed and keep changing their story. *They made me pay a late fee when I didn't owe one.* I have made complaints with the Federal Trade Commission and with the NY Department of Finance.

I refuse to pay money I don't owe and our Government does need to step in and help us with this company. I have been dealing with this for weeks now and I am sick of getting nowhere, and when you ask for a manager or supervisor or someone that can tell you what is going on, they don't do it and give you another excuse. I would suggest that anyone going to this company on their own freewill, needs to have their head checked.

*See* http://www.consumeraffairs.com/finance/ocwen_loan.html?page=18 (emphasis added) (last visited April 22, 2014).

35.     On this same "Consumer Affairs" website, on April 19, 2012, a consumer commented on Ocwen Loan:

> In September 2011, I received a written notice from Litton Loan, LLC that my mortgage was being transferred to Ocwen Loan, LLC.  I then received a regular monthly statement from Litton and made my September payment to Litton through my bank, the same way I always have. In October, I received my first monthly statement from Ocwen, and it showed that I had not paid my September payment.
>
> *I called Ocwen and was told that it would carry over and that no late charges or credit reporting could happen for the first 90 days of the transfer. I have been calling every month since October 2011. They have sent me letters to notify me that they needed detailed information from me to validate the payment. I have been emailing and faxing this information every time I get the same response from them.  It is an endless circle.*
>
> When I asked for a supervisor, I was told that there was no one to transfer me to, and when I asked to be transferred to the Ocwen research department, I was told I can't be transferred there either. What? I can't talk to the people, who are actually reviewing the documents that I am sending in to validate the payment?  *They are adding up late charges and trashing my credit.* I have bank statements that I have been sending them that clearly prove I made the payment to Litton Loan, LLC. And I am certain that they cannot show that they ever sent me a September 2011 statement for payment. Please help all of us that are Ocwen victims!

*See* http://www.consumeraffairs.com/finance/ocwen_loan.html?page=18 (emphasis added) (last visited April 22, 2014).

36.     Upon information and belief, even where loan modifications are agreed upon, servicers such as Defendants continue to abuse the loan payment process, incorrectly processing or "losing" payments, charging late fees and penalties, misapplying escrow monies, and otherwise causing harm to homeowners.

### A.     Defendants' Participation in HAMP

37.     Ocwen Loan executed a Servicer Participation Agreement ("SPA") with the Treasury Department on April 16, 2009, attached as **Exhibit A** ("Ocwen SPA"), thereby making Ocwen Loan a participating servicer in HAMP.

38.    On August 6, 2009, Larry B. Litton, Jr., President and Chief Executive Officer of Litton, executed an SPA, attached as **Exhibit B** ("Litton SPA"), thereby making Litton a participating servicer in HAMP.

39.    The Ocwen SPA and Litton SPA incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, letters, directives, or other communications" issued by the Treasury, Fannie Mae, or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation." Ocwen SPA at ¶1.A; Litton SPA at ¶1.A.

40.    Defendants offer HAMP TPPs to eligible homeowners by way of a HAMP TPP agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners who execute the agreement and fulfill the documentation and payment requirements.

41.    Servicer Participation Agreements with the Treasury Department require a participating servicer to follow all guidelines, procedures, and directives issued as part of HAMP. According to the first supplemental directive ("SD") issued under HAMP, participating servicers must "use a uniform loan modification process to provide a borrower with sustainable monthly payments." Home Affordable Modification Program, SD 09-01, 4/6/2009, SD 09-01 at 1 ("HAMP SD"). *See also Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages 11* (ver. 3.0, Dec. 2010) ("MHA Handbook").

42.    As participating servicers, Ocwen Loan and Litton are required to evaluate all loans that are sixty (60) or more days delinquent or appear to be at risk of imminent default in order to determine which loans meet the HAMP eligibility criteria. HAMP SD 09-01 at 4. Ocwen Loan and Litton are also required to consider a HAMP modification if, after receiving hardship information

from a borrower, "the servicer concludes a current borrower is in danger of imminent default." *Id.* at 13. Next, Ocwen Loan and Litton are required by HAMP to determine the borrower's eligibility for a modification based on either "recent verbal financial information obtained from the borrower" or the borrower's submission of "the required documentation to verify the borrower's eligibility and income." *Id.* at 5.

43.     After obtaining the borrower's financial information, Ocwen Loan and Litton are required to calculate whether, by applying certain successive steps known as the "waterfall," in the stated order of succession, the borrower's total monthly payment can be reduced to 31% of the borrower's monthly gross income. *See* SD 09-01, at 8-10. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *Id.* Defendants do not have discretion as to how this formula is applied; HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached. *Id.*

44.     If the application of the waterfall produces terms that yield the target 31% monthly mortgage payment, Ocwen Loan and Litton must perform the Net Present Value ("NPV") test, which analyzes whether the value of a performing modified loan exceeds the value of foreclosing on the property. A positive NPV indicates that a modified loan is more valuable to the investor than if the loan is not modified. In the case of a positive NPV, HAMP rules require the servicer to offer the borrower a mortgage modification. If the NPV test yields a positive result, Ocwen Loan and Litton must offer the borrower a HAMP TPP contract. *See* SD 09-01, at 4, 14-15.

45.     HAMP regulations, in effect at all times relevant to this action, are clear that Ocwen Loan and Litton were required to prequalify borrowers for eligibility for a permanent HAMP

modification before entering into a HAMP TPP contract. Specifically, the borrower documents a financial hardship either by verbal representations to the servicer, which are later verified with documents as required by the HAMP TPP contract, or by submission of appropriate documents at the outset of the application process. *See* SD 09-01, at 5.

46.     Accordingly, if the homeowner executes the HAMP TPP agreement, complies with all documentation requirements, and makes all three HAMP TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner ***must be offered*** a permanent HAMP modification.

47.     Servicers such as Defendants are also required to suspend foreclosure proceedings during HAMP evaluations and during trial modification periods. *Id.* at 14. In addition:

> When discussing the HAMP process, the servicer should provide the borrower with information designed to help them understand the modification terms that are being offered and the modification process. Such communication should help minimize potential borrower confusion, foster good customer relations, and improve legal compliance and reduce other risks in connection with the transaction. A servicer also must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions.

*Id.* at 13; *see also* MHA Handbook at 45.

48.     Defendants are also required to acknowledge in writing the receipt of the borrowers' initial HAMP application packages within ten (10) business days and to include in their response a description of its evaluation, as well as a timeline for processing paperwork. HAMP SD 09-07, 10/8/2009, at 1; *see also* MHA Handbook at 47. Beginning in March 2010, Defendants were required to provide a toll-free number in all communications with borrowers that would allow them to reach a representative capable of providing specific details about the HAMP modification process. HAMP SD 10-02. 3/24/2010, at 4; *see also* MHA Handbook at 45.

49.     Thus, by signing the respective Ocwen SPA and Litton SPA, Defendants were legally bound to comply with HAMP guidelines, including the guidelines that require Defendants, on a timely basis, to identify loans facing default, to evaluate such loans by applying a standardized waterfall and NPV analyses, and to offer permanent HAMP modifications for all loans with a positive NPV. *Id.*

50.     In the event Defendants concluded that a loan being considered for modification does not have a positive NPV, HAMP guidelines require Defendants to "send a Non-Approval Notice and consider the borrower for other foreclosure prevention options." MHA Handbook at 73.

51.     Additionally, Defendants are required to retain all HAMP-related documentation for each loan serviced for a period of seven (7) years from the receipt or creation of such documentation, including: (a) all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs, and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up; (b) all documents and information related to the monthly payments during and after the trial period, as well as incentive payment calculations and such other required documents; (c) detailed records of borrower solicitations or borrower-initiated inquiries regarding HAMP, the outcome of the servicer's evaluation for modification under HAMP, and specific justification with supporting details if the request for modification under HAMP was denied; (d) Defendants' records must also be retained to document the reason(s) for a trial modification failure; (e) if a HAMP modification is not pursued when the NPV result is "negative," documentation of Defendants' consideration of other foreclosure prevention options is required; and (f) if a borrower under a HAMP modification lost good standing, documentation of Defendants' consideration of the

borrower for other loss mitigation alternatives must be retained.  HAMP SD 09-01 4/6/2009, at 13-14; *see also* MHA Handbook at 25-26.

52.     Upon information and belief, Ocwen Loan and Litton systematically and uniformly fail to meet their obligations under their respective Ocwen SPA and Litton SPA, and under the TPP agreements entered into with homeowners such as Plaintiffs, by, *inter alia*, thwarting implementation of permanent HAMP modifications for eligible mortgagors, keeping inadequate records, failing to disclose accurate information to mortgagors, charging unreasonable fees and doing so without explanation, violating federal and state laws, and leaving mortgagors in limbo regarding the status of their loans.

53.     Upon information and belief, Litton was unable to meet their obligations under HAMP in part because Litton was wholly unprepared to handle the influx of HAMP applications that resulted from the government's implementation of the program in March 2009.  The following conditions resulted in this failure:

(a)     Litton's HAMP team lacked seasoned and experienced default management employees and there was no reliance on loan modification experts.

(b)     Litton's HAMP application intake and approval process was run by numerous operators who maintained individual hard copy spreadsheets instead of a reliable software system to track the modification process.  Additionally, callers did not have a single point of contact when it came to having their applications reviewed.

(c)     Incoming HAMP application documents were not filtered through a document management system that logged, scanned, and associated documents with the correct file.  This led to the misplacement of required documents necessary to achieve a HAMP loan modification.

**B.** **Defendants' Benefit from Extracting as Much As Possible in Fees from Distressed Mortgagors**

54.     Upon information and belief, Defendants profit substantially by extracting as many fees as possible from mortgagors in distress.  Separate and apart from their obligations under the Ocwen SPA and Litton SPA, Defendants have selfish financial reasons for inviting struggling mortgagors to apply for a modification and make trial payments.

55.     As discussed above, Ocwen Loan and Litton receive $1,000 from the U.S. government for each HAMP modification they process.  However, Defendants stand to make significantly more money by also collecting fees and interest on mortgages that are past due, in default, or otherwise troubled.  Accordingly, upon information and belief, Defendants devised and implemented a uniform scheme, under the guise of HAMP, to take advantage of the very mortgagors they have been tasked to assist by impermissibly delaying loan modifications in order to collect excessive fees on troubled mortgages and then to agree to loan modifications but to continue their practice of improperly processing payments, handling escrow monies, and assessing fees and penalties, among other tactics.

56.     According to the earlier referenced *Servicers Foreclosure* report, a servicer's primary source of income is a "monthly servicing fee, [which is] a fixed percentage of the unpaid principal balance of the loans in the pool" of loans that are being serviced.  *Servicers Foreclose* at vi. Therefore, there is a significant incentive for servicers like Defendants to delay foreclosure as long as a mortgagor is making payments in any amount.  As the report explains:

> *[t]he monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable in the long term.* In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees.

*Id.* (emphasis added). Thus, by stringing a mortgagor along in a drawn-out modification process, Defendants can maintain or even increase their fees without ever having to actually modify the mortgage or properly perform a modification agreement once made.

57.     Former Litton employees have confirmed that the general practice and culture of Litton, as directed by Goldman Sachs, is to string homeowners along with no intention of providing actual and permanent modifications. Litton put processes in place that are designed to foster delay, mislead homeowners, and avoid modifying mortgage loans. "[L]oans were denied without the proper review under a *'denial sweep' strategy"* and homeowners were "denied the modification on the grounds that documents were missing, even though Litton's computer system reflected receipt of the necessary paperwork." Suzanne Kapner, *NY Fed investigates Goldman unit*, FINANCIAL TIMES, May 24, 2011 (emphasis added). "Goldman [Sachs] quickly sent down word to [Litton to] abandon loan modifications altogether and push homeowners into foreclosure before a [foreclosure] moratorium." Joel Sucher, *Goldman Sachs and Litton Loan Servicing: A Very Uncomfortable Divorce*, HUFFINGTON POST, Nov. 16, 2012, http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html.

58.     Defendants' loan servicing and foreclosure activities have been scrutinized by regulatory authorities.

59.     On September 1, 2011, Goldman Sachs entered into a Consent Order with the Board of Governors of the Federal Reserve System "to address a pattern of misconduct and negligence relating to deficient practices in residential mortgage loan servicing and foreclosure processing involving its former subsidiary, Litton Loan Servicing LP." Press Release, Board of Governors of the   Federal   Reserve   System   (Sept.   1,   2011),   *available   at*

http://www.federalreserve.gov/newsevents/press/enforcement/20110901b.htm. The Consent Order is attached hereto as **Exhibit C**.

60.    Also, on September 1, 2011, Ocwen Financial, Litton, and Goldman Sachs Bank USA[3] entered into an Agreement on Mortgage Servicing Practices with the State of New York Department of Financial Services Banking Department ("Department"), attached hereto as **Exhibit D** ("MSP Agreement") as a condition to Ocwen Financial's acquisition of Litton.  The MSP Agreement provided that these parties would adhere to mortgage servicing practices enumerated by the Department to protect consumers in New York from concerns related to servicing practices, including unfair and improper practices related to the mortgage servicing industry generally and improper denials of loan modifications specifically.

61.    However, the Department found numerous indications of Ocwen Financial violating the Agreement.  On December 5, 2012, Ocwen Financial's President and Chief Executive Officer, Ronald M. Faris, executed on behalf of Ocwen Financial a Consent Order Under New York Banking Law §44 with the Department, attached hereto as **Exhibit E** ("NY Consent Order").  The NY Consent Order came after the Department found evidence that Ocwen was engaging in mortgaging servicing abuse in the state of New York, where Ocwen was "servicing more than 40,000 residential home loan accounts in New York held largely by distressed homeowners." NY Consent Order at 1; *see also infra* ¶¶ 68-70.  According to the NY Consent Order, the Department found evidence of Ocwen's mortgage loan-servicing abuses, including:

> (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification … (3) failing to conduct an independent review of certain loan modification denials … (4) failing to … accurately reflect the status and current

---

[3]    Upon information and belief, Goldman Sachs Bank USA is a New York State-chartered bank and a direct wholly owned subsidiary of Goldman Sachs.

balance of the borrower's account … and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen.

NY Consent Order at 2-3.

62.    Based on the Department's concerns, as part of the NY Consent Order, Ocwen Financial agreed to appoint and cooperate fully with an "independent monitor to conduct a comprehensive review of Ocwen's mortgage servicing files and practices" and report to the Department. *Id.* at 3-6. Ocwen Financial further agreed to "submit to the Department for approval a written plan that is designed to improve and enhance Ocwen's servicing of [residential] mortgage loans" in the state of New York. *Id.* at 6.

63.    Superintendent of the Department, Benjamin M. Lawsky, made a statement regarding Ocwen and the NY Consent Order, stating:

> It is not enough to have banks and mortgage servicers sign agreements promising to reform their business. The best unrealized reforms won't protect homeowners.  To protect homeowners facing the risk of losing their homes, *we must ensure that the [servicing] companies are actually living up to their promises.   Following complaints about Ocwen's servicing practices, we conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance.   The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure.*

*See* Press Release, New York State Dep't of Fin. Servs., *Cuomo Administration Requires Major Mortgage Servicer to Install Monitor to Ensure Promised Reforms are Implemented* (Dec. 5, 2012), *available at* http://dfs.ny.gov/about/press/pr1212051.htm.

64.    Ocwen and Litton were investigated for their mortgage servicing practices by the CFPB and various state financial regulators who partnered with state attorneys general.  Ultimately, on December 16, 2013, Ocwen consented to entry of a Consent Judgment with the CFPB and various state attorneys general, in the matter of *Consumer Fin. Protection Bureau v. Ocwen Fin. Corp.*, No. 1:13-cv-02025 (D.D.C.), attached hereto as **Exhibit F** ("Consent Judgment").  Pursuant

to this Consent Judgment, Ocwen agreed to comply with servicing standards set forth in the Consent Judgment and pay $127.3 million in relief to foreclosed-upon consumers and in administrative costs (likely pennies on the dollar), and provide $2 billion to homeowners at risk of foreclosure to reduce the principal on their loans. *Id.* Based on the CFPB's investigation, this settlement purports to address Ocwen's servicing of loans, including, but not limited to, the practice of failing to honor in-process loan modifications acquired from other servicers, failing to maintain accurate account statements, failing to timely and accurately apply payments made by borrowers, improperly denying loan modification relief to eligible borrowers, and providing false or misleading reasons for denial of loan modifications. *Id.*; *see also* Frequently asked questions about the Ocwen settlement, http://files.consumerfinance.gov/f/201312_cfpb_common-questions_ocwen.pdf (last visited April 22, 2014). The Consent Judgment covers loans that were serviced by Ocwen Loan and Litton between January 1, 2009 and December 31, 2012. *Id.* These practices cost homeowners improper fees and charges, unreasonable delays, and expenses to obtain loss mitigation relief. *Id.*

65.     Defendants have profited greatly from these complained of practices and abuses. For example, Ocwen Financial, the parent company of Ocwen Loan, recorded record-setting revenue of $232.7 million for the third quarter of 2012. *See* Ocwen Financial Third Quarter Results on Form 10-Q filed with the SEC on November 2, 2012, available at http://shareholders.ocwen.com/sec.cfm?DocType=Quarterly&Year=&FormatFilter=. Third Quarter business highlights include "deferred servicing fees related to delinquent borrower payments not accrued on Ocwen's balance sheet amounted to $295 million at the end of September 2012." *Id.*

C.    **The DuMont Plaintiffs**

    1.    **The DuMont Plaintiffs' Relationship with Litton and Litton's Deceptive Denial Sweep Misconduct**

66.    On July 19, 2010, the DuMont Plaintiffs submitted a HAMP application to Litton. From July 2010 to June 2011 (nearly one year), the DuMont Plaintiffs engaged in numerous communications with Litton regarding their HAMP application and *resent* requested documents countless numbers of times. However, throughout this period of time, Litton repeatedly claimed that the documents it had requested were never received. This claim was false as all properly requested documentation had been submitted by the DuMont Plaintiffs.

67.    On May 28, 2011, the DuMont Plaintiffs received a letter from Litton stating that their request for a HAMP modification had been reviewed and denied for the following purported reason: "[W]e are unable to offer you a HAMP modification because you did not provide us with the documents we requested."

68.    This was false, as the DuMont Plaintiffs had sent the required documentation for their HAMP application to Litton over and over again throughout the past year since their HAMP application had been submitted. In response to this letter, on May 28, 2011, the DuMont Plaintiffs wrote to Litton:

> I am very concerned about the letter I received. We have repeatedly discussed letters with you that we have been receiving by Litton asking us for additional information and each time we call it is discovered that you do in fact have everything needed for HAMP.
>
> Now today, we have received the attached letter that says we were denied because we have not responded to requests for more information.
>
> This is incorrect. We have made repeated calls and discussed the needs with Litton. Each time we have been told that we have everything to your offices that is required.
>
> Our representative, Milton Earl, has even made numerous notations on the account informing the departments that the requested information that the letters kept asking for is in your files.

Please help. Call me at 570-XXX-XXXX. Please do not hang up. I receive multiple calls from Litton and when I answer I am hung up on.

I will contact the Government agency that oversees HAMP now to make sure that procedures are being followed correctly.

I have left a message with my rep and am faxing a copy of this letter to you 713-793-4923.

Jonathan Grimes

69.   On June 10, 2011, the DuMont Plaintiffs received a letter response from Litton again explaining Litton's purported reasons for denying their HAMP application and deceptively holding itself out as committed to assisting homeowners in distress with foreclosure alternatives. The letter provided:

> Litton is committed to assisting homeowners in financial distress with a variety of loss mitigation options in order to avoid foreclosure and allow the customer to retain homeownership.

*     *     *

> However, on May 19, 2010, Litton was required to deny the request for a HAMP modification because you did not provide us with all of the required documentation needed to proceed with the modification review process. . . . [T]he loan is currently being reviewed for a non-HAMP modification.

70.   That same day, on June 20, 2011, the DuMont Plaintiffs again responded to Litton's denial letter, stating, in relevant part: "Multiple letters were received by us requesting the same materials. Each time we called regarding such a letter, we were told that the information had been received and to disregard the letter. We also want to make it clear that no warning of HAMP denial was ever received."

71.   The DuMont Plaintiffs had timely submitted all paperwork required for their HAMP application to be considered, but Litton failed to consider the HAMP application. The only plausible explanation for this was that the DuMont Plaintiffs' HAMP modification application was denied in one of Litton's mass denial sweeps which took place during this very time period, whereby, pursuant

- 25 -

to Goldman Sachs' instructions, Litton denied the vast majority of all pending HAMP applications without prior review or analysis for pure financial motives.

72.     As a result of the DuMont Plaintiffs being improperly denied a HAMP modification, they have suffered ascertainable damages in the form of increased interest and service fees, a longer loan payoff time, and a higher principal balance on their mortgage loan.

73.     The DuMont Plaintiffs were left with no recourse but to pursue the alternative loan modification.

### 2.     The DuMont Plaintiffs' TPP Agreement

74.     On June 24, 2011, the DuMont Plaintiffs received a non-HAMP TPP agreement from Litton along with a letter notifying them that they were approved to enter into a three (3)-month trial payment plan under an alternative, non-HAMP modification program.   This TPP agreement provided: "After all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified." The TPP agreement further provided that the interest rate on the DuMont Plaintiffs' loan *would be* reduced to 2% (from nearly 8%) if they complied with the TPP agreement. In order to accept the offer, the DuMont Plaintiffs were to make the following three (3) new monthly "trial period payments" in a timely manner:

| 1st payment | $1,301.78 by 8/1/2011 |
|---|---|
| 2nd payment | $1,301.78 by 9/1/2011 |
| 3rd payment | $1,301.78 by 10/1/2011 |

75.     On July 5, 2011 and July 15, 2011, the DuMont Plaintiffs made two separate payments ($1,083.77 and $218.01 = $1,301.78) to Litton to cover the first payment installment that was due August 1, 2011.

76.     On July 18, 2011, the DuMont Plaintiffs sent a certified letter to Litton confirming that the first payment due August 1, 2011 in the amount of $1,301.78 was sent.

77.     On July 25, 2011, the DuMont Plaintiffs telephoned Litton and spoke with Ms. Thomas who confirmed that the first payment was received by Litton.

78.     On August 15, 2011, Litton sent the DuMont Plaintiffs a notice that the servicing of their loan had been transferred to Ocwen Loan and that future payments should be made to Ocwen Loan.

### 3.     Ocwen Loan's Deceptive Misconduct with the DuMont Plaintiffs

79.     In or about August 2011, Ocwen Loan assumed Litton's TPP contract with the DuMont Plaintiffs. In September and October 2011, the DuMont Plaintiffs made the other two trial payments to Ocwen Loan pursuant to the TPP contract, in the amounts of $1,301.78 each.

80.     Then, on October, 18, 2011, the DuMont Plaintiffs received a *notice of default* from Ocwen Loan.

81.     That same day, on October 18, 2011, the DuMont Plaintiffs sent Ocwen Loan a letter stating that they had completed their three (3) trial payments, requesting that Ocwen Loan send them the alternative modification paperwork as per the terms of their TPP contract.

82.     On November 1, 2011, the DuMont Plaintiffs spoke with "Devyani K." and "Srinivas Kurugodu" of Ocwen Loan regarding the above notice of default, and they were told to ignore the notice.

83.     On November 11, 2011, the DuMont Plaintiffs received the alternative, non-HAMP modification agreement from Ocwen Loan. Pursuant to the modification agreement, the DuMont Plaintiffs' loan was to be automatically modified on January 1, 2012 with a new maturity date of August 1, 2035, with the first modified payment in the amount of $1,251.23 due on January 1, 2012. The agreement further provided that the new principal balance of the DuMont Plaintiffs' loan would be $173,842.15 and that the interest rate would be reduced to 2%.

84.     On November 11, 2011, the DuMont Plaintiffs signed and returned the alternative modification agreement to Ocwen Loan with a letter stating that the trial payments had been completed.  They also confirmed in the letter to Ocwen Loan that the first new modified payment of $1,251.23 was to be made by January 1, 2012, as Ocwen Loan had instructed.

85.     Further, in the same November 11, 2011 letter, the DuMont Plaintiffs re-confirmed that Ocwen Loan's representatives had instructed them to ignore the purported notice of default they had received on October 18, 2011.

### 4.     Ocwen Loan's Breach of the TPP Agreement

86.     On December 20, 2011, the DuMont Plaintiffs received a letter from Ocwen Loan, dated December 7, 2011, which stated the following:

Dear Customer:

Thank you for your recent application for a modification.  Based on our review: **We are unable to offer you a modification because: You failed to send the payment or agreement within the required timeframe.**

(Emphasis in original.)

87.     On December 20, 2011, the DuMont Plaintiffs spoke with "Azam" at Ocwen Loan who told them that Ocwen Loan needed another signed copy of the alternative modification agreement, even though the DuMont Plaintiffs had already executed and delivered it to Ocwen Loan on November 11, 2011.

88.     On December 23, 2011, the DuMont Plaintiffs spoke with "Eve" at Ocwen Loan. Eve requested that the DuMont Plaintiffs send her proof of the TPP agreement that Litton sent them on June 24, 2011.  On that same day, the DuMont Plaintiffs faxed Eve the TPP agreement, dated June 24, 2011.

89.     On December 26, 2011, the DuMont Plaintiffs submitted their January 2012 payment in the amount of $1,215.23 to Ocwen Loan.

- 28 -

90.     On January 3, 2012, the DuMont Plaintiffs spoke with "Mary" at Ocwen. Mary stated to them that Ocwen Loan had all the necessary documents for the alternative modification agreement and that its personnel were presently reviewing those documents.

91.     On January 10, 2012, the DuMont Plaintiffs submitted their February 2012 payment in the amount of $1,215.23 to Ocwen Loan.

92.     On January 12, 2012, the DuMont Plaintiffs spoke with "Sumit" at Ocwen Loan. Sumit stated that the DuMont Plaintiffs were delinquent. Sumit then scheduled a call back to the DuMont Plaintiffs with a Relationship Manager for February 3, 2012.

93.     On January 14, 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated January 10, 2012. The letter stated as follows with respect to the DuMont Plaintiffs' January 2012 payment:

Re:     INSUFFICIENT TO CURE DEFAULT
        Loan Number: 7090996435

Dear Mortgagor(s):

Ocwen recently received funds from your loan in the amount of $1,215.23. These funds are being returned in the same form (check, Western Union, MoneyGram, etc.) in which they were received.

These funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative arrangements have been agreed to. As indicated in the Notice of Default that was previously sent to you, payments are less than the amount required to reinstate the mortgage loan will be returned and that **will not stop any foreclosure proceedings that have begun**.

To cure the default you must pay the full amount due. To determine the amount due or discuss other possible alternatives that may be available to avoid a foreclosure sale, you should **contact your Home Retention Consultant immediately at (877) 596-8580**.

(Emphasis in original.)

94.     On January 26, 2012, the DuMont Plaintiffs received an automated call from Ocwen Loan stating that there was a change to their account. On that same date, the DuMont Plaintiffs

called Ocwen Loan and spoke with "Gaurav." Gaurav stated that the DuMont Plaintiffs' account was delinquent.

95.     On February 3, 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated January 30, 2012, that stated, in relevant part with respect to the DuMont Plaintiffs' February 2012 payment:

> Re:   INSUFFICIENT TO CURE DEFAULT
>       Loan Number: 7090996435
>
> Dear Mortgagor(s):
>
> Ocwen recently received funds for your loan in the amount of $1,215.23. These funds are being returned in the same form (check, Western Union, MoneyGram, etc.) in which they were received.
>
> These funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative arrangements have been agreed to. As indicated in the Notice of Default that was previously sent to you, payments are less than the amount required to reinstate the mortgage loan will be returned and that **will not stop any foreclosure proceedings that have begun**.
>
> To cure the default you must pay the full amount due. To determine the amount due or discuss other possible alternatives that may be available to avoid a foreclosure sale, you should **contact your Home Retention Consultant immediately at (877) 596-8580.**

(Emphasis in original.)

96.     On February 4, 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated January 25, 2012 that stated, in relevant part:

> Loan Number: 7090996435
> Property: 110-112 W River St, Wilkes Barre, PA  18702
>
> Dear Borrower(s),
>
> Recently we called your attention to your severely delinquent mortgage loan referenced above. We either have not heard from you or we have not reached a resolution. It is imperative that you contact us immediately to resolve this matter. Failure to do so can result in the accumulation of fees and costs associated with foreclosure, the sale of this property at auction and even eviction.
>
> Time is running out.

We may have resolutions available to help you avoid losing your home and having to make plans to vacate the property. Remember, poor credit may affect your ability to secure another place to live even as a tenant of a rental property.

There is still time to resolve this matter, and we may have programs to help you.

Contact the Customer Care Center today at 1-800-74OCWEN (1-800-746-2936) to learn how this matter can be resolved and avoid the unnecessary inconvenience and added expense of foreclosure.

Helping Homeowners is What We Do.

97.     On February 8, 2012, the DuMont Plaintiffs called Ocwen Loan and spoke with "Saheb." Saheb told the DuMont Plaintiffs that their account would be modified, but that Ocwen Loan needed to receive a payment. The DuMont Plaintiffs explained that the payments had been returned. Saheb told the DuMont Plaintiffs to send a cashier's check to Ocwen Loan, Attn: Cashier Dept., 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409.

98.     On February 9, 2012, the DuMont Plaintiffs sent a cashier's check in the amount of $1,251.23 to the above address.

99.     On February 15, 2012, the DuMont Plaintiffs called Ocwen Loan and spoke with "Winston." Winston told them that their recent payment had been rejected as there was a "payment refusal" hold on their account. Winston then asked them to call at the end of the week to learn the status of Ocwen Loan's "payment refusal" hold.

100.     On February 22, 2012, the DuMont Plaintiffs called Ocwen Loan and spoke with "Vivek." Vivek told them that he was unable to discuss their account and that he would have someone call them back.

101.     On February 27, 2012, the DuMont Plaintiffs called Ocwen Loan and left a message on the company's voicemail.

102.     On February 28, 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated February 23, 2012, returning their February 9, 2012 cashier's check in the amount of $1,251.23 and stating, in relevant part:

Re:     INSUFFICIENT TO CURE DEFAULT
Loan Number: 7090996435

Dear Mortgagor(s):

Ocwen recently received funds for your loan in the amount of $1,215.23.  These funds are being returned in the same form (check, Western Union, MoneyGram, etc.) in which they were received.

These funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative arrangements have been agreed to.  As indicated in the Notice of Default that was previously sent to you, payments are less than the amount required to reinstate the mortgage loan will be returned and **will not stop any foreclosure proceeding that have begun**.

To cure the default you must pay the full amount due.  To determine the amount due or discuss other possible alternatives that may be available to avoid a foreclosure sale, you should **contact your Home Retention Consultant immediately at (877) 596-8580.**

(Emphasis in original.)

103.     In February 2012, Ocwen Loan *initiated foreclosure proceedings on the DuMont Plaintiffs' loan.*

104.     On March 8, 2012, the DuMont Plaintiffs called Ocwen Loan.  The Ocwen Loan representative told the DuMont Plaintiffs that they owed Ocwen Loan the amount of $29,000.

105.     On March 15, 2012, the DuMont Plaintiffs called Ocwen Loan and were told that their alternative loan modification application had expired.  On this call, the DuMont Plaintiffs were told by Ocwen Loan that they needed to re-apply for a loan modification.

106.     On April 3, 2012, the DuMont Plaintiffs called Ocwen Loan and spoke with "Rakesh."  Rakesh told the DuMont Plaintiffs that if they desired to reinstate the alternative modification agreement the DuMont Plaintiffs would have to pay Thirty-One Thousand Dollars and

No Cents ($31,000). Rakesh further said that his notes indicated that the DuMont Plaintiffs had previously requested a short sale of the property.

107.   On April 3, 2012, the DuMont Plaintiffs sent a certified letter to Ocwen Loan disputing that they owed $31,000 to bring the account current and stating that they **had not** requested a short sale of their property.

108.   The DuMont Plaintiffs received a letter from Ocwen Loan, dated April 3, 2012, returning their March 22, 2012 check in the amount of $1,251.23 and stating, in relevant part:

> Re:   INSUFFICIENT TO CURE DEFAULT
> Loan Number: 7090996435
>
> Dear Mortgagor(s):
>
> Ocwen recently received funds for your loan in the amount of $1,215.23.  These funds are being returned in the same form (check, Western Union, MoneyGram, etc.) in which they were received.
>
> These funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan and no alternative arrangements have been agreed to.  As indicated in the Notice of Default that was previously sent to you, payments are less than the amount required to reinstate the mortgage loan will be returned and **will not stop any foreclosure proceeding that have begun**.
>
> To cure the default you must pay the full amount due.  To determine the amount due or discuss other possible alternatives that may be available to avoid a foreclosure sale, you should **contact your Home Retention Consultant immediately at (877) 596-8580**.

(Emphasis in original.)

109.   On April 20, 2012, the DuMont Plaintiffs called Ocwen Loan and spoke with "Shabna" who told them that they had to pay $7,000 under their "forbearance plan." This statement was false as the DuMont Plaintiffs were not on a forbearance plan.

110.   On April 26, 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated April 23, 2012, regarding a notice of intent to terminate forbearance.  The letter stated:

> Loan Number: 7090996435

Property Address: 110-112 W River St, Wilkes Barre, PA  18702-000

## NOTICE OF INTENT TO TERMINATE FORBEARANCE

Dear Borrower(s):

At Ocwen, we value each customer.  You are important to us, and that is why we are sending you this notice to urge you to make payment or contact us to resolve the breached terms and conditions of your forbearance agreement.  The terms of your forbearance agreement require you to make scheduled payments, and Ocwen has not received your payment.  Therefore, failure to remit your past due forbearance payment(s) will result in the termination of your forbearance agreement. As a result, you will be required to reinstate your loan under the original terms of the Mortgage Note.

### Total Amount Due Under Forbearance Agreement:

| 01 | $7,507.38 |
|----|-----------|

### Total Amount Due Under Original Note:

| Principal and Interest | $18,424.09 |
|------------------------|------------|
| Escrow | $10,567.03 |
| Escrow Advance | $0.00 |
| Current Late Charges | $1,948.77 |
| CURRENT AMOUNT DUE | $30,939.89 |

111.    On May 4, 2012, Ocwen Loan sent the DuMont Plaintiffs yet another letter regarding their loan.  This letter stated:

RE:    OLS Loan No.: 7090996435
       Case Number 7090996435EQ1

The Escalated Case Management Department would like to thank you for your recent correspondence regarding the above referenced loan.

Our office has re-evaluated the handling of your account in relation to your Making Home Affordable application and/or program guidelines.

The outcome of our review is outlines below:

**Your loan was service transferred from Litton to Ocwen Servicing on 9/1/2011.**

**Prior to the transfer, your loan was approved for an Alternative Modification with Litton Loan.  However the modification was not finalized due to not**

receiving the payments as agreed.  Our office offered you an opportunity to make up all missed payments and would be willing to honor the terms of the Alternative Modification agreement, however, to date we have not received the funds needed to bring the plan current in the amount of $8,758.61 for November 2011-May 2012.

After carefully evaluating your escalated dispute our office has determined if the funds are received, Ocwen will process the modification according to the signed modification agreement or you are welcome to reapply for the Home Affordable Modification Program.  Therefore, your escalated case is now considered closed.

As a result of this review, our office mailed you a Home Affordable Modification Program (HAMP) application on 4/12/2012.  In addition, I have also enclosed a HAMP application for your convenience.  Please contact our home Retention department to discuss the reapplication process at 1-877-596-8580 or submit the completed application and supporting documentation to mod@ocwen.com or fax it to 407-737-6174.

(Emphasis in original.)

112.    On May 21, 2012, the DuMont Plaintiffs sent Ocwen Loan a check by overnight mail in the amount of $7,507.38, which the DuMont Plaintiffs and Ocwen Loan had agreed to instead of the $8,758.61.

113.    In June 2012, the DuMont Plaintiffs received a letter from Ocwen Loan, dated June 23, 2012 that stated, in relevant part:

Loan Number: 7090996435
Property Address: 110-112 W River St, Wilkes Barre, PA 18702

Dear Borrower(s):

Recently we called your attention to your severely delinquent mortgage loan referenced above.  We either have not heard from you or we have not reached a resolution.  It is imperative that you contact us immediately to resolve this matter. Failure to do so can result in the accumulation of fees and costs associated with foreclosure, the sale of this property at auction and even eviction.

Time is running out.

We may have resolutions available to help you avoid losing your home and having to make plans to vacate the property.  Remember, poor credit may affect your ability to secure another place to live even as a tenant of a rental property . . . .

114.    In conclusion, as described in detail above, Ocwen Loan breached its TPP agreement with the DuMont Plaintiffs, as it failed to modify the DuMont Plaintiffs' loan on January 1, 2012 (or thereafter), as required by the TPP agreement.   Ocwen Loan failed to execute the Modification Agreement to make the permanent modification effective, as Ocwen Loan was required to do under the TPP agreement.  The DuMont Plaintiffs complied with all of the terms of the TPP agreement, making the three (3) trial payments on a timely basis and providing all required documentation. Despite this fact, Ocwen Loan breached the agreement, deliberately pushing the DuMont Plaintiffs' loan towards foreclosure and causing severe financial harm as discussed below.

### 5.    The DuMont Plaintiffs Were Damaged as a Result of Ocwen Loan's Breach of the TPP Agreement

115.    Ocwen Loan falsely reported the DuMont Plaintiffs delinquent on their mortgage to credit agencies and thereby damaged their credit.

116.    Ocwen Loan continues to charge the DuMont Plaintiffs late charges, increased principal, and other fees that should not be charged (*i.e.*, property valuation and inspection fees).

117.    The DuMont Plaintiffs entered into an TPP agreement with Defendants but suffered actual and ascertainable losses of money or property as a result of Defendants' breach of contract, including, but not limited to the payment of increased interest and service fees, a longer loan payoff time, a higher principal balance on their mortgage loan, and damage to their credit, penalties, and other improper charges.

118.    As of the filing of this Complaint, the DuMont Plaintiffs have yet to receive the Modification Agreement counter-signed by Ocwen.

119.    Upon information and belief, Defendants have engaged in the same deceptive course of conduct and pattern of practice as to thousands of other homeowners by failing to modify homeowners' loans in violation of TPP agreements.

- 36 -

### D.   Plaintiff Williams' Alternative Modified Contract

120.   On or about October 13, 2006, Plaintiff Williams received a mortgage for her home located at 55 Madison Street, Brooklyn, New York 11238, with the following terms: $750,000 at an interest rate of 7.720%.

121.   It was Plaintiff Williams' responsibility to pay her homeowners insurance and real estate taxes directly and she did so.

122.   By the beginning of 2010, Plaintiff Williams was experiencing financial troubles, and as of April 2010, Plaintiff Williams was in default of her mortgage loan.

123.   On or about April 30, 2010, Plaintiff Williams' loan was transferred to Ocwen Loan for servicing while it was in a default condition.

124.   In the summer of 2010, Plaintiff Williams put her home up for sale, and by the fall of 2010, she had received a short sale offer.

125.   Shortly thereafter, an Ocwen Loan representative informed Plaintiff Williams' real estate broker that the property was not eligible for a short sale because Plaintiff Williams' loan was being handled by the Ocwen Loan bankruptcy department. Thus, the real estate broker was unable to submit the short sale request.

126.   In or around October 2010, Plaintiff Williams called Ocwen Loan to attempt to determine why her loan was being handled by the bankruptcy department, since to her knowledge she was not a participant in any bankruptcy proceedings. She never received a satisfactory answer.

127.   In approximately November 2010, Plaintiff Williams received a notice from Ocwen Loan stating that her house was going to be put up for auction in February 2011.

### 1.   Plaintiff Williams and Ocwen Loan Entered into an Alternative Modification Agreement

128.   On or about December 7, 2010, Plaintiff Williams received correspondence from Ocwen Loan, dated November 29, 2010, offering an internal Ocwen Loan modification that would adjust her new principal loan balance to $367,472.67 upon completion of the affirmative steps. Specifically, the loan modification agreement provided:

> In order for the terms of this modification to become effective, you promise to make an initial down payment ("Down Payment") of $2,009.11 on or before 12/10/2010 and two (2) equal monthly payments in the amount of $2,009.11 to Ocwen ("Trial Period") beginning on January 1, 2011.

> If you successfully complete the Trial Period, your loan will be modified pursuant to the terms of this Agreement (the "Modification"), and your Note will become current and not in default.

129.   Plaintiff Williams executed the agreement and returned it to Ocwen Loan by the December 10, 2010 deadline, and she made the initial $2,009.11 payment to Ocwen Loan on December 9, 2010 via a Western Union transfer.

### 2.   Ocwen Loan's Breach of the Alternative Modification Agreement and Deceptive Misconduct

130.   Plaintiff Williams then received a statement from Ocwen Loan, dated December 31, 2010, which unilaterally changed the principal loan balance from $367,472.67 to $371,490.89.

131.   Plaintiff Williams protested this unilateral change in principal balance to Ocwen Loan, but without satisfaction.

132.   Plaintiff Williams made her trial payment for January 2011 on time.

133.   On or about January 21, 2011, Plaintiff Williams received an escrow notice from Ocwen Loan, dated January 7, 2011, stating that her monthly mortgage payment would rise to $2,774.31 on March 1, 2011 in order to cover escrow. The original terms of the modification, however, provided that Plaintiff Williams' modified mortgage loan would not include an escrow

unless the loan had originally included an escrow (which it did not), in which case the $2,009.11 payment included any requested escrow payments.

134.   Plaintiff Williams called Ocwen Loan to protest the imposition of an escrow payment and was instructed by a representative to continue making her trial payments of $2,009.11 and to purchase her own homeowners insurance and to make arrangements with the taxing authorities to pay her real estate taxes directly to them.

135.   Plaintiff Williams purchased her own homeowners insurance on January 24, 2011, which took effect on January 25, 2011.  Plaintiff Williams informed Ocwen Loan of this fact.

136.   Plaintiff Williams made her February 2011 trial payment of $2,009.11 on time.

137.   Shortly thereafter, Ocwen Loan sent a statement dated February 1, 2011, seeking payment on March 1, 2011 in the amount of $2,774.31 which included escrow amounts, despite Ocwen Loan's representations previously that the escrow would be removed if Plaintiff Williams handled those charges herself.  Plaintiff Williams called Ocwen Loan to protest the inaccurate statement and was told to continue paying $2,009.11.

138.   On March 9, 2011, Plaintiff Williams made her payment for March 2011 in the amount of $2,009.11 via a Western Union transfer.

139.   On or about March 10, 2011, Plaintiff Williams received an account statement from Ocwen Loan that showed receipt of her March 2011 payment and requesting the payment of $2,009.11 by April 1, 2011.  The statement did not request any monies for escrow.

140.   On April 1, 2011, Plaintiff Williams mailed her April 2011 payment and the funds were withdrawn from her bank account by Ocwen Loan on April 12, 2011.

141.   In or about April 2011, Plaintiff Williams received an escrow notice dated March 24, 2011, stating that Plaintiff Williams had an escrow shortfall and her monthly payments would be

raised to $2,600.03 to cover the shortfall or she could pay $2,215.20 all at once. In addition, on or about April 19, 2011, Plaintiff Williams received an account statement from Ocwen Loan seeking $2,600.03 for the May 2011 payment, which sum again included escrow monies.

142.   On April 21, 2011, Plaintiff Williams called Ocwen Loan and spoke with a representative named "Ray." Ray told Plaintiff Williams that she needed to make an additional payment of $950.26 towards the escrow amount. Further, Plaintiff Williams told Ray that in order for Plaintiff Williams to pay her taxes directly as per the term of the parties' loan modification agreement, Ocwen Loan needed to stop paying the taxes on her behalf. Ray assured Plaintiff Williams that once she made her payment of $950.26, her mortgage payments would return to the agreed upon amount of $2,009.11.

143.   Plaintiff Williams immediately sent the $950.26, and the funds cleared her bank account on May 5, 2011.

144.   Plaintiff Williams additionally made her mortgage payment for May 2011 in the amount of $2,009.11, as agreed. The funds cleared her bank account on May 9, 2011.

145.   Plaintiff Williams then received an account statement from Ocwen Loan dated May 17, 2011, stating that she owed $3,231.13 for her June 2011 payment. The amount requested again improperly included escrow monies and late charges.

146.   Plaintiff Williams attempted to contact Ocwen Loan but encountered long delays with the automated phone system and was hung up on several times by live persons once she was able to reach them.

147.   Plaintiff Williams also attempted to contact the Ocwen Loan "Research Department" and sent information to them, but she received no response.

148.    On May 30, 2011, Plaintiff Williams mailed her June 2011 payment in the amount of $2,009.11. These funds cleared her account on June 9, 2011.

149.    On or about June 1, 2011, Plaintiff Williams received a notification from Ocwen Loan via FedEx certified mail that her loan was thirty-one (31) days in default and that she could lose her home as a result.

150.    On or about June 1, 2011, Plaintiff Williams faxed a letter to Ocwen Loan reciting her on-time payment history and the problems that Ocwen Loan was causing with their improper and inconsistent imposition of demands for escrow monies. The letter asked Ocwen Loan to remove the escrow, refund escrow monies previously wrongfully collected, and fix her account to mark it as current and on time.

151.    Plaintiff Williams received no satisfactory answer from Ocwen Loan in response to her faxed letter.

152.    On or about June 6, 2011, Plaintiff Williams contacted the HOPE NOW hotline and spoke with a woman named "Carol." Plaintiff Williams and Carol made an appointment to call Ocwen Loan together, as Plaintiff Williams continued to have no success in reaching a live person at Ocwen Loan.

153.    On or around June 9, 2013, Plaintiff Williams and Carol called Ocwen Loan via conference call. They first spoke with "Madhu," who then transferred them to "Roshan," whereupon they were placed on hold. Roshan then came back on the line and attempted to tell Plaintiff Williams and Carol to call back later while he looked into the matter further. At that point, Carol replied that Roshan had already told them the same thing the first time he placed them on hold. Carol asked to speak to a specific department within Ocwen Loan. Roshan then replied that Plaintiff Williams' account had been corrected. Roshan stated that the need for an escrow was in the process

of being removed from Plaintiff Williams' account and her mortgage payments were in the process of being updated to show they were all current and paid.

154.    In or around the first week of August 2011, Plaintiff Williams received a letter from Ocwen Loan, noting that it had received Plaintiff Williams' June 1, 2011 letter, but providing no substantive response to it.

155.    Despite acknowledging receipt of Plaintiff Williams' June 1, 2011 letter and the Ocwen Loan representative's assurances to Plaintiff Williams and Carol that Plaintiff Williams' account was updated to show her corrected and proper non-delinquent status, Ocwen Loan sent Plaintiff Williams account statements from July 2011 through January 2012 improperly imposing a certified mail fee on Plaintiff Williams in connection with the May 2011 monthly payment that Ocwen Loan misapplied and claimed was late. Plaintiff Williams called Ocwen Loan several times in an effort to get the certified mail charge removed but received no satisfaction from Ocwen Loan. Plaintiff Williams eventually paid the certified mail fee under protest.

156.    Plaintiff Williams made her August 2011 payment on time in the amount of $2,009.11.

### 3.    Plaintiff Williams Was Damaged by Ocwen Loan's Breach of Contract and Deceptive Conduct

157.    On or about September 2011, Plaintiff Williams sought a personal loan but was denied. Upon inquiry, the reason given was that her credit report listed a mortgage payment of May 2011 that was paid more than thirty (30) days late. Plaintiff Williams called Ocwen Loan again, several times. When she finally spoke with customer service, Ocwen Loan admitted to Plaintiff Williams that her May payment was received on May 9, 2011 and that the thirty (30)-day late comment to the credit reporting agencies was false. Ocwen Loan assured her that it would be corrected by Ocwen Loan.

158.    Plaintiff Williams called Ocwen Loan again in October and November 2011 and was told the same thing.  At the end of November 2011, Ocwen Loan told Plaintiff Williams that the thirty (30)-day late comment had been corrected to the credit reporting agencies.

159.    On or about December 9, 2011, however, Plaintiff Williams learned that the thirty (30)-day late comment was still showing on her credit report.  Plaintiff Williams called Ocwen Loan to protest and was then told that she needed to send a letter to the Ocwen Research Department, which she did.

160.    On or about January 3, 2012, Plaintiff Williams spoke with a representative of Ocwen Loan about the correction to her credit report and was told that the Research Department said her credit report had been corrected.

161.    On or about January 18, 2012, Plaintiff Williams contacted the Department to complain about Ocwen Loan's false reporting to the credit reporting agencies.  Also, on January 18, 2012, Plaintiff Williams sent Ocwen Loan another written request to correct the false credit reporting.

162.    On or about January 24, 2012, Plaintiff Williams received a letter from the Department, stating that Ocwen Loan had until February 23, 2012 to respond to the issues she had raised.

163.    On or about January 27, 2012, Plaintiff Williams called Ocwen Loan and finally was allowed to speak with a representative named "Omar" in the Research Department.

164.    Omar initially claimed that the May 2011 payment was thirty (30) days late and that the check shown on her bank statement was for her April 2011 payment.  Plaintiff Williams pointed out to Omar that if what he said was true then Plaintiff Williams would have two thirty (30) day

delinquencies on her credit report. Omar then responded that Ocwen Loan had until February 23, 2012 to respond and hung up the call.

165.   Ocwen Loan responded to the Department by letter dated February 13, 2012. Ocwen Loan conceded that Plaintiff Williams had made her May 2011 payment on time and stated that it had submitted a request to the four major credit reporting agencies, Equifax, TransUnion, Experian, and Innovis, asking them to delete the negative credit reporting for the May 2011 payment.

166.   On or about February 19, 2012, Plaintiff Williams received a letter from Ocwen Loan listing her monthly payment history and under the column labeled "Account Status" it showed her monthly history from February 2011 through and including January 2012. All the months were depicted as "current" except for the month of May 2011. Instead of correctly noting that May 2011 was "current," Ocwen Loan falsely reported "No payment history available this month."

167.   To date, Ocwen Loan has failed to correct the negative information it supplied to the credit reporting agencies, namely that Plaintiff Williams made her May 2011 monthly payment on time.

168.   The false credit reporting by Ocwen Loan harmed Plaintiff Williams and adversely affected her credit and prevented her from obtaining a personal loan.

### E.   Plaintiff Adili

#### 1.   Litton's Wrongful and Deceptive Denials of Plaintiff Adili's HAMP Application in a "Denial Sweep"

169.   In or around January 2009, Plaintiff Adili suffered a reduction in income and was thus unable to make his full mortgage payment and was facing foreclosure notices. During that same time, Plaintiff Adili spoke with a representative at Litton seeking a HAMP modification, but at that time, HAMP programs were still being established.

170.     In or around August 2009, Plaintiff Adili filed for bankruptcy.   In or around September 2009, Plaintiff Adili began to make payments to Litton through bankruptcy.  In or around March 2010, Plaintiff Adili's bankruptcy was dismissed.

171.     Thereafter, on April 21, 2010, Plaintiff Adili submitted to Litton via fax a completed HAMP application and all of the required paperwork, including, among other documents, a complete copy of his most recent tax return with all schedules and forms, a signed IRS Form 4506-T (Request for Transcript of Tax Return), recent bank statements, and a profit and loss statement.

172.     On both May 10, 2010 and May 17, 2010, Litton sent letters to Plaintiff Adili confirming that Litton received Plaintiff Adili's HAMP application, but claiming that Litton was missing his most recently filed tax return and signed IRS Form 4506-T.  Despite having already sent these documents in with his application, Plaintiff Adili re-faxed these items to Litton on May 16, 2010, and yet again on May 18, 2010.

173.     On May 24, 2010, Plaintiff Adili wrote Litton: "I will be in Texas next week and if you have not received my documentation by today then I will hand deliver them to you in Texas."

174.     In a letter dated May 25, 2010 Litton responded: "We have noted the loan's records with the information you provided.   However, the loan reflects receipt of your modification documents.   Due to the volume of loan modification requests, please allow time for our Loss Mitigation Department to review the documents."

175.     Thereafter, Plaintiff Adili received a number of letters from Litton again requesting the same "missing" tax information that he previously sent to Litton in April 2010 with his HAMP application and multiple times thereafter.

176.    For example, on May 3, 2010, Plaintiff Adili wrote to Litton: "I have had no response

of your receipt of my form 4506-T form faxed to you numerous times.  Please contact me at (973)

[XXX-XXXX] with receipt of my fax and update of my Loan modification.  Thank you."

177.    On June 2, 2010, Litton responded by letter to Plaintiff Adili as follows: "We are in

receipt of the referenced document.  Due to the volume of correspondence received in this office, we

are unable to honor your request to call regarding the receipt of or non-receipt of the faxed

document(s)."

178.    Once again on June 17, 2010, Plaintiff Adili wrote to Litton asking for confirmation

of documents faxed to Litton: "I have once again faxed over documents for my modification today

and would appreciate a response thank you."

179.    On June 21, 2010, Litton responded to Plaintiff Adili: "The loan reflects receipt of

your modification documents.  However, due to the volume of loan modification requests, please

allow time for our Loss Mitigation Department to review the documents.  Once the documents have

been reviewed and verified, the loan's records will be updated."

180.    On July 2, 2010, Litton sent a letter to Plaintiff Adili denying his HAMP application

for a purported failure to provide requested information, stating as follows:

> Litton Loan Servicing LP ("Litton") has reviewed your request for a loan
> modification under the Home Affordable Modification Program ("HAMP").
>
> However, we are unable to offer you a HAMP modification because you did not
> provide us with the documents we requested.  A notice listing the specific documents
> we needed and time frame requires to provide them was sent more than 30 days.
>
>         *     *     *
>
> You loan has also been reviewed for a non-HAMP loan modification.
>
> However, you have failed to properly endorse or notarize the original Loan
> Modification Agreement and/or return the required funds, and the time frame to
> complete the modification has expired.   If foreclosure action has begun, it will
> continue until you make arrangements with us.

- 46 -

181.    Plaintiff Adili had submitted all paperwork for his HAMP application to be considered, but Litton failed to consider his HAMP application. Instead, upon information and belief, Plaintiff Adili's HAMP modification request was denied in one of Litton's mass denial sweeps.

182.    Further, Litton failed to fairly consider Plaintiff Adili for a non-HAMP loan modification. While Litton claimed in the above July 2, 2010 letter to have denied Plaintiff Adili for a non-HAMP modification because he did not return the signed "Loan Modification Agreement," that was not the case. Plaintiff Adili had never received a Loan Modification Agreement from Litton. In fact, Litton later admitted this to Plaintiff Adili in correspondence: "Unfortunately, the letter contained an error. A Loan Modification Agreement was not offer [sic] during the evaluation period."

183.    In August 2010, Plaintiff Adili continued to contact Litton, explaining that he provided all necessary paperwork for his HAMP application, and requesting a HAMP modification.

184.    On August 25, 2010, Litton responded to Plaintiff Adili's inquiries, stating: "We are unable to offer you a HAMP modification because you did not provide us with the documents requested. A written correspondence indicating all required documents needed along with the required time frame was sent to you more than 30 days ago. In addition, your loan has also been reviewed for a Non-HAMP modification. Unfortunately, are unable to offer you a modification at this time. Please contact our Default Counseling Department to discuss available options."

185.    Thereafter, Plaintiff Adili requested that Litton provide all available options to him. On August 30, 2010, Litton responded to Plaintiff Adili by letter as follows: "We recommend you contact our Foreclosure Department, at the default number listed below, to discuss the options that

are available to you.  In addition, you may also contact the foreclosure attorney's office of Powers, Kirn & Javardian at (856) 802-1000."

186.    Thereafter, Plaintiff Adili made a number of attempts to get Litton to reconsider his HAMP application that was improperly denied or to consider other alternatives to foreclosure.  In fact, in October 2011, Plaintiff Adili re-faxed his HAMP application and supporting paperwork to Litton in an attempt to get a modification of his loan.

187.    Despite Litton touting itself as dedicated to helping homeowners seek alternatives to foreclosure, Litton was only interested in pushing Plaintiff Adili's and other homeowners' loans into foreclosure in order to recover its advances on those loans.  Litton continuously referred Plaintiff Adili to Litton's foreclosure department.

188.    Upon information and belief, Litton denied Plaintiff Adili's HAMP application for illegitimate reasons as part of a mass denial sweep.

189.    As a result of Litton's unlawful denial of Plaintiff Adili's HAMP application, and failure to consider Plaintiff Adili for other loan modification alternatives, Plaintiff Adili has suffered ascertainable damages in the form of payment of increased interest and service fees, a longer loan payoff time, and a higher principal balance on his mortgage loan.

### 2.    Ocwen Loan's Unfair and Deceptive Conduct and Breach of Contract with Respect to Plaintiff Adili's Loan

190.    On October 14, 2011, Litton advised Plaintiff Adili that the servicing of his loan was being transferred to Ocwen Loan.  Plaintiff Adili was advised his HAMP application which had been resubmitted to Litton in October 2011 would now be transferred to Ocwen Loan to process.

191.    In or around April 2012, Plaintiff Adili received another HAMP application from Ocwen Loan.

192.   On that same date, Plaintiff Adili submitted his HAMP modification package to Ocwen Loan.

### a.   Ocwen Loan's TPP Contract with Plaintiff Adili

193.   On September 4, 2012, Ocwen Loan sent a TPP to Plaintiff Adili, advising him that he was approved for a HAMP trial plan. The TPP provided: "To accept this offer, you must make your first monthly 'trial period payment.' . . . After all trial period payments are timely made and you have submitted all the required documents, *your mortgage will be permanently modified*." (Emphasis added.)

194.   In order to receive the permanent modification, the TPP contract required Plaintiff Adili to make the following three (3) trial payments in a timely manner:

| 1st payment | $1,604.50 by 10/1/2012 |
| 2nd payment | $1,604.50 by 11/1/2012 |
| 3rd payment | $1,604.50 by 12/1/2012 |

195.   On October 9, 2012, after Plaintiff Adili made his first trial payment on time, Ocwen Loan sent Plaintiff Adili the HAMP modification agreement for his review. The accompanying cover letter provided: "As previously described, if you comply with the terms of the Home Affordable Modification Agreement Trial Period Plan, we will modify your mortgage loan and waive all prior late charges that remain unpaid."

196.   The HAMP modification agreement provided that if the preconditions to the modification were completed (trial payments and required documentation), Plaintiff Adili's "loan will automatically become modified on 1/1/2013" and "all unpaid late charged that remain unpaid will be waived." The agreement further provided that the new principal balance of the loan would be $348,339.19, with a deferred principal balance of $100,539.19, and that the interest rate would be reduced to 2%.

197.    Plaintiff Adili completed the other two trial payments on a timely basis and returned

all of the requested paperwork to Ocwen Loan, and on December 24, 2012, Plaintiff Adili signed the

HAMP modification agreement and returned it to Ocwen Loan.

198.    Plaintiff Adili made his January 2013 mortgage payment in the amount of $1,604.50,

which was accepted by Ocwen.

199.    On January 17, 2013, Ocwen Loan sent a letter to Plaintiff Adili stating that Ocwen

Loan was in receipt of his signed HAMP modification agreement and that Ocwen Loan had received

the three final trial payments on a timely basis.

### b.    Ocwen Loan's Breach of its TPP Agreement with Plaintiff Adili and Resulting Damages

200.    On January 30, 2013, Plaintiff Adili attempted to make his February 2013 payment

on the loan, but he learned his account with Ocwen Loan was frozen and he was not allowed to make

a payment.

201.    On February 1, 2013, Ocwen Loan sent Plaintiff Adili a letter confirming that Ocwen

Loan received his signed HAMP modification agreement, but falsely claiming that it was received

on January 3, 2013, two days past the deadline.

202.    On or about February 19, 2013, Ocwen Loan telephoned Plaintiff Adili and told him

that his mortgage loan amount of $116,000 was past due and that his home was currently in

foreclosure. On that call, Plaintiff explained to Ocwen Loan that the trial payments were received on

time by Ocwen Loan and accepted, and the signed HAMP modification agreement was received on

time before the January 1, 2013 due date. In addition, all of this information had been uploaded to

Ocwen Loan's website and was available for viewing on the Ocwen web page for Plaintiff Adili's

account in December 2012.

203.   On that call, Ocwen Loan denied that it had received the modification before January 1, 2013. Ocwen Loan claimed it was received two days late and that Plaintiff Adili did not qualify for the HAMP modification. Plaintiff Adili was then told to call the foreclosure department and the only options would be for him to apply for an internal modification or he would be foreclosed on if he did not respond immediately.

204.   On February 28, 2013, Plaintiff Adili received correspondence from the law firm of Powers & Kirn stating: "[o]ur client, Ocwen Loan Servicing, LLC, has referred your loan to us for foreclosure" and "[p]lease be advised that our firm has been retained for the purpose of pursuing legal action."

205.   Ocwen Loan continued to freeze Plaintiff Adili's account and refused to accept mortgage payments from Plaintiff Adili for the months of February through May 2013.

206.   Ocwen Loan failed to timely execute the HAMP modification agreement and permanently modify Plaintiff Adili's loan, in breach of the TPP agreement. While Plaintiff Adili met all of his obligations under the TPP agreement, Ocwen Loan improperly denied Plaintiff Adili a HAMP modification and tried to steer him towards foreclosure, which is more financially lucrative to Ocwen Loan.

207.   As a result of the breach, Ocwen Loan assessed Plaintiff Adili with late charges, increased principal, and other fees that should not be charged, and harmed his credit by falsely reporting he was delinquent in his payments even though Plaintiff Adili had timely tendered his payments and Ocwen Loan refused to accept them in breach of its contract with Plaintiff Adili.

208.   Eventually, after this lawsuit was commenced and with the intervention of his undersigned counsel, Ocwen Loan "agreed" it would accept Plaintiff Adili's January through May 2013 payments, which Ocwen Loan had previously refused to accept in breach of the TPP contract,

if Plaintiff Adili wired them all at once. In May 2013, Plaintiff Adili wired the sum for the January through May 2013 payments to Ocwen Loan. Thereafter, on June 10, 2013, Plaintiff Adili's counsel received on his behalf the HAMP modification contract executed by Ocwen Loan dated May 31, 2013. Nonetheless, by this time, the damage to Plaintiff Adili had already been done.

209.    As a result of Ocwen Loan's delay in modifying Plaintiff Adili's loan, in violation of the TPP, Plaintiff Adili has suffered ascertainable damages in the form of increased interest and service fees, a longer loan payoff time, a higher principal balance on his mortgage loan and damage to his credit.

## V.    CLASS ALLEGATIONS

210.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

211.    Plaintiffs bring this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and:

(a)    The Alternative Modified Contract Class: All homeowners who have entered into an Alternative Modified Contract with Litton and/or Ocwen Loan and complied with all conditions required by the Alternative Modified Contract, including making all payments and complying with Defendants' requests for documentation, and have suffered actual and ascertainable losses of money or property as a result of Litton and/or Ocwen Loan's failure to modify their loan in accordance with the Alternative Modified Contract.

(b)    The Denial Sweep Class: All homeowners who have submitted a HAMP application to Litton and/or Ocwen Loan and provided all necessary paperwork for the application on a timely basis and qualified for a HAMP modification, but were nevertheless improperly denied from receiving a HAMP modification by Litton's and/or Ocwen Loan and suffered actual and ascertainable losses of money or property as a result thereof.

(c)     The TPP Class: All homeowners who received temporary loan modification TPP agreements providing for HAMP or non-HAMP trial period plans with Litton and/or Ocwen Loan and complied with all conditions required by the TPP agreement, including making all payments and complying with Defendants' requests for documentation, and have suffered actual and ascertainable losses of money or property as a result of Litton's and/or Ocwen Loan's failure to modify their loan in accordance with the TPP agreement.

212.    Subject to additional information obtained through further investigation and discovery, the foregoing Class definition may be expanded or narrowed by amendment or amended complaint.   Specifically excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current employees and current or former officers, directors, agents, and representatives, and their family members, the judge assigned to this action, and any member of the Judge's immediate family.

213.    *Numerosity.* Plaintiffs do not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.  Based on the size of the modifications at issue, Plaintiffs believe that the amount in controversy exceeds $5 million.

214.    ***Existence and Predominance of Common Questions of Law and Fact.***   All members of the respective Classes have been subject to and affected by the same conduct.  These claims are based on standard form contracts and uniform practices in loan modification processing requirements.   Thus, questions of law and fact are common to members of the Class and

predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to, the following:

(a)     whether Defendants' receipt of an executed TPP agreement, along with supporting documentation and required monthly trial plan payments, creates a binding contract or otherwise legally obligates Defendants to offer members of the Class a permanent HAMP modification;

(b)     whether Defendants' failure to provide HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

(c)     whether Defendants' alternative loan modifications, where offered, were binding and enforceable;

(d)     the nature, scope, and operation of Defendants' obligations to homeowners under HAMP;

(e)     whether Defendants' conduct violates applicable state consumer protection laws and corresponding regulations; and

(f)     whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

215.    All members of the Class have been subjected to and affected by a uniform course of conduct by Defendants that was designed to increase Defendants' income through, *inter alia*: (a) late fees, penalties, and payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; (d) foreclosure-related expenses; (e) damage to their credit, and/or (f) assessment of other improper charges and penalties.

216.   *Typicality.*  The claims of the individually named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement, and were met with the same breach of contract by Defendants.

217.   *Adequacy of Representation.*  Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions, including consumer protection actions.

218.   *Superiority.*  A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendants.  It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

219.     Accordingly, this putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and (3).

220.     Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

221.     Alternatively, a class may be certified under Rule 23(c)(4) for certain issues, pursuant to *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006).

**COUNT I**

**BREACH OF CONTRACT/BREACH OF DUTY
OF GOOD FAITH AND FAIR DEALING**

*(as to Ocwen Loan)*

222.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

223.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

224.     Plaintiffs and members of the Class entered into written contracts with Ocwen Loan.

225.     Plaintiffs and members of the Class formed binding and enforceable agreements when they executed written contracts and/or when they made the first required payment under their respective contracts offered in writing by Ocwen Loan.

226.     Plaintiffs and all members of the Class gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with Ocwen Loan.

227.     Ocwen Loan failed to perform under the contracts with Plaintiffs and members of the Class and thereby breached the contracts.

228.     In addition, Ocwen Loan breached their duty of good faith and fair dealing under the contract by its refusal to perform their duties under the contracts without justification and/or excuse, and this conduct constituted a material breach of the contracts between the parties.

229.     As a result of Ocwen Loan's breach of the contracts, Plaintiffs and members of the Class suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including, but not limited to: (a) late fees, penalties and payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; (d) foreclosure-related expenses; (e) damage to their credit; (f) deterrence from seeking other remedies to address unaffordable mortgage payments; and/or (g) other damages for breach of contract.

230.     The amount of damages suffered by Plaintiffs and the Class by Ocwen Loan's breach of the contract is, upon information and belief, in excess of $5 million, all in an amount to be proven at trial.

## COUNT II

## VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW §349

### *(as to Ocwen Loan)*

231.     Plaintiff Williams repeats and re-alleges every allegation above as set forth herein in full.

232.     Plaintiff Williams brings this claim on her own behalf and on behalf of all others similarly situated.

233.     This is a claim for violation of the New York General Business Law ("GBL") § 349.

234.     Plaintiff Williams and all others similarly situated are "persons" within the meaning of GBL § 349(h).

235.     GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

236.   Ocwen Loan engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New York in violation of GBL § 349(a) by engaging in the methods, acts, practices, and conduct described in this Complaint, including Ocwen Loan's unconscionable and deceptive practices, including but not limited to: (a) assessment of late fees, penalties, and increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; and/or (d) damage to their credit, penalties, and other improper charges.

237.   Ocwen Loan's unfair and deceptive practices included, but were not limited to:

(a)   Ocwen Loan knowingly designing and maintaining a loan modification process that was riddled with flaws and staffed with employees who lacked the training, experience, education, or skill to accurately perform their obligations;

(b)   Ocwen Loan's routine and negligent "losing" of customers' loan documents, modification papers, loan payments, and other necessary materials to properly perform their obligations;

(c)   Ocwen Loan routinely requiring borrowers to submit and re-submit documents and financial information already in their possession claiming that they could not perform their obligations until and unless these documents are submitted time and again;

(d)   Ocwen Loan systematically making incorrect calculations and determinations at improper times during the loan modification process, falsely claiming that they were permitted to do so; and

(e)   Ocwen Loan systematically assessing late fees, penalties, increased interest and service fees, loan payoff times, higher principal balances, and/or damaging the credit of Plaintiff Williams' and all others similarly situated.

- 58 -

238.    Ocwen Loan has engaged in an act or practice that is deceptive and/or misleading in a material way and Plaintiff Williams and all others similarly situated have been injured.  Ocwen Loan's actions were unfair and violative of the public policy of the State of New York enunciated in New York Banking Regulations, 3 N.Y.C.R.R. part 419.  Ocwen Loan committed a breach of these regulations by:

(a)    failing to have "adequate staffing, written procedures, resources and facilities to provide timely and adequate responses to borrower inquiries and complaints regarding available loss mitigating options," id., §419.11(a);

(b)    requiring borrowers "to submit multiple copies of required documents during consideration for a loss mitigation option," id.; and

(c)    failing to comply with HAMP and/or NYS Banking directives in good faith.

239.    Plaintiff Williams and all others similarly situated are "person[s] who have been injured" by reason of Ocwen Loan's violation of GBL §349.

240.    Ocwen Loan willfully and knowingly engaged in the conduct described above.

241.    Plaintiff Williams and all others similarly situated suffered actual and ascertainable losses of money or property as a result of Ocwen Loan's unconscionable, deceptive, and/or unfair trade practices, including, but not limited to: (a) payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; and/or (d) damage to their credit, penalties, and other improper charges.

242.    Plaintiff Williams and all others similarly situated are entitled to all applicable damages, including actual damages, treble damages, and attorneys' fees pursuant to New York GBL §349(h).  Additionally, Ocwen Loan should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable, and unlawful practices.  Through these unfair acts and practices,

Ocwen Loan has improperly obtained and continues to improperly obtain money from all members of the Class in New York. As such, Plaintiff Williams respectfully requests that this Court grant the relief enumerated below.

243.    Ocwen Loan's unlawful and deceptive practices set forth above and throughout this Complaint was and is wanton, willful, and outrageous and manifests a reckless disregard for the consequences of Ocwen Loan's actions and for the rights of Plaintiff Williams and the members of the Class in New York, which warrants an award of punitive damages to deter Defendants from committing such acts in the future.

### COUNT III

### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §201-2(XXI)

#### *(as to all Defendants)*

244.    The DuMont Plaintiffs repeat and re-allege every allegation as if set forth herein in full.

245.    The DuMont Plaintiffs bring this claim on their own behalf and on behalf of all others similarly situated.

246.    This is a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §201-2(xxi).

247.    At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the UTPCPL.

248.    The DuMont Plaintiffs and all others similarly situated are "persons" as defined and construed under the UTPCPL.

249.    Defendants engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from Pennsylvania in violation of the UTPCPL

by engaging in the methods, acts, practices, and conduct described in this Complaint, including

Defendants' unconscionable and deceptive practices, including, but not limited to: (a) assessment of

late fees, penalties, and increased interest and service fees; (b) longer loan payoff times; (c) higher

principal balances; and/ or (d) damage to their credit, penalties, and other improper charges.

250.    Defendants' unfair and deceptive practices included, but were not limited to:

(a)      Defendants knowingly designing and maintaining a loan modification process

that was riddled with flaws and staffed with employees who lacked the training, experience,

education, or skill to accurately perform their obligations;

(b)      Defendants' routine and negligent "losing" of customers' loan documents,

modification papers, loan payments, and other necessary materials to properly perform their

obligations;

(c)      Defendants routinely requiring borrowers to submit and re-submit documents

and financial information already in their possession claiming that they could not perform their

obligations until and unless these documents are submitted time and again;

(d)      Defendants systematically making incorrect calculations and determinations at

improper times during the loan modification process, falsely claiming that they were permitted to do

so; and

(e)      Defendants systematically assessing late fees, penalties, increased interest and

service fees, longer loan payoff times, higher principal balances, and/or damaging the credit of the

DuMont Plaintiffs' and all others similarly situated.

251.    Defendants' conduct as set forth herein constitutes an unconscionable commercial

practice comprised of deceptive acts and practices in violation of the UTPCPL, 73 P.S. §201-2(xxi),

including their practice of leading borrowers to believe that Defendants would offer permanent

HAMP modifications of their mortgage upon successfully completing a TPP and then offering an Alternative Modified Contract which resulted in: (a) payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; (d) deterrence from seeking other remedies to address affordable mortgage payments; and (e) damage to their credit, penalties, and other improper charges.

252.   Defendants' conduct as set forth herein has been unfair in violation of the UTPCPL because the acts or practices violate established public policy, and because the harm they cause greatly outweighs any benefits associated with those practices.

253.   The DuMont Plaintiffs and all others similarly situated suffered actual and ascertainable losses of money or property as a result of Defendants' unconscionable, deceptive, and/or unfair trade practices, including, but not limited to: (a) payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; and/or (d) damage to their credit, penalties, and other improper charges.

254.   The DuMont Plaintiffs and all others similarly situated are entitled to all applicable damages, including actual damages, treble damages, costs, attorney's fees, and any other relief this Court may deem necessary or proper pursuant to 73 P.S. § 201-9.2. Additionally, Defendants should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable, and unlawful practices.  Through these unfair acts and practices, Defendants have improperly obtained and continue to improperly obtain money from all members of the Class in Pennsylvania.  As such, the DuMont Plaintiffs respectfully request that this Court grant the relief enumerated below.

255.   Defendants' unlawful and deceptive practices set forth above and throughout this Complaint was and is wanton, willful, and outrageous and manifests a reckless disregard for the consequences of Defendants' actions and for the rights of the DuMont Plaintiffs and the members of

the Class in Pennsylvania, which warrants an award of punitive damages to deter Defendants from committing such acts in the future.

## COUNT IV

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. §56:8:-1

#### *(as to all Defendants)*

256.    Plaintiff Adili repeats and re-alleges every allegation as if set forth herein in full.

257.    Plaintiff Adili brings this claim on his own behalf and on behalf of all others similarly situated.

258.    This is a claim for violation of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.*

259.    At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act.

260.    Plaintiff Adili and all others similarly situated are "persons" as defined and construed under the New Jersey Consumer Fraud Act.

261.    Defendants engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New Jersey in violation of the New Jersey Consumer Fraud Act by engaging in the methods, acts, practices, and conduct described in this Complaint, including Defendants' unconscionable and deceptive practices, including, but not limited to: (a) assessment of late fees, penalties, and increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; and/ or (d) damage to their credit, penalties, and other improper charges.

262.    Defendants' unfair and deceptive practices included, but were not limited to:

(a)     Defendants knowingly designing and maintaining a loan modification process that was riddled with flaws and staffed with employees who lacked the training, experience, education, or skill to accurately perform their obligations;

(b)     Defendants' routine and negligent "losing" of customers' loan documents, modification papers, loan payments, and other necessary materials to properly perform their obligations;

(c)     Defendants routinely requiring borrowers to submit and re-submit documents and financial information already in their possession claiming that they could not perform their obligations until and unless these documents are submitted time and again;

(d)     Defendants systematically making incorrect calculations and determinations at improper times during the loan modification process, falsely claiming that they were permitted to do so; and

(e)     Defendants systematically assessing late fees, penalties, increased interest and service fees, longer loan payoff times, higher principal balances, and/or damaging the credit of Plaintiff Adili and all others similarly situated.

263.     Defendants' conduct as set forth herein constitutes an unconscionable commercial practice comprised of deceptive acts and practices in violation of the New Jersey Consumer Fraud Act, including their practice of leading borrowers to believe that Defendants would offer permanent HAMP modifications of their mortgage upon successfully completing a TPP and then denying a permanent modification altogether which resulted in: (a) payment of increased interest and service fees; (b) longer loan payoff times; (c) higher principal balances; (d) deterrence from seeking other remedies to address affordable mortgage payments; (e) foreclosure-related expenses; and/or (f) damage to their credit, penalties, and other improper charges.

264.     Defendants' conduct as set forth herein has been unfair in violation of the New Jersey Consumer Fraud Act because the acts or practices violate established public policy, and because the harm they cause greatly outweighs any benefits associated with those practices.

265.     Plaintiff Adili and all others similarly situated are entitled to all applicable damages, including actual damages, treble damages, and attorneys' fees and costs pursuant to N.J. Stat. Ann. 56:8-19. Additionally, Defendants should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable, and unlawful practices.   Through these unfair acts and practices, Defendants have improperly obtained and continue to improperly obtain money from all members of the Class in New Jersey. As such, Plaintiff Adili respectfully requests that this Court grant the relief enumerated below.

266.     Defendants' unlawful and deceptive practices set forth above and throughout this Complaint were and are wanton, willful, and outrageous and manifest a reckless disregard for the consequences of Defendants' actions and for the rights of Plaintiff Adili and the members of the Class in New Jersey, which warrant an award of punitive damages to deter Defendants from committing such acts in the future.

VI.     **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A.     Certify this case as a class action and appoint the DuMont Plaintiffs and Plaintiff Adili to be the representatives of the Denial Sweep Class and the TPP Class, and Plaintiff Williams to be the representative of the Alternative Modified Contract Class, and their undersigned counsel to be Class counsel;

B.     Enter a judgment declaring the acts and practices of Defendants complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, together with an award of monetary damages and other available relief on those claims;

C.     Grant a permanent or final injunction enjoining Defendants' agents, employees, affiliates, and subsidiaries from continuing to harm Plaintiffs and the members of their respective Class;

D.     Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.     Order specific performance of Defendants' contractual obligations together with other relief required by contract and law;

F.     Award actual, exemplary, and statutory damages to Plaintiffs and their respective Class in amounts to be proven at trial;

G.     Award restitution and prejudgment interest;

H.     Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

I.     Grant Plaintiffs and their respective Class such other and further relief as this Court finds necessary and proper.

## VII.   JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

DATED:  April 22, 2014

GAINEY McKENNA & EGLESTON
THOMAS J. McKENNA
GREGORY M. EGLESTON

GREGORY M. EGLESTON
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone:  212/983-1300
212/983-0380 (fax)
tjmckenna@gme-law.com
gegleston@gme-law.com

GAINEY McKENNA & EGLESTON
BARRY J. GAINEY
218 Route 17 North, Suite 400
Rochelle Park, New Jersey 07662
Telephone: 201/225-9001
201-225-9002 (fax)
bgainey@gme-law.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
JANINE D. ARNO
CHRISTOPHER C. MARTINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
jarno@rgrdlaw.com
cmartins@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER COLLINS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ccollins@rgrdlaw.com

***Attorneys for Plaintiffs***