UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE DUMONT, JONATHAN GRIMES,
YVONNE WILLIAMS and KUJTIM ADILI,
On Behalf of Themselves And All Others Similarly
Situated,

                              Plaintiffs,

                    – against –

LITTON LOAN SERVICING, LP
and OCWEN LOAN SERVICING, LLC,

                              Defendants.

**OPINION AND ORDER**

12 Civ. 2677 (ER)

RAMOS, D.J.:

        Plaintiffs bring this action against mortgage loan servicers alleging unlawful and

deceptive practices in the wake of the recent housing crisis.  On March 3, 2014, this Court

dismissed several of Plaintiffs' claims without prejudice; the remaining claims were either

upheld or dismissed with prejudice.  *See* Doc. 85.  Accordingly, Plaintiffs George DuMont,

Jonathan Grimes (together, the "DuMonts"), Yvonne Williams ("Williams") and Kujtim Adili

("Adili") (collectively, "Plaintiffs") have amended their complaint, which now presents claims

against Defendants Litton Loan Servicing, LP ("Litton") and Ocwen Loan Servicing, LLC

("OLS").[1]  Fourth Am. Class Action Compl. ("FAC"), Doc. 92.  Litton and OLS were Plaintiffs'

mortgage servicers at the time the alleged wrongful acts were committed.  The FAC presents

four claims against Defendants:  (1) breach of contract and the implied covenant of good faith

---

[1] Plaintiffs previously alleged claims against Ocwen Financial Corporation ("OFC") and Goldman Sachs Group, Inc. ("Goldman"), along with Litton and OLS.  *See* Third Am. Class Action Compl. ("TAC"), Doc. 51.  OFC and Goldman were dismissed by the Court's March 3, 2014 Order.  Doc. 85 at 52.

and fair dealing against OLS, (2) violations of the New York General Business Law against

OLS; (3) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law as

to both defendants; and (4) violations of the New Jersey Consumer Fraud Act as to both

defendants.

Defendants move to dismiss Plaintiffs' first, third, and fourth claims pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.  Def.'s Mem. L. Support Mot. Dismiss,

Doc. 96.  For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part

and DENIED in part.

## I.    Background[2]

The Court presumes familiarity with the facts and procedural history of this case, which

are detailed in its March 3, 2014 Order (the "March 2014 Order"), granting in part and denying

in part Defendants' motion to dismiss.[3]  The facts detailed below are those relevant to

Defendants' challenge.

### A.  The DuMont Loan

The DuMonts are residents of Pennsylvania.  FAC at ¶ 10.  On July 19, 2010, the

DuMonts submitted a Home Affordable Modification Program ("HAMP") application to Litton,

who was servicing their mortgage.  *Id.* at ¶ 66.  More than ten months later, on May 28, 2011,

Litton denied the application on the grounds that the DuMonts had not provided all of the

---

[2] The following facts are based on the allegations in the FAC, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[3] The Court upheld Williams's breach of contract and FDCPA claims against OLS.  Doc. 85 at 51.  Williams did not attempt to replead any of the claims that the Court dismissed without prejudice, and Defendants do not challenge the sufficiency of Williams' claims in the instant motion.

required documents.  *Id*. at ¶ 67.  However, the DuMonts maintain that throughout the course of the ten months, they submitted the necessary paperwork a number of times in response to letters they received from Litton that mistakenly asserted that they had not submitted the HAMP application.  *Id*. at ¶¶ 68, 71.  In numerous telephone conversations detailed in the FAC, Litton representatives consistently assured the DuMonts that their documents had been received and that they should disregard Litton's requests for missing information.  *Id*. at ¶¶ 68, 70.  As a result of Litton's ultimate denial of their HAMP application, the DuMonts were purportedly left with no recourse but to pursue an alternative loan modification, otherwise known as a non-HAMP modification.  *Id*. at ¶ 72.

On June 24, 2011, the DuMonts received a letter from Litton containing a temporary agreement referred to as a trial period plan ("TPP").  *Id*. at ¶ 74.  Under the TPP agreement, the DuMonts were required to make three monthly trial payments in order to secure the permanent non-HAMP loan modification.  *Id.*  The TPP agreement provided that once the three payments and all required documents were received, the DuMont's mortgage would be permanently modified with a reduced interest rate of two percent.  *Id.*  However, the loan servicer was required to execute a separate agreement in order to make the permanent non-HAMP modification effective.  *Id.* at ¶ 114.  The DuMonts timely made their trial payments due in August, September and October as required by the TPP agreement.  *Id.* at ¶¶ 75, 79.  In the interim, they were informed that the servicing rights to their loan had been transferred to OLS in August.  *Id*. at ¶ 78.  Consequently, OLS assumed Litton's TPP agreement with the DuMonts. *Id*. at ¶ 79.

The DuMonts received a notice of default from OLS on October 18, 2011.  Despite the alleged default, however, which the DuMonts deny, they also received a modification agreement from OLS nearly one month later, on November 11, 2011, pursuant to the TPP agreement they had originally entered into with Litton, which they promptly signed and returned.  *Id*. at ¶¶ 80, 83-84.  The modification agreement provided that the DuMont's loan would be automatically modified on January 1, 2012, when a first modified payment of $1,251.23 would be due.  *Id*. at ¶ 83.  The agreement further specified a new principal balance and a reduced interest rate of two percent.  *Id*.

Nevertheless, on December 20, 2011, OLS informed the DuMonts that it was unable to grant them a modification because they failed to send the payment or agreement within the required timeframe.  *Id*. at ¶ 86.  A series of follow-up calls yielded conflicting messages from OLS representatives as to the status of the DuMonts' account, ranging from confirmation that their documents had been received to a notice of delinquency.  *Id*. at ¶¶ 88, 90, 92.  In the meantime, the DuMonts submitted their first and second modified payments in the specified amount to OLS on December 26, 2011 and January 10, 2012, respectively.  *Id*. at ¶ 89.  However, they subsequently received a series of letters from OLS stating that their January payment was being returned for failure to satisfy the amount required to reinstate the mortgage loan and avoid foreclosure.  *Id*. at ¶¶ 93, 95, 96, 102.  The DuMonts' attempts to resolve the issue once again resulted in contradicting responses from OLS representatives.  *Id*. at ¶¶ 99, 100.  The DuMonts resubmitted a cashier's check in the amount of $1,251.23 on February 9, 2012, which OLS once more returned as being insufficient to cure default.  *Id*. at ¶ 102.

OLS initiated foreclosure proceedings in February 2012.  *Id.* at ¶103.  A series of exchanges between OLS and the DuMonts culminated in a May 4, 2012 letter from OLS stating that it was willing to honor the terms of the modification agreement if it received the funds necessary to bring the plan current for November 2011 through May 2012.  *Id.* at ¶ 111.  On May 21, 2012, the DuMonts sent OLS a check in the amount they had agreed to with OLS.  *Id.* at ¶ 112.  In June 2012, the DuMonts received yet another letter from OLS concerning their "severely delinquent mortgage loan."  *Id.* at ¶ 113.  As of the filing of the FAC, the DuMonts have not received a counter-signed modification agreement from OLS.  *Id.* at ¶ 117.

The DuMonts allege that OLS breached the TPP agreement by failing to modify the loan by January 1, 2012, and by neglecting to execute the modification agreement to make the permanent loan modification effective, as it was required to do.[4]  *Id.* at ¶ 114.  The FAC alleges that OLS damaged the DuMont's credit by reporting the purported delinquencies to credit agencies.  *Id.* at ¶ 115.  The DuMonts have allegedly been subjected to various fees, along with increased principal and interest amounts, and a longer loan payoff time.  *Id.* at ¶¶ 116-117.

**B.  The Adili Loan**

Adili resides in New Jersey.  *Id.* at ¶ 12.  On April 21, 2010, Adili submitted a HAMP application to his mortgage servicer, Litton.  *Id.* at ¶ 171.  In May 2010, Litton sent two separate letters to Adili confirming receipt of his HAMP application, but claiming that it was missing

---

[4] The DuMonts relied on two contracts in the TAC.  The first contract consisted of the TPP agreement with Litton, which stated that, if the specified trial payments were made on time and pursuant to its terms, they would qualify for a permanent loan modification.  TAC at ¶ 75.  The second alleged contract was a permanent non-HAMP modification agreement with OLS that the DuMonts claimed they executed and returned to OLS on November 11, 2011.  *Id.* at ¶ 84.  The only terms of the modification agreement that Plaintiffs alleged were the due date and amount due for the first payment.  *Id.* Without ever indicating whether OLS permanently modified the DuMonts' loans, Plaintiffs broadly alleged losses "as a result of Defendants' breach of contract[.]"  *Id.* at ¶ 114.

documents which Adili maintains he had already sent. *Id*. at ¶ 172. Nonetheless, Adili resubmitted the requested information. *Id*. Starting in May 2010, Adili received numerous additional letters from Litton requesting the same missing information. *Id*. at ¶ 175. In response to Adili's inquiries, Litton also repeatedly confirmed receipt of the documents. *Id*. at ¶¶ 177, 179.

On July 2, 2010, Litton informed Adili of its denial of his HAMP application for failure to provide the requested information. *Id*. at ¶ 180. An excerpt from the letter quoted in the FAC indicates that Adili was also denied a non-HAMP loan modification for failure to properly endorse or notarize the original Loan Modification Agreement and/or pay the required funds. *Id*. Yet, Adili contends that he never received a Loan Modification Agreement, a fact which Litton later admitted. *Id*. at ¶ 182. As a result, the FAC states that Adili experienced increased interest and service fees, a longer loan payoff time, and a higher principal balance. *Id*. at ¶ 189.

On October 14, 2011, Adili learned that the servicing of his loan was being transferred to OLS. *Id*. at ¶ 190. In April 2012, Adili received a HAMP application from OLS, which he promptly submitted. *Id*. at ¶ 191. On September 4, 2012, OLS sent a TPP agreement to Adili, which indicated that his mortgage would be permanently modified once the three trial payments were made. *Id*. at ¶¶ 193-194. On October 9, 2012, shortly after Adili made his first trial payment, he received a HAMP modification agreement from OLS. *Id*. at ¶ 195. The modification agreement provided that, once the preconditions to the modification were completed, his loan would "automatically become modified on 1/1/2013[.]" *Id*. at ¶ 196. Furthermore, all remaining unpaid late charges would be waived at that time and Adili would receive a new principal balance and a lower interest rate of two percent. *Id*. On January 17,

6

2013, OLS confirmed receipt of Adili's HAMP modification agreement and his three trial payments on a timely basis. *Id.* at ¶ 199.

However, when Adili attempted to make his new, modified February 2013 payment, he discovered that his account was "frozen." *Id.* at ¶ 200. OLS claimed that it received Adili's signed HAMP modification agreement two days past the deadline, which Adili contests. *Id.* at ¶ 201. On February 19, 2013, OLS called Adili to inform him that his mortgage payment was past due and his home was in foreclosure. *Id.* at ¶ 202. OLS refused to accept mortgage payments from Adili until he brought the instant action. *Id.* at ¶ 205, 208. At that time, it also finally returned an executed HAMP modification contract on May 31, 2013. *Id.* at ¶ 208.

Adili claims OLS breached the TPP agreement by failing to timely execute the HAMP modification agreement and permanently modify his loan. *Id.* at ¶ 206. The FAC states that, as a result of OLS delay, Adili has suffered late charges, an increased principal amount, unwarranted fees, and harm to his credit score. *Id.* at ¶ 207.

### C. Mass Denial Sweeps

Both the DuMonts and Adili allege that they were victims of Litton's "mass denial sweeps." *Id.* at ¶ 71, 188. Plaintiffs use the term to refer to Litton's purported policy of denying homeowners modifications on the grounds that documents were missing. *Id.* at ¶ 57. Litton allegedly put in place processes to "foster delay, mislead homeowners, and avoid modifying mortgage loans" because as mortgage servicers, Defendants benefit from the increased fees generated by servicing distressed loans. *Id.* Plaintiffs specifically accuse Defendants of taking advantage of mortgagors "by impermissibly delaying loan modifications in order to collect excessive fees on troubled mortgages." *Id.* at ¶ 55.

7

## II.    Discussion

### A.  12(b)(6) Motion to Dismiss Standard

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir.1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without

regard for the weight of the evidence that might be offered in support of Plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Moreover, the fact that scienter can be alleged "generally" merely means that Rule 9(b)'s heightened particularity requirement does not apply; it does not mean that conclusory allegations will suffice. *Iqbal*, 556 U.S. at 686-87 ("Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8."); *see Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014).

## B. Count One: Breach of Contract[5]

### i. The DuMonts' Breach of Contract Claim Against OLS

"To state a breach of contract claim under Pennsylvania law, Plaintiffs must plead '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by

---

[5] The Court notes that Plaintiffs' allegations with respect to the duty of good faith and fair dealing are introduced merely as one example of how Defendants breached the alleged contracts. FAC at ¶ 228. As was the case with the previous Complaint, Plaintiffs do not bring a separate cause of action for breach of the implied covenant. *See* TAC at ¶ 218; *see also* Doc. 85 at 9 n.4.

the contract and (3) resultant damages.'"[6]  *Mickel Drilling Partners ex rel. Mickel v. Cabot Oil*

*& Gas Corp.*, No. 11 Civ. 0061, 2012 WL 4953081, at *8 (M.D. Pa. Oct. 16, 2012) (quoting

*CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super.1999)).

The DuMonts relied on two contracts in the Third Amended Complaint ("TAC").  The

first contract consisted of the TPP agreement with Litton, which stated that the DuMonts would

qualify for a permanent loan modification if the specified trial payments were made on time and

pursuant to the TPP agreement's terms.[7]  TAC at ¶ 75.  The second alleged contract was a

permanent non-HAMP modification agreement with OLS that the DuMonts claimed they

executed and returned to OLS on November 11, 2011.  *Id.* at ¶ 84.  The Court determined that

Plaintiffs failed to state a claim under the first contract—the TPP agreement—because the TAC

alleged that OLS and the DuMonts did ultimately execute a non-HAMP modification agreement.

Doc. 85 at 10.  The claim was dismissed without prejudice.  *Id*. at 51.  As to the second, non-

HAMP modification agreement, the Court held that Plaintiffs stated a viable claim for breach of

the material terms governing the amount and due date of the first monthly payment.  *Id.*

The DuMonts have now discarded their breach of contract claims with respect to the non-

HAMP modification agreement.[8]  *See* FAC at ¶ 114.  Instead, the FAC maintains that OLS

---

[6] The parties have briefed the breach of contract claims under the assumption that each named Plaintiff's cause of action arises under the law of that Plaintiff's state of residence.

[7] Unlike the FAC, the TAC did not assert that the TPP agreement contained a promise to permanently modify the DuMonts' loans.  *Compare* TAC at ¶ 75, *with* FAC at ¶ 74.  Nor did the TAC affirmatively state that OLS failed to permanently modify the DuMonts' loans.

[8] In their initial briefing, Defendants observed that the DuMonts "abandoned" their breach of contract claim with respect to the modification agreement.  Doc. 96 at 9.  Plaintiffs responded that they did not "abandon" their claim; they merely conformed their pleading to newly discovered evidence.  Doc. 97 at 6.  Defendants' reply suggests that they have interpreted this statement to mean that the FAC is actually alleging breaches of both the TPP and modification agreements.  Doc. 98 at 2.  The Court does not adopt this reading.  Although Plaintiffs may dislike the

breached the obligations it assumed from Litton under the first TPP agreement, which required it to execute a modification agreement and permanently modify their loans. *Id.* Plaintiffs assert that they made the change in order to conform their pleadings to newly discovered evidence. Pls.' Mem. L. Opp. Defs.' Mot. Dismiss, Doc. 97 at 6. Apparently, Defendants produced documents in relation to the instant action after the TAC was filed. *Id.* at 6-7. It was then that Plaintiffs' counsel became aware of new evidence demonstrating that OLS never signed or executed the modification agreement, as had been previously alleged. *Id.* The FAC therefore claims that, although the DuMonts received an alternative, non-HAMP modification agreement from OLS, the mortgage servicer failed to execute the agreement to make the permanent modification effective. FAC at ¶¶ 83, 114. As a result, OLS never permanently modified the DuMonts' mortgage. *Id.* at ¶ 114.

The FAC sufficiently pleads a breach of contract claim against OLS. First, it alleges the existence of a contract—the TPP agreement—which OLS assumed in August 2011, when the servicing of the loan was transferred from Litton to OLS. *Id.* at ¶ 79. Second, the FAC identifies the material terms of the contract: the TPP agreement provided that the DuMonts were required to make three monthly payments of $1,301.78 in a timely manner, and that once those payments and supporting documents were received, the mortgage would be permanently modified. *Id.* at ¶ 74. The FAC also alleges that once the DuMonts complied with their obligations under the TPP agreement, OLS was required to modify the DuMont's loan on January 1, 2012 and to execute a separate modification agreement to make the permanent modification effective. *Id.* at ¶ 114. Specifically, the TPP agreement provided, "[a]fter all trial payments are timely made and you

---

use of the term "abandon" to describe the fact that the FAC no longer alleges a breach of the modification agreement, that is effectively what they did in their amended complaint.

have submitted all the required documents, your mortgage *will be* permanently modified." *Id.* at ¶ 74 (emphasis added). Plaintiffs claim that they complied with the terms of the TPP agreement by submitting the three trial payments and providing all required documents on time. *Id.* Rather than comply with its obligations, however, OLS purportedly rejected their payments throughout 2012 and initiated foreclosure proceedings, all while its representatives provided Plaintiffs with false assurances, contradictory information and faulty guidance that consistently proved to be futile. *Id.* at ¶¶ 97, 99, 103, 104-106, 109. Finally, the DuMonts sufficiently plead damages, which they suffered in the form of improper fees, increased interest, a longer loan payoff time, high principal balance and damage to their credit. *Id.* at ¶¶ 116-117.

Courts within the Third Circuit have upheld similar breach of contract claims brought under Pennsylvania state law involving TPP agreements associated with HAMP applications.[9] For example, in *Wilson v. Bank of America, N.A.*, the plaintiff accused Bank of America ("BOA") of breaching a TPP agreement similar to the one here. No. 14 Civ. 2498, 2014 WL 4744555, at *2 (E.D. Pa. Sept. 24, 2014). The plaintiff alleged that the agreement provided that if her financial information confirmed her eligibility for HAMP and she made the three trial payments, her mortgage would be permanently modified. *Id.* The plaintiff sent BOA the required documents and mailed the three TPP payments. *Id.* at *3. However, the plaintiff never received the modification agreement promised. *Id.* The court denied BOA's motion to dismiss, noting that "[s]everal courts have found that the TPP does create an enforceable agreement to, at minimum, offer a permanent loan modification, at least for purposes of a surviving a motion to

---

[9] Although the instant case involves a non-HAMP TPP agreement, the reasoning in prior decisions does not rely on the type of loan modification offered by the servicer.

dismiss under Rule 12(b)(6)."  *Id.*  (citing *Laughlin v. Bank of Am., N.A*., No. 13 Civ. 4414, 2014 WL 2602260, at *6 (D.N.J. June 11, 2014)).

Similarly, in *Cave v. Saxon Mortgage Services*, a defendant mortgage servicer provided plaintiffs with a HAMP loan modification package, which included a TPP agreement that the plaintiffs accepted and fully performed.  No. 11 Civ. 4586, 2012 WL 1957588, at *2 (E.D. Pa. May 30, 2012).  Specifically, the TPP agreement contained a "clear promise" that the defendant would provide the plaintiffs with a permanent loan modification if several conditions precedent were met, including a determination by the lender that the plaintiffs qualified.  *Id*. at *5.  The court denied the defendant's motion to dismiss, finding that the complaint stated a breach of the TPP agreement by alleging that the defendant neither offered the plaintiffs a permanent modification nor sent the defendants a timely written denial explaining why they did not qualify.  *Id*. at *7.  While the DuMonts, unlike the plaintiffs in *Wilson* and *Cave*, received a modification agreement, their loan was never actually modified and they never received an *executed* version of the agreement necessary to make the permanent modification effective, as allegedly required by the TPP agreement.  FAC at ¶¶ 114, 118.  Therefore, like the plaintiffs in *Wilson* and *Cave*, the DuMonts' loan was not ultimately permanently modified, as was required by the TPP agreement.  *Id*. at ¶ 114.

Defendants point to two decisions within this district interpreting New Jersey law, holding that the TPP agreements at issue did not constitute a promise to permanently modify the original loan.  *See Costigan v. CitiMortgage, Inc*., No. 10 Civ. 8776 (SAS), 2011 WL 3370397, at *6-7 (S.D.N.Y. Aug. 2, 2011), *Thomas v. JPMorgan Chase & Co*., 811 F. Supp. 2d 781, 796-797 (S.D.N.Y. 2011).  In both decisions, the court cited language contained in each TPP

13

agreement in which the plaintiffs attested that they understood that the plan was not a

modification of the loan documents and that the loans would not be modified unless and until:

(1) all of the conditions were met; (2) they received an executed copy of a modification

agreement; and (3) the modification effective date had passed.  *See Costigan*, 2011 WL 3370397,

at *6; *Thomas*, 811 F. Supp. 2d at 796.  These cases do not compel a different result here.  First,

these cases were not construing Pennsylvania law.  Secondly, the FAC does not attach the actual

TPP agreement, and Defendants have not sought to introduce it.  Accordingly, the Court must

rely on the facts alleged in the FAC—which do not suggest that the provisions at issue in

*Costigan* and *Thomas* are present here.  Here, the FAC clearly alleges that the agreement sent to

the DuMonts provided (1) that their mortgage would be modified if they timely complied with

certain requirements, and (2) that the DuMonts actually timely complied with those

requirements.

Furthermore, the Seventh and Ninth Circuits have interpreted provisions identical to

those at issue in *Costigan* and *Thomas* differently.  They read the provisions to mean that no

permanent modification *existed* until the plaintiffs met all of the necessary conditions, the

servicer executed a modification agreement, and the effective modification date passed.[10]  *See*

*Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 882-883 (9th Cir. 2013); *Wigod v. Wells Fargo*

*Bank, N.A.*, 673 F.3d 547, 563 (7th Cir. 2012).  Under this interpretation, the servicer "still had

an obligation to *offer*" the plaintiffs a permanent modification once they satisfied all of their

obligations under the agreement.  *Id.*  The Seventh Circuit concluded that, once the servicer

---

[10] The Seventh Circuit clarified that, "[b]efore these conditions were met, the loan documents remained unmodified and in force, but . . . [the loan servicer] still had an obligation to offer [the plaintiff] a permanent modification once she satisfied all her obligations under the agreement."  *Wigod*, 673 F.3d at 563.

14

signed the TPP agreement and returned it to the plaintiff, "an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if she fulfilled its conditions." *Id.* The Ninth Circuit adopted the reasoning in *Wigod*. *Corvello*, 728 F.3d at 883.

Defendants also argue that the DuMonts fail to state a claim for breach of contract because the FAC simultaneously alleges that OLS neglected to provide a permanent loan modification while claiming that they received a permanent loan modification. Defs.' Reply Mem. L. Supp. Mot. Dismiss, Doc. 98 at 2. Defendants reason that Plaintiffs "cannot have it both ways" by conceding that they were provided a modification agreement while accusing OLS of failing to modify the DuMont mortgage. *Id.* at 98 (citing FAC at ¶¶ 83, 114). Defendants misread the FAC. Nothing in the FAC suggests that OLS actually processed a permanent loan modification or that the situation has otherwise been resolved. The FAC explicitly states that OLS breached the TPP agreement by "fail[ing] to *modify* the DuMont Plaintiffs' loan on January 1, 2012 (or thereafter)[.]" FAC at ¶ 114 (emphasis added). The FAC further states that, as of its filing, the DuMonts have not received a modification agreement counter-signed by OLS. FAC at ¶ 118. Therefore, it is not inconsistent to argue that the DuMonts received a modification agreement which was not counter-signed or that OLS failed to modify the loan, as the TPP agreement ostensibly required. Nowhere in the FAC or in the Plaintiffs' papers do they suggest that the DuMonts were ever granted a permanent loan modification.

Defendants additionally contend that Plaintiffs should be precluded from alleging that they never received a permanent loan modification when they have consistently pled otherwise. Doc. 96 at 8-9. The general rule is that prior inconsistent pleadings are admissible against the plaintiff in the case in which they were originally filed as "controvertible, not conclusive,

admissions[.]" *Barris v. Hamilton*, No. 96 Civ. 9541 (DAB), 1999 WL 311813, at *2 (S.D.N.Y.

May 17, 1999) (quoting *The Ltd., Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5  (S.D.N.Y.

1988)).  "While there may be a rare occasion to disregard the contradictory and manipulated

allegations of an amended pleading . . . the more usual and benevolent option is to accept the

superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in

due course." *Id.* (internal citation omitted).  "[I]n a typical case, a prior inconsistent pleading

should not trump the Court's obligation under Rule 12(b) (6) to accept a complaint's allegations

as true." *Palm Beach Strategic Income, LP v. Salzman*, No. 10 Civ. 261 (JS) (AKT), 2011 WL

1655575, at *6 (E.D.N.Y. May 2, 2011) *aff'd*, 457 F. App'x 40 (2d Cir. 2012) *and aff'd*, 457 F.

App'x 40 (2d Cir. 2012).

     The circumstances surrounding the amended pleadings in the instant action are not

atypical.  Plaintiffs provides the Court with a plausible explanation for the DuMonts' amended

contract claims:  after the TAC was filed, Defendants produced documents which led the

Plaintiffs' counsel to learn that OLS never countersigned or otherwise executed the modification

agreement.  Therefore, this is no such "rare occasion" that would warrant not accepting the

FAC's facts as true.

     Furthermore, the DuMonts' breach of contract claims are not premised on an entirely new

agreement; rather, the Court previously interpreted the TAC as also alleging breach of the TPP

agreement.  Doc. 85 at 10.  The Court was unable to find a colorable basis for breach of that

contract based on its reading of the TAC as admitting that OLS executed a modification

agreement.[11]  *Id*.  Finally, Defendants' argument relies on portions of the TAC asserting that the parties had entered into a modification agreement.  *See* Doc. 96 at 8-9 (citing TAC ¶¶ 84, 103, 114).  However, nowhere in the previous complaint did Plaintiffs unequivocally claim whether they did or did not receive a permanent loan modification.[12]  Given that the court dismissed the DuMonts' breach of contract claim without prejudice, Plaintiffs were within their right to modify their Complaint based on newly discovered evidence.

### ii.    Adili's Breach of Contract Claims Against OLS

A breach of contract claim under New Jersey law consists of the following elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).

In the March 3, 2014 Order, the Court dismissed Adili's breach of contract claims without prejudice on the basis that Adili failed to allege that he entered into a contract with Defendants to permanently modify his mortgage under HAMP.  Doc. 85 at 16.  The Court observed that the TAC broadly referred to a HAMP modification approved by OLS, without alleging that it was a TPP or that its terms required OLS to offer a permanent modification.  *Id*.

---

[11] The TAC never expressly indicated that OLS executed the modification agreement.  However, it appeared to operate under the assumption that the agreement was effective.  *See* TAC at ¶¶ 103, 114 (stating that the parties had entered into loan modification contract with OLS).  Furthermore, the TAC previously stated that "to *qualify* for a permanent alternative loan modification, the DuMont Plaintiffs were required to make the . . . trial payments in a timely manner."  TAC at ¶ 75 (emphasis added).  Plaintiffs now claim that the TPP agreement stated that the DuMonts' mortgage "*will* be permanently modified" if they complied with its terms.  FAC at ¶ 74 (emphasis added).

[12] With respect to the modification agreement, the Court observed in the March 2014 Order that, although "the only material terms alleged are the amount of and due date for the DuMonts' first monthly payment," "even this very first payment under the modified loan was rejected, allegedly in contravention of the contract's terms."  Doc. 85 at 10.

at 15-17.  Furthermore, the TAC was "entirely devoid of details regarding the purported damages he [Adili] suffered as a result of the supposed breach."  *Id*. at 17.  Specifically, there were "no references to any late fees, penalties, increased interest payments or principal balances, longer loan payoff times, damage to Adili's credit, or any of the other purported damages referenced in Plaintiffs' brief."  *Id*.

The FAC cures these former defects.  First, it provides for the existence of a contract between the parties—a TPP agreement, which stated:  "To accept this offer, you must make your first monthly 'trial period payment.' . . . After all trial period payments are timely made and you have submitted all the required documents, *your mortgage will be permanently modified*."  FAC at ¶ 193 (emphasis in original).  Second, Adili claims that he submitted all of the trial payments and required documents to OLS in a timely manner.  *Id*. at ¶¶ 195, 197.  Third, the FAC states that OLS breached the TPP agreement by failing to timely execute the HAMP modification agreement and permanently modify Adili's loan.[13]  *Id*. at ¶ 206.  Fourth, notwithstanding that his loan was ultimately modified, Adili alleges that, as a result of OLS' willful delay, he suffered damages in the form of increased interest and service fees, a longer loan payoff time, a higher principal balance on his mortgage and damage to his credit.  *Id*. at ¶ 209.

Defendants claim that Adili fails to allege a breach of the TPP agreement because he ultimately received a permanent loan modification.  Doc. 96 at 11 (citing FAC at ¶¶ 199, 208-209).  However, the TPP agreement language quoted in the FAC implies that that Adili would receive a permanent loan modification after he made the required payments and submitted all

---

[13] After Plaintiffs filed the case and following the Defendants' filing of their first set of motions to dismiss, Adili finally received an executed the modification agreement from OLS on June 10, 2013, dated May 31, 2013.  *Id*. at ¶ 208.

necessary documents.  FAC at ¶ 193.  Adili's final trial payment, which he purportedly submitted on time, was due on December 1, 2012.  *Id*. at ¶¶ 193, 197.  Adili signed and returned the modification agreement by the January 1, 2013 cutoff date.[14]  *Id*. at ¶ 202.  Rather than promptly executing the modification agreement and permanently modifying Adili's loans, OLS allegedly waited nearly six months to do so, and only after the filing of this lawsuit and the intervention of counsel.  *Id*. at ¶ 208.  In the meantime, Adili suffered six months of damages in the form of an increased principal balance, late charges and other fees, and harm to his credit history.  *Id*. at 207.

"New Jersey courts uniformly have applied the principle that where no time is fixed for the performance of a contract, by implication a reasonable time was intended."  *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp*., 228 F.3d 275, 284 (3d Cir. 2000) (collecting cases) (internal quotation marks omitted).  Thus, even if the time for OLS' performance was not fixed at January 1, 2013, as the FAC suggests, "where the time for the performance of the contract is not fixed, the court will imply a reasonable time."  *F/V Robins Nest, Inc. v. Atl. Marine Diesel, Inc*., No. 92 Civ. 3900 (JEI), 1994 WL 594592, at *4 (D.N.J. Oct. 24, 1994) (citing *Ridge Chevrolet-Oldsmobile, Inc. v. Scarano*, 238 N.J. Super. 149, 155, 569 A.2d 296, 300 (App. Div. 1990)).  On the facts presented, the Court is unable to conclude that OLS' six-month turnaround constituted a reasonable amount of time, particularly in light of the harm Adili claims to have suffered despite having fully performed his obligations under the TPP agreement.

---

[14] Although OLS purportedly claimed that it received Adili's modification agreement two days late, the FAC maintains otherwise.  *Id*.

Another basis for dismissing Adili's breach of contract claim, according to Defendants, is the FAC's failure to allege that the TPP agreement required OLS to execute the modification agreement for it to become effective.  Doc. 98 at 5 (citing FAC at ¶¶ 193, 195, 196).  Indeed, the FAC never expressly states that OLS was required to do so.  Yet, contrary to Defendants' assertion, the FAC reasonably implies OLS' failure to execute the modification agreement prevented Adili from receiving a permanent loan modification, as required by the TPP agreement.  For example, the FAC suggests that once OLS executed the modification agreement, Adili's mortgage loan was in fact modified.  *See* FAC at ¶¶ 208-209 (discussing the receipt of the modification agreement in June 2013 and alleging that Adili suffered damages as a result of OLS' "delay in modifying" his loan); *see also id*. at ¶ 206 ("[OLS] failed to timely execute the HAMP modification agreement and permanently modify Plaintiff Adili's loan, in breach of the TPP agreement.").  Regardless, the FAC clearly alleges that the TPP agreement required OLS to permanently modify Adili's mortgage once all of the conditions were satisfied.  *Id*. at ¶ 193.  It sufficiently pleads breach of contract against OLS by alleging that Adili's loan was only modified after significant delay.  *See id*. at ¶¶ 208-209.

Defendants also contend that Adili has failed to allege damages.  Doc. 96 at 11.  However, the damages which Adili claims to have suffered are precisely the kind that the Court deemed sufficiently pled with respect to the DuMonts in the March 2014 Order:  a higher principal balance, improper fees and late charges and damage to his credit score.  *See* Doc. 85 at 11; *see also* FAC at ¶¶ 207, 209.  Accordingly, Adili has sufficiently plead that he suffered damages.

### C.  Count Two: Pennsylvania Unfair Trade Practices and Consumer Protection Law

In its March 2014 Order, the Court determined that the DuMonts' UTPCPL claim was being brought pursuant to that statute's "catchall" provision, which bars any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. Ann. § 201-2(4)(xxi); *see* FAC ¶¶ 244-255.  To state a claim based on deceptive conduct, the DuMonts are required to allege (1) a deceptive act; (2) justifiable reliance; and (3) ascertainable loss caused by that reliance.  *Seldon v. Home Loan Servs., Inc*., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009).  A "deceptive act" is "conduct that is likely to deceive a consumer acting reasonably under similar circumstances."  *Id.* (quoting Black's Law Dictionary 455 (8th ed. 2004)) (internal quotation marks omitted).  In dismissing the DuMonts' claim under the UTPCPL, the Court found that, although the TAC's allegations were sufficient to establish deceptive conduct on the part of Litton and OLS, it failed to allege ascertainable loss with respect to the denial of the HAMP modification.  Doc. 85 at 23-24.  It also determined that the economic loss doctrine bars the DuMonts from recovering under the UTPCPL because the allegations giving rise to their claim were inextricably entwined with the allegations underlying their contract claim.  *Id*. at 25-26.

Defendants renew their argument that Plaintiffs' amended UTPCPL claim is barred by the economic loss doctrine.  Doc. 96 at 10-15.  In turn, Plaintiffs have asked the Court to reconsider its application of the economic loss doctrine.  Doc. 97 at 10-13.  In its March 2014 Order, the Court noted that, although the Pennsylvania Supreme Court has not spoken on the issue, the Third Circuit and various district courts in Pennsylvania have applied the doctrine to UTPCPL claims.  Doc. 85 at 25 (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 681 (3d Cir.

2002)).  The Court recognized that other Pennsylvania courts have expressly disagreed with the

Third Circuit's decision, but, "[a]bsent contrary guidance from the Pennsylvania Supreme Court

or the Second Circuit, the Court sees no reason to adopt a different approach in this case."  *Id*. at

25 n.19.  Plaintiffs maintain that, after the parties briefed the issue (but before the Court issued

its opinion), Pennsylvania intermediate and trial courts continued to reject the Third Circuit's

holding in *Werwinski*.  Doc. 97 at 11.  Nonetheless, Plaintiffs never filed a motion for

reconsideration, nor would they be able to do so at this juncture.[15]  Plaintiffs also failed to inform

the Court of this intervening authority until June 9, 2014, in a letter submitted in response to

Defendants' request for a pre-motion conference.  *See* Letter from Robbins Geller Rudman &

Dowd LLP (June 9, 2014).

    In any event, an underlying decision "may not usually be changed unless there is 'an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent a manifest injustice.'"  *Official Comm. of Unsecured Creditors of Color

Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Virgin Atl.

Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  This is because the

original order or decision is considered to be the "law of the case," which "will be disregarded

only when the court has 'a clear conviction of error' with respect to a point of law on which its

previous decision was predicated[.]"  *Cohen v. UBS Fin. Servs., Inc.*, No. 12 Civ. 02147 (LGS),

2014 WL 240324, at *2 (S.D.N.Y. Jan. 22, 2014) (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109

(2d Cir. 1981)).  No such error exists here.  In the March 2014 Order, the Court acknowledged

the disagreement between the Third Circuit and some lower Pennsylvania state courts and, after

---

[15] Local Civil Rule 6.3 requires that a notice of motion for reconsideration be served within fourteen days after the entry of a court's determination of the original motion.

careful consideration, concluded that it would follow the Third Circuit's reasoning.  Doc. 85 at

25 n.19.  Plaintiffs do not point to a binding decision by the Pennsylvania Supreme Court or the

Second Circuit that would require reconsideration of the issue.[16]

The FAC does not allege any new facts that would alter the Court's determination that

the UTPCPL violations allegedly committed by OLS are "inextricably entwined" with the TPP

agreement between the parties.  *See Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 597 (E.D.

Pa. 2011).  The economic loss doctrine therefore bars the DuMonts' UTPCPL claim against

OLS.  Plaintiffs' third cause of action is dismissed with prejudice.

### D.  Count Four: New Jersey Consumer Fraud Act

New Jersey's Consumer Fraud Act ("CFA") states that it is unlawful for any person to

use or employ**:**

> any unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact with
> intent that others rely upon such concealment, suppression or
> omission, in connection with the sale or advertisement of any
> merchandise or real estate . . .

N.J. Stat. § 56:8-2.  This court has previously observed that mortgage loans fall within the scope

of the statute.  *See Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 794 (S.D.N.Y.

2011) (citing *Gonzalez v. Wilshire Credit Corp.*, 411 N.J. Super. 582, 592, 988 A.2d 567, 573

(App. Div. 2010) *aff'd*, 207 N.J. 557, 25 A.3d 1103 (2011)).  To successfully plead a CFA claim,

Adili must allege (1) unlawful conduct; (2) ascertainable loss; and (3) a causal relationship

between the unlawful conduct and the ascertainable loss.  *Morris Cnty. Cardiology Consultants,*

---

[16] In fact, the Third Circuit has continued to apply the economic loss doctrine to bar certain claims under the UTPCPL.  *See Sunshine v. Reassure Am. Life Ins. Co.*, 515 F. App'x 140, 145 (3d Cir. 2013).

*PA v. Nw. Mut. Life Ins. Co.*, No. 08 Civ. 00308 (SRC), 2009 WL 3068260, at *2 (D.N.J. Sept. 21, 2009) (citing *Frederico,* 507 F.3d at 202).

The Court previously dismissed the CFA claim for failure to state a claim.  First, it dismissed Adili's CFA claims against Litton because it merely alleged that Adili was the victim of a general "denial sweep strategy," whereby Litton denied modifications by falsely claiming that necessary documents were missing.  Doc. 85 at 27.  Adili had only alleged that one of his four denials was based on missing documents.  *Id*.  Most notably, the TAC was silent with respect to any damages Adili suffered in connection with his HAMP applications.  *Id*.  As to OLS, the TAC failed to allege that an actionable misrepresentation was made to Adili in particular, and instead referred to "borrowers" as a general category of people who suffered harm at OLS' hands.  *Id*. at 28.

i.   **CFA Pleading Standards**[17]

Defendants argue that Plaintiffs' fail to plead their CFA claim with sufficient particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.  Doc. 96 at 16. Plaintiffs counter that, while Rule 9(b) may apply to CFA claims sounding in fraud, because they rely on the "unconscionable commercial practices" clause of the CFA, the more lenient requirements of Rule 8 should apply.  Doc. 97 at 14 n.11.

It is true that cases sounding in traditional fraud principles do apply Rule 9(b) to CFA claims.  *See Slimm v. Bank of America Corporation*, No. 12 Civ. 5846 (NLH) (JS), 2013 WL

---

[17] In the March 2014 Order, the Court did not resolve the issue of whether the pleading requirements of Federal Rule of Civil Procedure Rule 9(b) applied because Adili's CFA claim failed irrespective of which standard was used. Doc. 85 at 27 n.21.

1867035, at *12 (D.N.J. May 2, 2013).  The *Slimm* court determined that the plaintiffs did not

plead their claims in accordance with the heightened pleading standards of Rule 9, which applies

to a cause of action based upon fraud.  *Id.*  In the second case Defendants cite, the plaintiff

accused the defendant insurance company of violating the CFA by failing to provide coverage

and/or failing to notify it of a potential claim for total disability.  *Morris Cnty. Cardiology*

*Consultants, PA v. Nw. Mut. Life Ins. Co*., No. 08 Civ. 00308 (SRC), 2009 WL 3068260, at *1

(D.N.J. Sept. 21, 2009).  The court stated that a plaintiff alleging a violation of the CFA must

plead the details of the alleged fraud with the specificity required by Rule 9(b).  *Id.* at *2.

However, courts within the District of New Jersey that have directly addressed the

pleading standards applicable to CFA violations based on the "unconscionable commercial

practices" clause have instead applied Rule 8 to those causes of action.  As one court explained,

"unconscionable commercial practices are categorized as 'affirmative acts,' as opposed to

knowing omissions" and therefore do not require a "showing of 'intent to deceive' or

'knowledge of the falsity of the representation.'"[18]  *Katz v. Live Nation, Inc*., No. 09 Civ. 3740

(MLC), 2010 WL 2539686, at *5 (D.N.J. June 17, 2010) (citing *Busse v. Homebank LLC*, No. 07

Civ. 03495 (WJM) (MF), 2009 WL 424278, at *9 (D.N.J. Feb. 18, 2009)).  Since

"[u]nconscionable commercial practice claims are distinct from [ ]CFA claims sounding in

fraud," "the heightened pleading standard of Rule 9(b) does not apply."  *Id.* (citing *Dewey v.*

_____

[18] One of the cases Defendants cite suggests that this reasoning has not been universally adopted among courts in the
District of New Jersey.  *See Morris Cnty.*, 2009 WL 3068260, at *2 ("The allegations in the Complaint as pled
against all Defendants do not rise to the level of an unconscionable commercial practice under the CFA and do not
meet the particularity requirements of Rule 9(b).").  *See also Busse v. Homebank LLC*, No. 207 Civ. 03495 (WJM)
(MF), 2009 WL 424278, at *8 (D.N.J. Feb. 18, 2009) ("Without addressing whether Rule 9(b) applies to an action
involving a CFA claim solely for unconscionable commercial practices without an accompanying common law
fraud claim, the Court determines that Plaintiffs state their claim with particularity.")

*Volkswagen AG*, 558 F. Supp. 2d 505, 525 (D.N.J. 2008)).  Most recently, the Third Circuit

reasoned that "because the intent to deceive or actual deception is not required for a CFA claim,

a heightened pleading standard under FRCP Rule 9 is not warranted."  *Ciser v. Nestle Waters N.*

*Am. Inc.*, 13 No. 13 Civ. 4509, 2015 WL 75235, at *5 n.7 (3d Cir. Jan. 7, 2015) (citing *Cox*, 138

N.J. at 17, 647 A.2d at 462).

Furthermore, the only court within this circuit to have grappled with the issue concluded

that plaintiffs alleging an unconscionable commercial practice under the CFA should not be

required to do more other than meet Rule 8(a)'s baseline pleading requirements.  *Porter v. Prop.*

*Damage Control Grp., Inc.*, No. 03 Civ. 5972, 2007 WL 2907403, at *2 (E.D.N.Y. Sept. 28,

2007).  The court based its conclusion on the fact that the plain language of the CFA, which

distinguishes the two by indicating that it applies not only to fraud, but also to other

"unconscionable practices."  *Id.*  Furthermore, the New Jersey Supreme Court has suggested that

deviations falling short of fraud may still violate the statute.  *Id.* (citing *Kugler v. Romain*, 58

N.J. 522, 544, 279 A.2d 640, 652 (1971)).[19]

### ii.   Application of Rule 8 to Adili's CFA Allegations

Plaintiffs contend that Defendants' conduct "constitutes an unconscionable commercial

practice comprised of deceptive acts and practices in violation of the New Jersey Consumer

Fraud Act."  FAC at ¶ 263.  The New Jersey Supreme Court has described an unconscionable

commercial practice as "an amorphous concept obviously designed to establish a broad business

---

[19] Although there is no binding precedent that is on point, this analysis is also in line with the Second Circuit's
approach to claims arising under New York General Business Law § 349, which it interprets as extending "well
beyond common-law fraud to cover a broad range of deceptive practices."  *Pelman ex rel. Pelman v. McDonald's
Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).  Therefore, it is "not subject to the pleading-with-particularity requirements
of Rule 9(b)[.]"  *Id.*

ethic." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18, 647 A.2d 454, 462 (1994) (quoting *Kugler*, 58 N.J. at 543, 279 A.2d at 651).  The standard of conduct implied by the term "unconscionable" is a "lack of good faith, honesty in fact and observance of fair dealing."  *Katz*, 2010 WL 2539686, at *5 (quoting *Cox*, 138 N.J. at 18, 647 A.2d at 462).  Although "[t]he capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice," "[i]ntent is not an essential element."  *Id.* (quoting *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 378, 371 A.2d 13, 16 (1977)).

Plaintiffs have cured the prior complaint's failure to allege facts that allow the Court to infer the existence of unconscionable commercial practices resulting in damages to Adili.  As to Litton, the FAC states that, after Adili responded to various requests from Litton for "missing" tax information, which he submitted with his HAMP application "and multiple times thereafter," Litton refused to grant him a modification for a purported failure to provide documents Adili claims to have submitted.  FAC at ¶¶ 172, 175, 180, 182.  The FAC goes on to allege that Adili had a similar experience with OLS.  Although OLS provided Adili with a TPP agreement, the FAC alleges that OLS falsely claimed to have received Adili's modification agreement two days late and purportedly froze his account and refused to execute the modification agreement as a result.  FAC at ¶¶ 201, 205.  In stark contrast to the prior bare-bones complaint, Adili claims that Litton and OLS' conduct caused him to suffer damages in the form of increased interest, service fees, a longer loan payoff time, a high principal balance on his mortgage and damage to his credit.  *Id.* at ¶¶ 189, 209.

### iii.     Sufficiency of CFA Allegations

Defendants claim that Adili has not alleged ascertainable loss because he concedes that he ultimately received a permanent modification.  Doc 96 at 20.  However, as was the case with Adili's breach of contract claim, Defendants fail to account for the harm which Adili claims to have suffered as a result of waiting approximately three years from the alleged submission of his first HAMP application in April 2010.  FAC at ¶¶ 171, 208.  Defendants insist that Adili should be required to explain his damages with more precision, specifically how or why he was required to pay a higher interest rate, had a longer payoff time, or had a higher principal balance.[20]  Doc. 96 at 20.  Yet, Adili plainly claims he suffered such harm as a direct result of Defendants' actions, culminating in increased interest and service fees, a longer loan payoff time, a higher principal balance on his mortgage loan and harm to his credit.  FAC at ¶¶ 189, 207, 209, 263.  *See* FAC at ¶¶ 189, 207.  These allegations are sufficient survive a motion to dismiss.

Finally, Defendants maintain that Adili's CFA claim should be dismissed because contract-based allegations alone cannot support a claim under the statute.  Doc. 96 at 16.  Unlike claims brought under the UTPCPL, the economic loss doctrine does not preclude CFA claims.  *See G & F Graphic Servs., Inc. v. Graphic Innovators, Inc*., 18 F.Supp.3d 583, 589-590 (D.N.J. May 8, 2014) ("The CFA imposes . . . all sellers of merchandise . . . a duty to be fair and honest in consumer transactions which is 'independent of the duties that arose under the contract[.]'").  The New Jersey Supreme Court has indicated that "by providing that a court should treble those [remedial contract] damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach"

---

[20] Defendants do not mention the other damages Adili claims to have suffered, including service fees, late charges, penalties, and harm to his credit.  *See* FAC at ¶¶ 189, 207, 261.

when a plaintiff alleges a CFA violation.  *Cox*, 138 N.J. at 18, 647 A.2d at 462; *see Florian*

*Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 528 (D.N.J. 1998) ("To hold that this

statutory [CFA] claim is subsumed by plaintiff's breach of contract cause of action would be

contrary to legislative intent and would preclude consumer fraud claims in far too many

circumstances.").  The very case that Defendants cite in support of their argument recognizes the

viability of a CFA claim based on breach of contract, holding that a CFA claim survives

alongside a breach of contract claim where a plaintiff alleges "substantial aggravating

circumstances," consisting of business behavior that "stands outside the norm of reasonable

business practice in that it will victimize the average consumer*." Slack v. Suburban Propane*

*Partners, L.P.*, No. 10 Civ. 2548 (JLL), 2010 WL 3810870, at *4 (D.N.J. Sept. 21, 2010)

(internal quotation marks and citations omitted) (dismissing the plaintiffs' CFA claim where

their allegations merely challenged the enforceability of a contract, without more).  The only

breach of contract claim brought by Adili is against OLS.  FAC at ¶ 227.  The FAC adequately

pleads several aggravating circumstances surrounding OLS' alleged failure to timely modify

Adili's loans, which includes providing Adili with purportedly false information, freezing his

account and refusing to accept mortgage payments, steering Adili towards foreclosure, harming

his credit by falsely reporting delinquent payments, and assessing Adili with late charges and

fees.  FAC at ¶¶ 201, 206, 207.

    The CFA has been interpreted "broadly in order to accomplish its remedial purpose,

namely, to root out consumer fraud."  *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255,

264, 696 A.2d 546, 551 (1997) (citing *Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 69, 494 A.2d

804, 811 (1985)).  "A court adjudicating a CFA claim must approach dismissal of said claim

'with hesitation.'"  *Parker v. Howmedica Osteonics Corp.*, No. 07 Civ. 02400 (JLL), 2008 WL

141628, at *2 (D.N.J. Jan. 14, 2008) (quoting *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 13, 842 A.2d 174, 177 (App. Div. 2003)).  Given these directives, and having found that the FAC satisfies the plausibility standard imposed by Rule 8, the Court denies the motion to dismiss the CFA claim against Litton and OLS.[21]

## III.   Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, the Plaintiffs' breach of contract claims survive the instant motion ("Count I"), along with Adili's CFA claim ("Count IV").  The DuMonts' claim against all Defendants for violations of the UTPCPL is dismissed with prejudice ("Count III").  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 95.

The parties are further directed to appear before the Court for a conference on April 3, 2015 at 10:30 a.m.

It is SO ORDERED.

Dated:   March 11, 2015
         New York, New York

                                        _____
                                        Edgardo Ramos, U.S.D.J.

---

[21] To the extent that Plaintiffs' CFA claims against Litton are premised on "denial sweeps," Defendants contend that they fail to state a claim because the FAC insufficiently alleges the existence of "denial sweep" activity.  Doc. 96 at 17.  However, Plaintiffs' CFA claim against either Litton or OLS survives without reference to the allegations of general denial sweep activity.  Therefore, the Court need not address the Plaintiffs' denial sweep theory at this time.